No. 21-12517

# UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

—————————

3M COMPANY, *et al.*,

*Defendants-Appellants*,

v.

LLOYD BAKER,

*Plaintiff-Appellee.*

—————————

On Appeal from the United States District Court
for the Northern District of Florida
Nos. 3:19-md-2885, 7:20-cv-39

—————————

## BRIEF FOR DEFENDANTS-APPELLANTS
—————————

COLE CARTER
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL 60654
(312) 862-2000

PAUL D. CLEMENT
 *Counsel of Record*
KASDIN M. MITCHELL
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue, NW
Washington, DC 20004
(202) 389-5000
paul.clement@kirkland.com

*Counsel for Defendants-Appellants*

February 25, 2022

No. 21-12517, *3M Co. v. Baker*

## CERTIFICATE OF INTERESTED PERSONS

Pursuant to Eleventh Circuit Rule 26.1-1, counsel for Defendants-Appellants 3M Company, 3M Occupational Safety LLC, Aearo Holdings LLC, Aearo Intermediate LLC, Aearo Technologies LLC, and Aearo, LLC hereby certifies that the following is a complete list of the trial judge(s), all attorneys, persons, associations of persons, firms, partnerships, or corporations that have an interest in the outcome of the particular case on appeal, including subsidiaries, conglomerates, affiliates, and parent corporations, including any publicly held corporation that owns 10% or more of the party's stock, and other identifiable legal entities related to a party:

- 3M Company (**MMM**) – Defendant-Appellant

- 3M Occupational Safety LLC – wholly owned subsidiary of Defendant-Appellant 3M Company

- Aearo Holdings LLC – wholly owned subsidiary of Defendant-Appellant 3M Company

- Aearo Intermediate LLC – wholly owned subsidiary of Defendant-Appellant 3M Company

- Aearo Technologies LLC – wholly owned subsidiary of Defendant-Appellant 3M Company

- Aearo, LLC – wholly owned subsidiary of Defendant-Appellant 3M Company

- Aylstock Witkin Kreis & Overholtz – counsel for Plaintiff-Appellee

- Aylstock, Bryan Frederick – counsel for Plaintiff-Appellee

No. 21-12517, *3M Co. v. Baker*

- Barr, Brian H. – counsel for MDL Plaintiffs

- Beall, Charles Franklin, Jr. – counsel for Defendants-Appellants

- Benton, Diana Clough – counsel for Defendants-Appellants

- Bhimani, Jay L. – counsel for Defendants-Appellants

- Bouk, Winston Troy – counsel for MDL Plaintiffs

- Bradley Arant Boult Cummings – counsel for Defendant-Appellant 3M Company

- Branscome, Kimberly O. – counsel for Defendants-Appellants

- Brock, Robert C. – counsel for Defendants-Appellants

- Brown & James – counsel for Plaintiff-Appellee

- Brown, Micah David – counsel for Defendants-Appellants

- Buchanan, David R. – counsel for Plaintiff-Appellee

- Burns, Michael A. – counsel for MDL Plaintiffs

- Buxner, Evan D. – counsel for MDL Plaintiffs

- Carter, Cole T. – counsel for Defendants-Appellants

- Cartmell, Thomas P. – counsel for MDL Plaintiffs

- Castiglia, Craig – counsel for Defendants-Appellants

- Ciresi Conlin LLP – counsel for Plaintiff-Appellee

- Clark Love & Hutson – counsel for Plaintiff-Appellee

- Clement, Paul D. – counsel for Defendants-Appellants

- Cooper, David M. – counsel for Plaintiff-Appellee

- Cornell, Katherine Lindsey – counsel for MDL Plaintiffs

- Czak, Steven C. – counsel for Defendants-Appellants

No. 21-12517, *3M Co. v. Baker*

- DeCamp, Kyle Richard – counsel for Defendants-Appellants

- Dechert LLP – counsel for Defendants-Appellants

- De Paulo, Tabitha J. – counsel for Defendants-Appellants

- Elizabeth, Sierra – counsel for Defendants-Appellants

- Ellis, Robert P. – counsel for Defendants-Appellants

- Esfandiarifard, Saghar – counsel for Defendants-Appellants

- Estes, Luke – Plaintiff-Appellee

- Fields, Barry E. – counsel for Defendants-Appellants

- Fox, Shawn – counsel for Plaintiff-Appellee

- Gibney, Blake – counsel for Defendants-Appellants

- Glass, David M. – counsel for the United States of America

- Gori Julian & Associates – counsel for MDL Plaintiffs

- Gottlieb, Simon – counsel for Defendants-Appellants

- Gunderson, Karl B. – counsel for Defendants-Appellants

- Hacker, Stephen – Plaintiff-Appellee

- Hill, Thomas Larry – counsel for Defendants-Appellants

- Hodge, Leigh Anne – counsel for Defendant-Appellant 3M Company

- Hoekstra, Jennifer M. – counsel for MDL Plaintiffs

- Hutson, Shelley Van Natter – counsel for Plaintiff-Appellee

- Jones, Hon. Gary R. – U.S. Magistrate Judge for the Northern District of Florida

- Karis, Hariklia – counsel for Defendants-Appellants

- Keefer, Lewis – Plaintiff-Appellee

No. 21-12517, *3M Co. v. Baker*

- Kelly, Maxwell H. – counsel for Plaintiff-Appellee

- Kim, Mary H. – counsel for Defendants-Appellants

- Kirkland & Ellis LLP – counsel for Defendants-Appellants

- Kolsky, Joshua M. – counsel for the United States of America

- Kreis, Douglass A. – counsel for Plaintiff-Appellee

- Laminack Pirtle & Martines – counsel for MDL Plaintiffs

- Leach, Garret A. – counsel for Defendants-Appellants

- Leuthauser, Nolan M. – counsel for Defendants-Appellants

- Levin Papantonio Rafferty – counsel for MDL Plaintiffs

- Marlowe, Emily B. – counsel for Plaintiff-Appellee

- Mitchell, Kasdin – counsel for Defendants-Appellants

- Morriss, F. Chadwick – counsel for Defendants-Appellants

- Mostyn Law – counsel for MDL Plaintiffs

- Moore Hill & Westmoreland – counsel for Defendants-Appellants

- Neglia, Ashley E. – counsel for Defendants-Appellants

- Nomellini, Mark J. – counsel for Defendants-Appellants

- O'Callaghan, Orla – counsel for Defendants-Appellants

- Odom, Megan L. – counsel for Plaintiff-Appellee

- Onder Law LLC – counsel for MDL Plaintiffs

- Ozurovich, Allison K. – counsel for Defendants-Appellants

- Pirtle, Thomas W. – counsel for MDL Plaintiffs

- Pulaski Law Firm – counsel for MDL Plaintiffs

No. 21-12517, *3M Co. v. Baker*

- Quinn Emanuel Urquhart & Sullivan LLP – counsel for Plaintiff-Appellee

- Rafferty, Troy Alan – counsel for MDL Plaintiffs

- Rivera, Maria P. – counsel for Defendants-Appellants

- Rodgers, Hon. M. Casey – U.S. District Judge for the Northern District of Florida

- Sacchet, Michael A. – counsel for Plaintiff-Appellee

- Sandman, Patrick P. – counsel for Defendants-Appellants

- Seeger, Christopher A. – counsel for MDL Plaintiffs

- Seeger Weiss LLP – counsel for Plaintiff-Appellee

- Seeley, Caleb A. – counsel for Plaintiff-Appellee

- Tam, Jonathan S.  – counsel for Defendants-Appellants

- Tracey Fox King & Walters – counsel for Plaintiff-Appellee

- Tracey, Sean Patrick – counsel for Plaintiff-Appellee

- Van Fleteren, Haley J. – counsel for Defendants-Appellants

- Wagstaff & Cartmell – counsel for MDL Plaintiffs

- Wasdin, Nicholas F. – counsel for Defendants-Appellants

- Wilson, Quinn Robert – counsel for MDL Plaintiffs

Defendant-Appellant 3M Company states that it is a corporation whose shares are publicly traded (NYSE: **MMM**).  3M Company does not have a parent corporation and no publicly held corporation owns 10% or more of 3M's stock.

No. 21-12517, *3M Co. v. Baker*

Defendant-Appellants 3M Occupational Safety LLC, Aearo Holdings LLC, Aearo Intermediate LLC, Aearo Technologies LLC, and Aearo, LLC state that they are wholly owned subsidiaries of Defendant-Appellant 3M Company.

February 25, 2022

s/Paul D. Clement
Paul D. Clement

**STATEMENT REGARDING ORAL ARGUMENT**

Appellants respectfully request oral argument. This appeal arises from a two-week trial that was the third bellwether trial in the largest-ever multidistrict litigation. It presents numerous legal errors by the district court that may be repeated in future trials absent correction by this Court. Oral argument would assist the Court in resolving these important issues in the context of this important and historic MDL.

## TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS.................................................CIP-1

STATEMENT REGARDING ORAL ARGUMENT................................................. i

TABLE OF AUTHORITIES................................................................ iv

INTRODUCTION ....................................................................... 1

STATEMENT OF JURISDICTION ......................................................... 3

STATEMENT OF THE ISSUES .......................................................... 3

STATEMENT OF THE CASE ............................................................ 4

    A.    Legal Background ................................................. 4

        1.    The government-contractor defense ......................... 4

        2.    The Noise Control Act ..................................... 6

    B.    Factual Background................................................ 8

        1.    The development of the CAEv2 ............................. 8

        2.    Aearo's initial labeling and testing of the CAEv2.................. 10

        3.    Aearo relays the fitting tip to the military................................ 12

        4.    Military audiologists implement the flange-fold tip ............... 13

        5.    The military continues to use and test the CAEv2 until 2015 ................................................................ 16

    C.    Procedural History................................................ 17

        1.    MDL-wide summary-judgment ruling on government-contractor defense ..................................................... 18

        2.    The district court's ruling on the Noise Control Act .............. 19

        3.    Other evidentiary rulings ......................................... 22

      4.    The verdict and subsequent trials ............................................ 28

SUMMARY OF ARGUMENT ........................................................................ 28

STANDARD OF REVIEW ........................................................................... 32

ARGUMENT ................................................................................................. 33

I.    The Government-Contractor Defense Preempts Plaintiff's Strict-Liability Failure-to-Warn Claim ...................................................... 33

    A.    The Military Told Appellants Not to Send Instructions With the CAEv2 ............................................................................ 33

    B.    Appellants Satisfy the Remaining Factors ......................... 38

II.    The District Court's Erroneous Interpretation Of The Noise Control Act Requires A New Trial ....................................................... 41

    A.    Appellants' Sale of the CAEv2 to the Military Is Exempt From the Noise Control Act .............................................. 41

    B.    The Erroneous Interpretation of the Noise Control Act Is Reversible Error ................................................................ 48

III.    Numerous Evidentiary Issues Require A New Trial ...................... 49

    A.    The Vietas Letter and *Qui Tam* Report Are Inadmissible Hearsay and Unfairly Prejudicial ...................................... 49

    B.    Communications Regarding the Discontinuation of the CAEv2 Are Inadmissible .................................................. 53

    C.    Evidence About Alleged Manufacturing Issues In Mexico Is Inadmissible .................................................................... 54

CONCLUSION ............................................................................................. 57

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES[*]

## Cases

*Ali v. Fed. Bureau of Prisons*,
 552 U.S. 214 (2008)............................................................43

*Artis v. District of Columbia*,
 138 S.Ct. 594 (2018)...........................................................42

*\*Boyle v. United Techs. Corp.*,
 487 U.S. 500 (1988)............................................... 4, 5, 33, 38

*Brinson v. Raytheon Co.*,
 571 F.3d 1348 (11th Cir. 2009) ...........................................5

*Chavez v. Mercantil Commercebank, N.A.*,
 701 F.3d 896 (11th Cir. 2012)..............................................32

*City of Tuscaloosa v. Harcros Chems., Inc.*,
 158 F.3d 548 (11th Cir. 1998)..............................................32

*Dorse v. Eagle-Picher Indus., Inc.*,
 898 F.2d 1487 (11th Cir. 1990)................................. 5, 18, 35

*Encino Motorcars, LLC v. Navarro*,
 138 S.Ct. 1134 (2018).........................................................43

*Glassco v. Miller Equipment Co.*,
 966 F.2d 641 (11th Cir. 1992)..............................................35

*\*Graham Cnty. Soil & Water Conservation Dist.
 v. U.S. ex rel. Wilson*,
 559 U.S. 280 (2010)................................................... 44, 46

*Graves v. 3M Co.*,
 17 F.4th 764 (8th Cir. 2021)..............................................6, 33

*Harduvel v. Gen. Dynamics Corp.*,
 878 F.2d 1311 (11th Cir. 1989) ............................................5

---

[*] Citations upon which Appellants primarily rely are marked with asterisks.

iv

*HollyFrontier Cheyenne Refining, LLC*
    *v. Renewable Fuels Ass'n,*
    141 S.Ct. 2172 (2021) .......................................................................47

*Hudgens v. Bell Helicopters/Textron,*
    328 F.3d 1329 (11th Cir. 2003) ....................................................5, 36

*Hughes Aircraft Co. v. Jacobson,*
    525 U.S. 432 (1999).........................................................................43

*In re Agent Orange Prod. Liab. Litig.,*
    517 F.3d 76 (2d Cir. 2008) ......................................................... 39, 40

*In re Tylenol (Acetaminophen) Mktg., Sales*
    *Pracs. & Prods. Liab. Litig.,*
    181 F.Supp.3d 278 (E.D. Pa. 2016) ...............................................56

*Jowers v. Lincoln Elec. Co.,*
    617 F.3d 346 (5th Cir. 2010) ...........................................................6

*LaCourse v. PAE Worldwide Inc.,*
    980 F.3d 1350 (11th Cir. 2020) .....................................................36

*Leite v. Crane Co.,*
    749 F.3d 1117 (9th Cir. 2014) .........................................................6

*McDonnell v. United States,*
    136 S.Ct. 2355 (2016)....................................................................45

*Oliver v. Oshkosh Truck Corp.,*
    96 F.3d 992 (7th Cir. 1996) .............................................................6

*Owens v. Samkle Automotive Inc.,*
    425 F.3d 1318 (11th Cir. 2005) .....................................................47

*Papp v. Fore-Kast Sales Co.,*
    842 F.3d 805 (3d Cir. 2016) ............................................................6

*\*Reiter v. Sonotone Corp.,*
    442 U.S. 330 (1979).......................................................................46

*S.D. Warren Co. v. Maine Bd. of Env't Prot.,*
    547 U.S. 370 (2006).......................................................................46

*Sawyer v. Foster Wheeler LLC*,
  860 F.3d 249 (4th Cir. 2017) ................................................................6

*Smith v. Marcus & Millichap, Inc.*,
  991 F.3d 1145 (11th Cir. 2021) .........................................................43

*Tate v. Boeing Helicopters*,
  55 F.3d 1150 (6th Cir. 1995) ................................................ 6, 33, 38

*United States v. Joseph*,
  709 F.3d 1082 (11th Cir. 2013) .........................................................32

*United Techs. Corp. v. Mazer*,
  556 F.3d 1260 (11th Cir. 2009) .........................................................52

**Statutes**

28 U.S.C. §1292(b) ............................................................................19

42 U.S.C. §4901(a)(1) ..........................................................................6

42 U.S.C. §4901(b) ..........................................................................6, 44

42 U.S.C. §4902(3) ..................................................................... 42, 45

*42 U.S.C. §4902(3)(B)(i) .................................................. 2, 7, 43, 48

42 U.S.C. §4907(a) ..........................................................................6, 41

42 U.S.C. §4907(b) ................................................................................7

**Rules**

Fed. R. Evid. 403 ...............................................................................50

Fed. R. Evid. 407 ...............................................................................53

Fed. R. Evid. 803(8) ..........................................................................51

**Regulations**

40 C.F.R. §211.104 ...............................................................................8

40 C.F.R. §211.109 ...............................................................................8

40 C.F.R. §211.111 ..............................................................................8

40 C.F.R. §211.204 ..............................................................................8

40 CFR §211.204-1 .............................................................................19

40 CFR §211.204-4(e) .........................................................................19

44 Fed. Reg. 56,120 (Sept. 28, 1979) ................................................. 7

## Other Authorities

117 Cong. Rec. 3084 (1971) .............................................................7, 44

Black's Law Dictionary (11th ed. 2019)................................................42

Motion to Reconsider Admission of Vietas Letter, *Blum v. 3M Co.*,
    No. 7:20-cv-122 (N.D. Fla. Oct. 14, 2021) ................................. 17, 51

*Noise Control: Hearings Before the H. Comm. On Pub. Health and
    Env't*, 92nd Cong. 167 (1971) .......................................................7, 45

Order on 3M MIL No. 41, *Camarillorazo v. 3M Co.*, No. 7:20cv98
    (S.D. Fla. Oct. 26, 2021).....................................................................42

# INTRODUCTION

This appeal follows from the third of sixteen bellwether trials in the sprawling multi-district litigation concerning the Combat Arms earplugs version 2 ("CAEv2"), sold to the military by 3M and Aearo Technologies (together, "Appellants"). Although Appellants were deprived of their key defense and the trial was shot through with erroneous legal and evidentiary rulings, the jury found for Appellants on all but one of plaintiff Lloyd Baker's claims—strict-liability failure to warn. The jury returned an approximately $1.1 million verdict on that claim.

Plaintiff's claim never should have been presented to a jury because the government-contractor defense forecloses it. The military made a discretionary decision to decline direct supplier-to-soldier instructions regarding the CAEv2. The military initially told Appellants to omit such instructions because it wanted to train soldiers to fit their hearing protection in person. And when the military later decided to supplement that one-on-one instruction with brief written directions, it drafted its own. The entire purpose of the government-contractor defense is to protect private actors in circumstances like these, where the central actor is the federal government and its actions are shielded by sovereign immunity and redressed through alternative benefit programs.

The district court made an even more obvious error in ignoring the plain text of the federal Noise Control Act in concluding that Appellants failed to comply with

EPA labeling requirements.  In reality, while the Act presumptively covers both noise-emitting and noise-reducing "products," it expressly exempts "any military weapons or equipment which are designed for combat use."  42 U.S.C. §4902(3)(B)(i).  The CAEv2 fit the terms of the exemption to a tee, which presumably explains why the military expressly instructed Appellants to deliver the CAEv2 in a manner that would make compliance with the EPA regulations well-nigh impossible.  The district court ignored the plain text, statutory context, and common sense by limiting the exemption to noise-emitting military equipment and then compounded the prejudicial effect of that erroneous legal ruling by repeatedly instructing the jury that the EPA regulations applied and allowing plaintiff to label Appellants law-breakers.  That error all but directed a verdict against Appellants on plaintiff's failure to warn claim, requiring a new trial.

To make matters worse, the district court committed a slew of additional errors that were highly prejudicial to Appellants' defense and further distorted the evidence before the jury.  In particular, the district court allowed plaintiff to fill the artificial gap it created by hamstringing Appellants' ability to explain the government's role in shortening the earplug and limiting instructions with inaccurate hearsay evidence, suggesting the government had found the product to be defective.  It then allowed plaintiff to admit communications related to the discontinuation of the CAEv2 (an acknowledged subsequent remedial measure), and to present hours of testimony

2

about supposed quality-control failures at Appellants' manufacturing facility, even though plaintiff had not brought a manufacturing-defect claim. The combined effect of these errors was not just reversible error but to render the trial outcome useless for bellwether purposes. The verdict reflects not a fair estimate of the worth of these claims, but the wisdom of following precedent, reading statutes and regulations fairly, and excluding hearsay and irrelevant evidence. This Court should enter judgment for Appellants or, in the alternative, remand for a new trial in which Appellants may present their key defense in a trial that is focused on admissible evidence and to a jury that is correctly instructed on the law.

## STATEMENT OF JURISDICTION

The district court had federal subject-matter jurisdiction under 28 U.S.C. §1442(a)(1) and 28 U.S.C. §1332. This Court has appellate jurisdiction under 28 U.S.C. §1291.

## STATEMENT OF THE ISSUES

1.     Whether the district court erred in denying Appellants' motion for summary judgment on the government-contractor defense with respect to plaintiff's failure-to-warn claims, and granting plaintiff's cross-motion.

2.     Whether the district court erred in holding that the Noise Control Act's regulatory exemption for "any military weapons or equipment which are designed

for combat use" applies only to noise-emitting products, and not noise-reducing products like the CAEv2.

3.    Whether the district court erred in admitting a hearsay statement from an Air Force colonel that the CAEv2 "were found to be defective" and the conclusions of a civil investigation report summarizing the hearsay statements of interviewees, which plaintiffs made a cornerstone of their trial presentation.

4.    Whether the district court erred in admitting communications related to the discontinuation of the CAEv2, which the court itself ruled was a subsequent remedial measure.

5.    Whether the district court erred in admitting evidence of alleged quality-control problems at the manufacturing facility for the CAEv2, despite the absence of any manufacturing-defect claim.

## STATEMENT OF THE CASE

### A.    Legal Background

#### 1.    The government-contractor defense

The Supreme Court in *Boyle v. United Technologies Corporation* first recognized that the federal government's "uniquely federal interest[]" in disputes involving "the procurement of equipment" by the government can displace state tort-law claims—even where the "litigation is purely between private parties and does not touch the rights and duties of the United States."  487 U.S. 500, 506-07 (1988).  In the design context, the Court held that liability "cannot be imposed," when the

government approves "reasonably precise" design specifications, the equipment "conformed" to them, and the supplier warned the government of any dangers in the use of the equipment that were known to the supplier but not to the government. *Id.* at 512. That government-contractor defense precludes liability because the "selection of the appropriate design for military equipment" is a "discretionary function" that involves "the balancing of many technical, military, and even social considerations, including specifically the trade-off between greater safety and greater combat effectiveness." *Id.* at 511.

This Court has repeatedly recognized that the government-contractor defense can displace a variety of state-law tort claims, including failure-to-warn claims. *See, e.g.*, *Harduvel v. Gen. Dynamics Corp.*, 878 F.2d 1311 (11th Cir. 1989); *Brinson v. Raytheon Co.*, 571 F.3d 1348 (11th Cir. 2009); *Hudgens v. Bell Helicopters/Textron*, 328 F.3d 1329 (11th Cir. 2003); *Dorse v. Eagle-Picher Indus., Inc.*, 898 F.2d 1487 (11th Cir. 1990). *Dorse* was a one-sentence per curiam opinion that adopted a district court opinion holding that *Boyle*'s analysis "guides the court" in a "failure to warn case." 898 F.2d at 1489.

Other courts of appeals agree that application of the defense to failure-to-warn claims should "track[] the *Boyle* analysis closely," preempting those claims where "(1) the United States exercised its discretion and approved the warnings, if any; (2) the contractor provided warnings that conformed to the approved warnings; and

(3) the contractor warned the United States of the dangers in the equipment's use about which the contractor knew, but the United States did not." *Tate v. Boeing Helicopters*, 55 F.3d 1150, 1157 (6th Cir. 1995); *Graves v. 3M Co.*, 17 F.4th 764, 772 (8th Cir. 2021); *Sawyer v. Foster Wheeler LLC*, 860 F.3d 249, 256 (4th Cir. 2017); *Papp v. Fore-Kast Sales Co.*, 842 F.3d 805, 814 (3d Cir. 2016); *Leite v. Crane Co.*, 749 F.3d 1117, 1123 (9th Cir. 2014); *Jowers v. Lincoln Elec. Co.*, 617 F.3d 346, 352 (5th Cir. 2010); *Oliver v. Oshkosh Truck Corp.*, 96 F.3d 992, 1003-04 (7th Cir. 1996).

## 2.    The Noise Control Act

In 1972, Congress passed the Noise Control Act (or NCA) to "promote an environment for all Americans free from noise that jeopardizes their health and welfare." 42 U.S.C. §4901(b). Congress found that "inadequately controlled noise presents a growing danger to the health and welfare of the Nation's population." *Id.* §4901(a)(1). And it sought to remedy this problem by, among other things, providing "information to the public respecting the noise emission and noise reduction characteristics of such products." *Id.* §4901(b).

The Act expressly covers both noise-emitting and noise-reducing products. The Act authorizes the U.S. Environmental Protection Agency ("EPA") to regulate the labeling of any product "which emits noise capable of adversely affecting the public health or welfare" *or* "which is sold wholly or in part on the basis of its effectiveness in reducing noise." 42 U.S.C. §4907(a). For these products, the EPA

may "require that notice be given to the prospective user of the level of the noise the product emits, *or* of its effectiveness in reducing noise." *Id.* §4907(b) (emphasis added). The Act defines "product" as "any manufactured article or goods or component thereof," but expressly exempts "any military weapons or equipment which are designed for combat use." *Id.* §4902(3)(B)(i). The combat-use exemption ensures that, for the sake of "[n]ational security," "the responsible authorities be free to determine to what extent noise control objectives must be subordinated to military necessities in the use of such articles." 117 Cong. Rec. 3084 (1971) (statement of Sen. Cooper). And it recognizes that the military "had already established an extensive and in the main an extremely effective hearing conservation program." *Noise Control: Hearings Before the H. Comm. On Pub. Health and Env't*, 92nd Cong. 167 (1971) (statement of director of EPA's Office of Noise Abatement and Control).

In 1979, the EPA issued labeling regulations pursuant to the Act. Those regulations reach both noise-emitting and noise-reducing products and are intended "to provide accurate and understandable information on *noise generating or noise reducing* properties of new products, so that the public can make meaningful comparisons concerning these properties when making decisions to use or buy the products." 44 Fed. Reg. 56,120 (Sept. 28, 1979) (codified at 40 C.F.R. pt. 211) (emphasis added). They thus require newly manufactured products to display

7

information about their noise characteristics, including a "Noise Rating" (NR) for noise-emitting products and a "Noise Reduction Rating" (NRR) for noise-reducing products. 40 C.F.R. §211.104. All covered noise-reducing devices must display, among other things, the NRR and proper fitting instructions on the device, carrying case, or product packaging. *Id.* §211.204. The regulations require manufacturers to verify the accuracy of the label through testing, *id.* §211.111, and permit EPA to inspect their facilities to ensure compliance, *id.* §211.109.

### B.    Factual Background

#### 1.    The development of the CAEv2

The CAEv2 is the product of collaboration between the U.S. military and Appellants to solve a longstanding problem: battlefields are loud and yet soldiers are reluctant to wear hearing protection in the field. Many soldiers choose to risk injury to their hearing rather than limit their ability to hear mission-critical sounds such as commands and enemy movement. Indeed, before the introduction of the CAEv2, Army regulations advised soldiers that they "should NOT wear hearing protections when they impair necessary hearing," as in "dismounted infantry operations." Ex.8 at 6-2(d)(2).[1]

---

[1]    Exhibit references are to the exhibits to Appellants' motion for summary judgment below, Dkt.1071.

In the mid-1990s, the military began researching the development of "nonlinear" hearing protection technology, which would allow soldiers to hear relatively quiet sounds while protecting them against louder and more dangerous noises. *See* Ex.10; Ex.1. In December 1997, the manager of the Army's Hearing Conservation Program and chair of the Defense Department's Hearing Conservation Working Group, Dr. Doug Ohlin, convened a meeting to discuss the development of a nonlinear earplug for the U.S. military. Ex.2. He invited two French engineers who had developed a nonlinear filter that could be inserted into a conventional earplug—a technology the military had been following for years. *Id.*; *see* Ex.1. He also invited three hearing conservation specialists from the Army and Elliott Berger, the chief scientist at the Aearo Company in Indianapolis. Ex.2 at 1. Aearo—later acquired by 3M—was the manufacturer of a popular earplug known as the UltraFit, which the French had used in testing in conjunction with the nonlinear filter. Ex.2 at 1.

Ohlin expressed his preferences about the earplug at that meeting. He stated that he was unwilling to issue soldiers two separate earplugs—one conventional and one nonlinear—and was instead "interested" in a two-ended earplug. Ex.2 at 2. He noted that a single earplug with two ends would be easier for the Army's field audiologists to dispense. *Id.*

9

Aearo ultimately developed a two-ended earplug to satisfy the military's needs and sent Ohlin twenty-five pairs in March 1998. Ex.11. More than a year later, Ohlin informed Aearo that it needed to shorten the earplug by approximately one-quarter inch because, among other reasons, the earplugs "st[uck] out too far for the [K]evlar combat helmet"—a "show stopper" for the military. Ex.4. Aearo then created shortened samples and sent them to Ohlin for review. He deemed the new samples "acceptable," Ex.3 at 4, and requested the military approve them for purchase. Ex.9.

### 2.    Aearo's initial labeling and testing of the CAEv2

The military insisted on providing its own in-person training for the first several years it used the CAEv2. Ohlin accordingly asked Aearo to ship the earplugs in bulk—50 pairs in a bag in a cardboard box. Ex.62 at 326:15-21. Ohlin specifically directed Aearo "not to include instructions in th[e] box" because "[h]e felt that personal training was the most effective way to train the soldiers." *Id.* at 326:19-327:10. As one of the military audiologists explained, it would have been "unusual" for the military to rely on a manufacturer's instructions "to educate … a soldier on proper use." Ex.66 at ¶17. Another explained that military audiologists did not "rely on Aearo or 3M to provide any written instructions to soldiers on the Combat Arms," 6/15/21 Tr. at 317:14-21, and that "[w]hen [they] were responsible for training technicians and hearing conservation officers on how to fit the Combat

10

Arms Version 2, [they] weren't relying on any Aearo or 3M instructions." 6/15/21 Tr. at 336:11-15. The military's insistence on bulk shipment without instructions reinforced Appellants' understanding that the CAEv2 fell under the NCA's combat-use exemption after "having studied the EPA regulation at length and having spoken to the military." 6/9/21 Tr. at 28:14-16.

Aearo later decided to sell the CAEv2 on the civilian market and complied with the EPA labeling requirements by providing a "Noise Reduction Rating" and user instructions with each individual product. To calculate that rating, Aearo conducted "real-ear-attenuation-at-threshold" (REAT) testing. In a REAT test, the experimenter fits a human subject with the device being tested, attempting to obtain the "best fit" possible for each subject. Ex.20 at 12. The experimenter determines the subject's ability to hear certain sounds at certain volumes, both with and without the device. *Id.* The NRR aims to measure the amount of attenuation provided by the product and can be calculated after the product's attenuation has been recorded for ten subjects, participating in three trials each. Ex.60 at 128:8-129:3.

At issue in this litigation are the results of two of the initial REAT tests performed by Aearo. During the first REAT test, a few subjects had unusually variable results. Ex.21. Aearo decided to end the test and investigate the source of the variability. Ex.59 at 214:13-215:4. On the next REAT test, the experimenter used a technique on at least one subject called the "flange fold," where he folded

back the flanges on the opposing end of the earplug to obtain a better fit. Ex.24 at 2. The results were less variable on this second test, yielding an NRR within the expected range. *Id.*; Ex.23.

Elliott Berger and the experimenter contemporaneously documented their conclusions about the testing in an internal report known here as the "flange report." Ex.24. Berger and the experimenter determined that the shorter length requested by the military caused fitting issues for some subjects during the first test, which led to the observed variability. Because the stem was "so short," "it was difficult … to insert the plug deeply into some subjects' ear canals." *Id.* at 2. Additionally, because the earplug's shortening brought its ends closer together, the bottom edge of the opposing flanges sometimes contacted the outer ear before the experimenter could fully insert the earplug. *Id.*

Consistent with the findings from this internal testing, Aearo included a fitting tip on the label for the civilian version of the CAEv2 advising users that "[f]itting is … improved if the sealing rings of the outward directed plug are rolled back upon themselves." Ex.25 at 2.

### 3. Aearo relays the fitting tip to the military

Aearo told the military about the flange-fold fitting tip and the reasons for it. Elliott Berger informed Doug Ohlin of "the fact that the shortened earplug was creating a problem in the initial test and … the work we had done to try and resolve

that problem to get optimum performance for labeling purposes." Ex.59 at 297:13-22. Berger explained to Ohlin that "rolling back the flanges would be important for some people," *id.* at 337:8-18, and asked whether "this additional type of instruction" would be "acceptable to the military." *Id.* at 305:10-20. Berger also shared the flange-fold tip with others in the military. In 2001, an Army audiologist reached out to Berger, at Ohlin's recommendation, for information about the CAEv2. *See* Ex.28. Berger responded with a copy of the retail instructions for the CAEv2, which included the flange-fold fitting tip, and the report from Aearo's second test of the CAEv2, which noted that the experimenter used the flange-fold technique. *See* Exs.29, 25, 23.

### 4. Military audiologists implement the flange-fold tip

Ohlin determined that the flange-fold technique was acceptable and passed it along to the military audiologists responsible for fitting soldiers with earplugs and training them in their use. Under Defense Department regulations, every branch of the military must have a robust hearing conservation program that employs trained audiologists and technicians to monitor servicemembers' hearing, ensure they are using appropriate hearing protection devices, and instruct them in those devices' proper use. Ex.26. The regulations mandate that all personnel "shall receive adequate and effective training in the proper care and use of personal hearing protectors," *id.* at §6.6.10, and require that "[p]reformed earplugs," like the CAEv2,

"shall be fitted and issued only under the supervision of personnel"—either audiologists or technicians working at their direction—"who have been specifically trained to fit earplugs." *Id.* at §6.6.7. With any earplug, audiologists and technicians perform two in-person tests: (i) a "visual inspection" to observe the position of the earplug in the soldier's ear, and (ii) a "tug test" to "make sure that [the soldier] felt the suction and that the earplug didn't just come out of the ear." Ex.58 at 33:5-36:15. An audiologist or technician must "examine the fit and condition of preformed … earplugs," like the CAEv2, "at least annually." Ex.26 at §6.6.9.

The military audiologists met annually to "get instruction from leadership" and "get an update" on "what was new that [they] needed to pay attention to." Ex.58 at 105:10-107:5. As early as 2001, Ohlin told one of those annual gatherings, which included "most of the military audiologists," that "if you needed to, you could fold back the flange on the [CAEv2] to get a good fit." *Id.* at 106:21-107:1, 98:2-3. The military audiologists and technicians incorporated the flange-fold tip into the fitting procedures they performed with individual soldiers. One audiologist testified that he "include[d] the information [he] received from Doug Ohlin regarding folding back the flanges as needed to achieve a good fit" when he "trained the technicians" at the base where he worked. *Id.* at 110:7-11. Another audiologist explained that he instructed technicians who issued earplugs to soldiers, "if they believed the bottom edge of the opposing flange was preventing them from inserting the earplug far

14

enough into a soldier's ear canal, they should roll back the opposing flanges and try again." Ex.66 at ¶9. The PowerPoint presentation the audiologist used to train technicians included a slide advising technicians to fold back the flanges "if they had difficulty obtaining achieving a proper fit." *Id.* at ¶12.

The military ultimately chose to create written instructions for the CAEv2 to supplement in-person training. When Ohlin told Aearo the military was considering issuing instructions, Aearo offered to ship the CAEv2 in individual packages printed with instructions. Ex.38. But Ohlin notified Aearo that his office had been asked to create a "wallet-sized instruction card" for the CAEv2 and that he planned to print approximately 200,000 copies. Ex.39. Ohlin's office made "large quantities of wallet cards available to audiologists and hearing technicians throughout the Army." Ex. 66 at ¶15. Ohlin's wallet card included a picture of the CAEv2 with one set of flanges folded back and provided the instruction that "[f]or very large ear canals, fold opposing plug back."



Ex.41.  The back of the card included a quote—which the district court redacted over Appellants' objection—from a "Soldier in Iraq" who testified that the "Combat Arms earplugs … work great in this environment … they probably made the difference between eardrum/hearing damage and not." *Id.*

Appellants separately sold relatively small numbers of individually packaged pairs of the CAEv2 in retail stores on Army bases.  Ex.62 at 183:4-184:8.  The instructions contained in these individual packages included the same flange-fold fitting tip that appeared on the civilian packaging.  Ex.43.  Ohlin reviewed and approved these retail instructions in 2005, after suggesting additional language that Aearo adopted.  *Id.*

### 5.    The military continues to use and test the CAEv2 until 2015

Military laboratories repeatedly tested the CAEv2 between 2001 and 2015 and never documented any defects.  *See* Exs.7, 45-52.  On the contrary, the Air Force Research Laboratory concluded after a REAT test that the CAEv2's conventional end "provide[d] very good attenuation" and that the product "seems to work as advertised."  Ex.7 at 71, 20.  Those results were consistent with numerous tests across the country—by the military and others—concluding that the CAEv2 was effective.  *See* Exs.7, 45-52.

The military continued to use the CAEv2 until 2015.  6/9/21 Tr. at 8:16-20.  Appellants stopped selling it after a competitor company obtained the flange report

16

in unrelated patent litigation.  The business director of 3M's hearing protection division emailed subordinates to tell them to cancel all orders of the CAEv2, and, in response to questions, explained that the company "cannot ship any further products with current labeling" and "cannot distribute this with the current NRR on the package." P-Gen-128 at 1, 3.  The same competitor company that had sued for patent infringement then filed a *qui tam* action against 3M in 2016, alleging that Appellants had withheld the findings of the report from the military.  *See* P-Gen-10 at 6-7. Although 3M denied the allegations, it settled the lawsuit for $9.1 million in July 2018 rather than continue with the costly litigation.  *Id.*  The Justice Department issued a press release explaining that "[t]he claims resolved by the settlement [we]re allegations only, and there has been no determination of liability."  Motion to Reconsider Admission of Vietas Letter, *Blum v. 3M Co.*, No. 7:20-cv-122, Dkt.88-2 (N.D. Fla. Oct. 14, 2021).

## C.   Procedural History

Shortly after the settlement was announced, plaintiffs' lawyers began advertising for personal-injury clients who developed hearing loss or tinnitus in the military from 2000 to 2015.  In April 2019, the Judicial Panel on Multi-District Litigation consolidated hundreds of federal cases for pretrial proceedings before Judge Rodgers in the Northern District of Florida.  Dkt.1.

Plaintiffs' master complaint in the MDL alleged that the CAEv2's defective design caused imperceptible loosening in soldiers' ears and that Appellants concealed the flange report's findings regarding potential fitting issues and the purported need "to fold back the opposing flanges of the earplug." Dkt.704 at ¶174. Plaintiffs asserted numerous design-defect and failure-to-warn claims, along with related negligence, warranty, and misrepresentation claims.

### 1. MDL-wide summary-judgment ruling on government-contractor defense

After several months of discovery, the parties filed cross-motions for summary judgment on Appellants' government-contractor defense. Dkt.1071, 1072. In July 2020, the district court denied Appellants' motion and granted plaintiffs' motion for summary judgment on that defense. Dkt.1280. With respect to failure-to-warn claims, the district court held that "[p]ursuant to *Dorse* [*v. Eagle-Picher Indus., Inc.*, 898 F.2d 1487, 1489 (11th Cir. 1990)]," the government-contractor defense applies *only* where a federal government contract *affirmatively prohibits* a warning or contains specific warning requirements that significantly conflict with those required by state law." *Id.* at 49-50 (emphases added). Because there was "no contract, formal specification, or incorporated government publication in which the Army forbade Aearo from fulfilling any state law duty to warn or instruct" or "dictated the specific warnings to be given," the court held that Appellants could not invoke the defense. *Id.* at 51. In the alternative, even if the "more relaxed" *Boyle*

standard applied, the court held that Appellants could not prove that the military "exercised its discretion as to warnings." Dkt.1280 at 52-53. The court acknowledged that the military "told the company not to include instructions inside the boxes for bulk shipments of the earplug because military audiologists would provide in-person training to each service member," but nevertheless concluded that the directive did not "preclude Aearo from affixing warnings to the *outside* of the boxes." Dkt.1280 at 53-54 (emphasis added).

Appellants sought permission to immediately appeal this case-dispositive ruling, *see* 28 U.S.C. §1292(b), before the parties expended tremendous resources on numerous arguably unnecessary bellwether trials. The district court denied the motion. Dkt.1329.

### 2.   The district court's ruling on the Noise Control Act

Before the first bellwether trial, Appellants moved for summary judgment on plaintiffs' negligence per se claims, which alleged that Appellants had violated the EPA regulations promulgated under the NCA. 40 CFR §§211.204-1, 211.204-4(e). Appellants argued that—as Aearo believed in the late 1990s—the exemption for "any military weapons or equipment which are designed for use in combat" applied to the CAEv2 and thus exempted them from the EPA's regulations. The district court did not dispute that the earplugs fall within the ordinary meaning of "equipment" or that they were "designed for use in combat," but nevertheless held

19

that they fell outside the exemption for "equipment … designed for use in combat." The district court invoked the *noscitur a sociis* canon, according to which a word is "known by the company it keeps," reasoning that because weapons "emit rather than reduce noise, 'equipment' is subject to the same meaning." *Estes.*Dkt.53 at 23-24. The court then denied Appellants' motion for summary judgment.

Plaintiff fully embraced that ruling—and the district court enforced it enthusiastically—throughout the trial. The issue featured in plaintiff's opening statements, where his counsel argued that Appellants "violate[d] the regulations that govern testing of hearing protection devices" when they sold the first 2,000 pairs of CAEv2 to the military before beginning a labeling test. 6/7/21 Tr. at 36:19-25. When Elliott Berger testified that his "understanding" was that "[t]here was no requirement for an EPA label or even instructions" because the CAEv2 "was not being sold in a commercial market," the judge immediately instructed the jury that, although the jury could consider "Mr. Berger's testimony about what his belief was, … that is not the law." 6/9/21 Tr. at 26:8-14. "The law," the court explained, "is that the label was required on any product—the CAEv2—whether it was sold commercially or to the military." *Id.* at 26:14-16. Plaintiff's counsel proceeded to ask Berger whether, "having heard the Court's instruction on the law," "you were not complying with the law with regard to selling this product to the military without a label." *Id.* at 27:24-28:1, 28:10-13. In front of the jury, Berger was forced to admit

that, "[b]y the Court's interpretation today, we would not have been compliant with the law." *Id.* at 29:1-2.

The court's final instructions to the jury reiterated that the federal labeling regulations applied to the CAEv2. The court instructed, over Appellants' objection, 6/15/21 Tr. at 15:20-22, that "in determining whether Mr. Baker has proven his strict liability or negligence claims"—which included his strict-liability failure-to-warn claim—"you may consider that certain EPA regulations apply to the testing and labeling of all hearing protection devices sold commercially or to the military, including the CAEv2." *Baker.*Dkt.182 at 25. "These regulations provide that certain information must have been included *with every CAEv2*, whether packaged individually or in bulk." *Id.* (emphasis added). The court instructed that plaintiff alleged "3M violated the EPA regulations by, for example, [f]ailing to label the CAEv2 with an accurate [NRR]"; "[f]ailing to test the CAEv2 in conformance with ANSI S3.19"; and "[f]ailing to provide instructions as to the proper insertion or placement of the CAEv2, on either the individual or bulk package." *Id.* at 26. The court continued that any violations were "not necessarily negligence, but may be considered by you as evidence in determining strict liability and/or negligence." *Id.* Plaintiff underscored the point in closing argument: "EPA label regulations require

21

testing before selling.  Violation.  Violation.  We'll see more of th[e]se as we go through this.  Violation after violation."  6/18/21 Tr. at 53:24-54:2.

### 3.  Other evidentiary rulings

1. The district court used its (mistaken) government-contractor defense ruling to severely limit what Appellants could tell the jury about the military's role in shortening the earplug and precluding direct supplier-to-soldier instructions on their use.  The court told Appellants before the first bellwether trial that "it's not going to be suggested to the jury, they're not going to be told, it's not going to be argued to them, witnesses are not going to get into that the government was responsible for the design. That is not going to happen. You can take it up with the Eleventh Circuit, but it's not going to happen in this courtroom."  3/17/21 *EHK*.Tr. at 141:20-25, 142:1.

With Appellants precluded from even telling the true story of the government's central role in designing the CAEv2, plaintiff's counsel went even further, making extensive use of two hearsay documents to create a false narrative: that the military had conducted an investigation and concluded that the CAEv2 was defective (untrue) and that Appellants had concealed the CAEv2's defects from the military (equally false).

The first was a letter from July 2019—years after Appellants stopped selling the CAEv2 to the military—from Air Force colonel Jay Vietas advising that the CAEv2 should be removed from the Air Force's inventory.  That letter contained a

demonstrably false and highly prejudicial hearsay statement on the ultimate issue in this case: that the CAEv2 "were found to be defective." P-Gen-2586.

Appellants objected to the admission of the letter on several grounds, including hearsay, relevance, and undue prejudice under Rule 403. *Baker*.Dkt.115 at 19. The district court agreed with Appellants that the letter was hearsay, but allowed the jury to "consider this document for what the Air Force knew about the earplugs, what the Air Force believed about the earplugs, and why the Air Force made the decision that it did to remove the earplugs from its inventory." 6/8/2021 Tr. at 199:16-19.

The second was an internal Justice Department document created as part of the *qui tam* litigation relating interviews of military officials as to whether they knew about Appellants' internal test results and whether that information was material to their purchase decision. *See* P-Gen-10. The vast majority of the interviews were of procurement officials with no expertise in hearing protection. *Id.* at 7-8. One of the few interviews with military audiologists confirmed they were aware "if the earplug touched one part of the ear (the Tragus) it could push out of the ear … [s]o their office recommended that personnel flip the first flange back." *Id.* at 258.

The special agent's summary of her investigation stated: "Interviews of US Government personnel confirmed that had they known about the February 2000 test results (i.e., that the CAE was too short for proper insertion in the users' ears and,

therefore, did not perform well in certain individuals) on the CAE they may not have purchased the items." *Id.* at 7. Appellants moved to exclude the report and underlying interview notes as hearsay. Dkt.1664 at 6-7. The court excluded the interview notes, but ruled the special agent's summary constituted a "factual finding" from a government investigation, and thus qualified for the public-records exception in Rule 803(8). Dkt.1693 at 5-6.

Plaintiff *repeatedly* referenced and relied on the Vietas letter and *qui tam* report. Plaintiff's counsel read the Vietas letter to the jury during opening statements, 6/7/21 Tr. at 61:24-62:14, and used it with five live witnesses and in one video deposition. *See* 6/8/21 Tr. at 196:16-199:20, 208:10-209:8; 6/9/21 Tr. at 323:17-324:19; 6/10/21 Tr. at 271:19-272:2; 6/11/21 Tr. at 303:9-304:7; 6/15/21 Tr. at 95:7-97:23; 6/17/21 Tr. at 58:3-59:18. It then served as one of the cornerstones of plaintiff's closing argument. His counsel said (incorrectly) that an "[i]nvestigation [was] conducted by the Air Force" and they concluded "these are defective, get them out of people's ears." 6/18/21 Tr. at 75:4-10. And plaintiff's counsel likewise emphasized the *qui tam* report in opening statements, 6/7/21 Tr. at 34:14-35:12, and in questioning six of the eight live witnesses—all except plaintiff and his wife. *See* 6/8/21 Tr. at 209:21-213:4; 6/9/21 Tr. at 173:24-179:25, 322:14-323:8; 6/10/21 Tr. at 270:14-19; 6/14/21 Tr. at 89:24-90:3; 6/15/21 Tr. at 89:14-91:7, 217:19-218:10. And in the rebuttal portion of closing argument—the last thing the jury heard before

deliberations—plaintiff's counsel emphasized that despite everything Appellants' counsel said in closing argument, "there's something they cannot escape." 6/18/21 Tr. at 137:6. "[T]hey're trapped by the U.S. Attorney's Office and the Department of the Army's investigation and the Air Force investigation." *Id.* at 137:8-10. According to plaintiff's counsel, "the box that they're in is that the Army and the Air Force already looked at all of this when they concluded this was a defective product." *Id.* at 139:3-5. Plaintiff's counsel repeatedly referred to this supposed "trap" during his rebuttal argument. *See id.* at 140:1-2; 140:10-12; 142:4-5.

2. Plaintiff tried to suggest that Appellants themselves had found the CAEv2 defective by introducing a 2015 email from a 3M business director stating that the company "cannot ship any further products with current labeling" and "cannot distribute this with the current NRR on the package." P-Gen-128 at 1, 3. The district court had already held that all "evidence of 3M's discontinuation of sales of the CAEv2 is a subsequent remedial measure" and "plainly inadmissible to prove Defendants' negligence, culpable conduct, that the CAEv2 was defective, or the need for warning or instruction." Dkt.1693 at 12-13. On that basis, Appellants objected to the business director's email before the second bellwether trial. The court sustained the objection in part, but carved out the statements regarding the labeling and NRR, ruling they were admissible because the statements were "not intertwined with discontinuation, nor do they lead to the conclusion that the product was

25

discontinued." *McCombs*.Dkt.105-1 at 7; *see Baker*.Dkt.129 at 1 (adopting prior ruling).

Plaintiff relied on those plainly inadmissible statements throughout the trial. His counsel read the statements during opening argument and claimed, "They know [the NRR] is false. They know it." 6/7/21 Tr. at 60:25-61:7. Plaintiff's counsel questioned six live witnesses about the email. *See* 6/8/21 Tr. at 196:4-8; 6/9/21 Tr. at 15:8-20; 6/10/21 Tr. at 151:24-154:2; 6/15/21 Tr. at 214:17-215:25; 6/16/21 Tr. at 172:12-173:10; 6/17/21 Tr. at 56:16-57:5. One of plaintiff's medical experts testified that he would be "livid" if he found out a company whose hearing protector he recommended to patients was "falsifying data" and that he would "go back and see if [his patients] had noise-induced hearing loss." 6/10/21 Tr. at 153:6-20. In closing argument, plaintiff's counsel claimed "the company actually knew this product was defective in 2015, when [the business director], internally at least, said we can't distribute the product." 6/18/21 Tr. at 139:14-17. "That is a deafening admission. They know this." *Id.* at 139:25.

3. Finally, plaintiff introduced a slew of patently irrelevant evidence about alleged quality-control problems at the Mexican facility that manufactured the CAEv2, despite the lack of any manufacturing-defect claim. That evidence centered on a device called the "acoustic resistance checker"—or "ARC box" for short—which the manufacturing facility used to test the nonlinear end of each CAEv2

earplug to ensure that the filter was working appropriately.  *See* 6/9/21 Tr. at 285:8-286:19.  The Mexico facility had trouble properly calibrating the ARC boxes when it first began using them, which led Aearo to issue a series of waivers adjusting the permissible range of readings on the ARC box testing.[2]  One of these waivers indicated that 80% of all CAEv2 were failing the test, according to the original range of permissible ARC box readings.  *See* 6/15/21 Tr. at 189:9-17.

Appellants moved in limine to exclude all evidence related to "alleged manufacturing defects or failed quality control in the manufacturing process for the CAEv2" as irrelevant and unduly prejudicial, for the rather obvious reason that plaintiff asserted no manufacturing-defect claim.  But the district court deemed the evidence "relevant to Plaintiffs' claims that Defendants' overall quality assurance process for the CAEv2 was substandard."  Dkt.1695 at 18-19.

Plaintiff made extensive use of the manufacturing evidence at trial.  Plaintiff's counsel questioned four of his eight live witnesses about the ARC box testing and associated waivers, and played an hour's worth of deposition testimony on the topic.  *See* 6/8/21 Tr. at 164:17-172:24; 6/9/21 Tr. at 140:19-159:4; 6/15/21 Tr. at 30:23-71:3, 93:16-95:3, 194:22-207:3, 266:15-268:18.  One of the four was a putative

---

[2] Aearo eventually discovered that the calibration issue stemmed from the altitude difference between the Mexico facility and Aearo's laboratory in Indianapolis, where the ARC boxes were originally calibrated.  *See* 6/9/21 Tr. at 290:7-291:8.

"expert in government procurement," 6/15/21 Tr. at 174:24-25, who lacked any "technical expertise" regarding ARC box testing, *id.* at 237:12, but still testified that the supposed quality-control problems made Appellants "noncompliant" with their obligations. *Id.* at 197:10. Plaintiff's counsel returned to the manufacturing issues during closing arguments, claiming Appellants' quality-control testing showed the CAEv2 was "80 percent defective," yet Appellants were "[r]eleasing product under waivers" and "[s]hipping them out to servicemembers." 6/18/21 Tr. at 70:15-6. "3M had a chronic problem with this plug. It never met the specs. 80 percent failure rates." *Id.* at 22-23.

4. **The verdict and subsequent trials**

Despite this wealth of irrelevant and highly prejudicial evidence, the jury found for Appellants on every count other than plaintiff's strict-liability failure-to-warn claim. *Baker.*Dkt.183. The jury found that plaintiff had sustained $1.7 million in damages but concluded that he was 38% responsible, resulting in a $1,054,000 total damages award. *Id.*

## SUMMARY OF ARGUMENT

The trial in this case was the product of numerous legal errors that distorted the evidence in favor of plaintiff's theory of the case and prejudiced the jury against Appellants at every turn. Chief among those errors were the district court's decision not only to deny Appellants' motion for summary judgment on the government-

contractor defense, but to grant plaintiffs' motion and remove the defense from the case, and the district court's plainly erroneous construction of the Noise Control Act. That statute undeniably covers both noise-emitting products and noise-reducing devices, and its exemption for equipment designed for combat use just as plainly exempts both noise-emitting products, like weaponry, and noise-reducing equipment, like the CAEv2. The district court's contrary and erroneous legal ruling all but amounted to a directed verdict on plaintiff's failure-to-warn claim, which not coincidentally was the only claim on which he prevailed. The trial was permeated with other errors that gave the jury a wholly distorted picture of events and robbed the verdict of any value as a bellwether outcome. This Court should reverse the decision below and correct these errors so they do not recur in the numerous follow-on trials the district court envisions.

**I.** The failure-to-warn claim never should have seen a jury because it is plainly preempted by the government-contractor defense. It is undisputed that Ohlin told Appellants not to include any instructions with their shipments of the CAEv2 because the military would instruct the soldiers on its own. Ohlin then reinforced that direction by insisting on bulk shipments that made providing instructions on individual units somewhere between impracticable and impossible. And it is undisputed that, when the military decided to distribute written instructions to supplement that instruction, it decided to draft its own wallet card rather than

obtaining instructions from Appellants.  But rather than grant summary judgment to Appellants on the defense, the district court granted summary judgment to *plaintiffs*, and went a huge step further and prevented Appellants from giving the jury an accurate picture of the government's role.  This Court should reverse the district court's grant of summary judgment to plaintiffs and enter judgment in favor of Appellants.  At the very least, the Court should vacate the verdict for a new trial where Appellants may present their defense and provide a true picture of the government's role.

II.  The district court's erroneous interpretation of the NCA provides an independent and sufficient basis for a new trial.  The Act presumptively covers both noise-emitting and noise-reducing products, and expressly exempts "any military weapons or equipment which are designed for combat use" from EPA's regulatory authority.  42 U.S.C. §4902(3)(B)(i).  That exemption unmistakably covers noise-emitting "military weapons" and (at least) noise-reducing military "equipment … designed for combat use."  That makes eminent sense, as the prospect of the EPA second-guessing military judgments about noise levels of combat weaponry or the appropriate earplugs for the battlefield is not a happy one.  Indeed, the only close question is whether the exemption exempts noise-emitting "equipment … designed for combat use," as covering noise-emitting equipment tends to render the express coverage of "weapons" superfluous.  Nonetheless, the

district court misapplied the *noscitur a sociis* canon to maximize that superfluity problem by holding that "equipment" refers *only* to military products that, like "weapons," *emit* noise. That atextual interpretation of the exemption is a flat misapplication of the canons of statutory construction and ignores any sensible judgment about which federal agency should be making decisions about all manner of military equipment. The district court's misguided ruling resulted in an erroneous jury instruction and highly prejudicial evidence and argument on the warnings issue. By repeatedly instructing the jury that Appellants were required to affix a label to each pair of CAEv2—which Appellants concededly did not do—the district court left the jury with little choice but to find for Appellants on plaintiff's failure-to-warn claim. That plainly constitutes reversible error.

**III.** Numerous evidentiary errors also require a new trial and require correction before they are replicated in follow-on trials. The court allowed plaintiff to make extensive use of a letter on Air Force letterhead that includes the demonstrably false statement—which all agree is hearsay—that the earplugs "were found to be defective." On top of that, the district court admitted the hearsay statement from the *qui tam* investigation that "[i]nterviews of US government personnel confirmed that had they known about the February 2000 test results … they may not have purchased the items," even while acknowledging that the underlying interviews were inadmissible hearsay. The court also admitted an email

31

relating to the discontinuation of the CAEv2, which plainly should have been excluded as a subsequent remedial measure. And the court admitted hours of testimony relating to alleged quality-control problems at 3M's manufacturing facility in Mexico, despite the fact that the plaintiff never alleged injury caused by a manufacturing defect. The individual and collective impact of these evidentiary errors deprived Appellants of a fair trial and require vacatur of the jury verdict.

## STANDARD OF REVIEW

This Court will "review de novo a district court's rulings on cross-motions for summary judgment, and the facts are viewed in the light most favorable to the non-moving party on each motion." *Chavez v. Mercantil Commercebank, N.A.*, 701 F.3d 896, 899 (11th Cir. 2012) (citation omitted).

The Court "review[s] *de novo* whether the district court misstated the law in its jury instruction[s]." *United States v. Joseph*, 709 F.3d 1082, 1093 (11th Cir. 2013). "Rulings on the admissibility of evidence are reviewed for abuse of discretion," but "[a] district court by definition abuses its discretion when it makes an error of law." *City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 556 (11th Cir. 1998).

## ARGUMENT

### I. The Government-Contractor Defense Preempts Plaintiff's Strict-Liability Failure-to-Warn Claim.

The government-contractor defense should have put an immediate end to this entire MDL and to plaintiff's strict-liability failure-to-warn claim in particular. There can be no serious dispute that the three elements of the defense are supported by undisputed evidence: that the government exercised its discretion in forbidding Appellants to include direct supplier-to-soldier warnings with the CAEv2, that Appellants complied with that directive, and that Appellants warned the military of all risks known to them but not the government. *See Boyle*, 487 U.S. at 512; *see also, e.g.*, *Tate v. Boeing Helicopters*, 55 F.3d 1150, 1157 (6th Cir. 1995); *Graves v. 3M Co.*, 17 F.4th 764, 772 (8th Cir. 2021). That should have spelled the end of plaintiff's strict-liability failure-to-warn claim.

#### A. The Military Told Appellants Not to Send Instructions With the CAEv2.

The record is crystal clear that the military exercised its "discretion" to prohibit Appellants from including instructions with their shipments of the CAEv2. *Tate*, 55 F.3d at 1157. Ohlin expressly told Appellants "not to include instructions in th[e] box" when shipping the CAEv2 because he "felt that personal training was the most effective way to train the soldiers, and that the military audiologists were going to take on that responsibility of individually training every solider." Ex.62 at

33

326:19-327:3. Ohlin then made providing individual-box-instructions impossible by expressly directing Appellants to ship the CAEv2 earplugs in bulk with "50 pair in a plastic bag, with nothing else in there, inside a box." Ex.62 at 326:16-18. Moreover, the military audiologists had a legal duty to train every soldier in the use of hearing protection and ensure that they could obtain a proper fit with their earplug of choice. Ex.26 at §§6.6.7, 6.6.10. When the military later decided it wanted to distribute written instructions to soldiers, Appellants offered to provide them, but the military chose to draft its own wallet card. *See* Exs.38, 39. These facts readily satisfy the first *Boyle* factor.

The district court did not take issue with any of these facts. Instead, it granted summary judgment to plaintiffs based on a misreading of this Court's precedents and unreasonable inferences from the record. According to the district court, the *Boyle* framework does not apply to failure-to-warn claims because this Court in *Dorse* held that the defense applies "only where a federal government contract *affirmatively prohibits* a warning or contains specific warning requirements that significantly conflict with those required by state law." Dkt.1280 at 50 (emphasis added). This case would satisfy even that demanding test, but that is not a correct reading of *Dorse*. The district court in *Dorse*—whose opinion this Court adopted in a one-sentence per curiam opinion—announced no such novel standard. To the contrary, it held that *Boyle* provides a "guide[]" in failure-to-warn cases, even if the

34

three-part test is not strictly transferable. 898 F.2d at 1489 (appended district court opinion). The court then went on to conclude that the elements of the government-contractor defense were lacking there, noting, among other things, that the defendant's contract "d[id] not contain any prohibition against health warnings on the product." *Id.* That recitation of the facts does not support the district court's insistence that the defense applies to failure-to-warn claims "*only where* a federal government contract affirmatively prohibits a warning or contains specific warning requirements that significantly conflict with those required by state law." Dkt.1280 at 49-50 (emphasis added).

Nor was the district court right to invoke *Glassco v. Miller Equipment Co.*, 966 F.2d 641, 643 (11th Cir. 1992), for the proposition that this Court "has not retreated from [the *Dorse*] standard, and in fact has reaffirmed it." Dkt.1280 at 50. In the district court's telling, this Court "revers[ed]" the district court's "grant of summary judgment" in *Glassco* "as 'inconsistent with *Dorse*' where the district court applied [the] three-part *Boyle* test to failure-to-warn claim"—suggesting that this Court reversed *because* the district court had applied *Boyle*. *Id.* In fact, this Court said nothing about the applicability of *Boyle* to failure-to-warn claims and simply held, in a single sentence without elaboration, that the district court's grant of summary judgment "is inconsistent with *Dorse*." *Glassco*, 966 F.2d at 644. Again, that is a far cry from establishing a novel "affirmative prohibition" test for failure-

to-warn claims that is not consistent with *Boyle*'s requirement that the government simply exercise its discretion. The far better reading of *Dorse* is that the general *Boyle* framework applies, just as this Court has held with respect to other state tort claims, where the Court "rejiggered" *Boyle* "[t]o account for the contextual switch from a design-defect case to a negligent-maintenance case." *LaCourse v. PAE Worldwide Inc.*, 980 F.3d 1350, 1359 (11th Cir. 2020) (describing *Hudgens v. Bell Helicopters/Textron*, 328 F.3d 1329 (11th Cir. 2003)).

At any rate, whether applying a "rejiggered" version of *Boyle* or the more stringent so-called "*Dorse*" test, the result here is the same. The military expressly told Appellants *not* to provide instructions and then effectively foreclosed individual instructions by insisting on bulk shipments of the CAEv2, with nothing inside the box except 50 earplugs in a plastic bag, so that it could later instruct the soldiers in person. And when the military decided to provide brief written instructions for individual sets of earplugs, it refused Appellants' offer to develop instructions and used its own wallet card instead. Plaintiff's failure-to-warn claims thus seek to impose a duty on Appellants to provide instructions with the earplugs, which is in direct conflict with the military's command "affirmatively prohibit[ing]" that conduct.

The district court's alternative holding—that even under *Boyle* the military did not sufficiently prohibit instructions from Appellants—only serves to

36

demonstrate the lengths the district court was willing to go to deprive Appellants of a government-contractor defense.  The district court acknowledged that the military "told [Appellants] not to include instructions inside the boxes for bulk shipments of the earplug because military audiologists would provide in-person training to each service member," Dkt.1280 at 53-54, but held that the directive "did not preclude [Appellants] from affixing warnings to the *outside* of the boxes."  *Id.* (emphasis added).  That reading of the record is, at best, implausible.  Perhaps the military would not have minded instructions on the outside of bulk shipment boxes, but only because they would have been utterly useless in providing instruction or warning to individual soldiers and thus could not have interfered with the military's stated preference for providing its own instructions directly to service members.  And those outside-the-bulk-shipment-box instructions would not have complied with EPA regulations were they applicable (*but see infra*).  That the bare possibility of providing such useless instructions on the outside of a bulk shipment box was a strike against Appellants' government-contractor defense is a sure sign the district court was not applying a valid test for accommodating general government-contractor principles to the specific context of failure-to-warn claims.

The evidence all supports the same conclusion:  the military exercised its discretion to rely on in-person training and its wallet card, not instructions from the manufacturer, to inform soldiers about the CAEv2.  The military's exercise of

discretion preempts any state-law duty Appellants might have had to ignore the government's directive and include unwanted instructions or warnings with bulk shipments of the CAEv2.

### B.    Appellants Satisfy the Remaining Factors.

Although the district court did not reach whether Appellants conformed to the government's wishes and warned of risks known to them but not the military, Appellants are entitled to summary judgment on them as well.  The relevant facts here are beyond dispute, and the equities strongly favor resolving this case-dispositive issue now.  Appellants have already been forced to defend against fourteen plaintiffs in eleven trials in less than a year—with five more to come this spring.  The Court should decide in this appeal whether Appellants should have to stand trial on plaintiffs' failure-to-warn claims.

The record here makes abundantly clear that Appellants "conformed" to the directives of the government.  *Tate*, 55 F.3d at 1157.  The military asked Appellants *not* to provide any information with its bulk shipments of the CAEv2, and that is what Appellants did.

The record is also abundantly clear that Appellants "warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States" and that were "substantial enough to influence [its] decision."  *Boyle*, 487 U.S. at 512; *In re Agent Orange Prod. Liab. Litig.*, 517 F.3d

76, 99 (2d Cir. 2008). Plaintiffs' attorneys commenced this litigation because they thought they had found a document—the flange report—recording fitting issues that Appellants kept from the military. That theory has never been viable. Aearo told the military about the flange report's conclusions: that the opposing flanges of the CAEv2 could cause fitting issues for some individuals, and the issues could be resolved by folding back the opposing flanges before insertion. The author of that report, Elliott Berger, has repeatedly testified that he told the military "rolling back the flanges would be important for some people and that it was something [Aearo] w[as] doing on the most recent test." Ex.59 at 297:13-22, 337:8-18. And a slew of military documents and testimony corroborate that testimony. *See* Exs.29, 25, 23. And then when the *military* created the wallet card in 2004, it included a picture of the CAEv2 with the opposing flanges folded back and advised soldiers with "very large ear canals" to "fold [the] opposing plug back." Ex.41.

In the face of this evidence, plaintiff insists that the warning was nevertheless insufficient because the flange report observed fitting issues in subjects with "medium and larger" ear canals, yet the wallet card advised folding back the flanges only in "very large" ear canals. Ex.24 at 2; Ex.41 at 1. But that argument, too, is not supported by the record. The manager of the Army Hearing Program testified that Ohlin instructed "most military audiologists" that "if you needed to, you could fold back the flange on the earplug get a good fit." Ex.58 at 98:2-3, 106:12-107:1.

39

Ohlin's instruction was not limited "to one particular size ear canal." *Id.* at 99:4-8. And a former manager of the Army Hearing Conservation program stated that he instructed the technicians who fit soldiers with the CAEv2 to try "roll[ing] back the opposing flanges" "if they believed the bottom edge of the opposing flange was preventing them from inserting the earplug far enough into a soldier's ear canal." Ex.66 at ¶9. While he told technicians the issue was "particularly likely to occur with soldiers who had large ear canals," he did *not* tell them the issue "would only occur with soldiers who had large ear canals." *Id.* at ¶¶10-11. This evidence leaves no doubt that the military knew about fitting issues for some individuals and that the issues could be resolved by folding back the opposing flanges before insertion—the only information "substantial enough to influence the military['s] decision" to use the CAEv2. *In re Agent Orange*, 517 F.3d at 99.[3]

* * *

With all elements satisfied, the government-contractor defense entitles Appellants to summary judgment on plaintiff's failure-to-warn claim. Plaintiff

---

[3] In the face of this evidence, plaintiffs later argued the flange report established that "the flanges *had* to be folded to ensure the CAEv2 worked"—i.e., the technique was needed for *everyone*. Dkt.1089 at 30. But that sweeping claim lacks any foundation in the flange report or the underlying testing. Even on the first REAT test documented in the flange report, in which no flanges were folded back, the CAEv2 exceeded the government's minimum mean attenuation expectations at every frequency. *Compare* Ex.21 at 5, *with* Ex.55 at 44.

should not be able to second-guess that discretionary decision and impose liability on Appellants for judgments made by the government.

## II. The District Court's Erroneous Interpretation Of The Noise Control Act Requires A New Trial.

Despite the absence of that central government-contractor defense, Appellants prevailed at trial on all of plaintiff's claims but one—strict-liability failure to warn. That reflects not the strength of that lone claim, but that the district court all but directed a verdict on that claim based on a profoundly flawed construction of the NCA.

### A. Appellants' Sale of the CAEv2 to the Military Is Exempt From the Noise Control Act.

The court's holding—that even though the NCA applies to both noise-*emitting* and noise-*reducing* products, its exemption for combat-use equipment applies to only the noise-emitting subset of such equipment—violates first principles of statutory construction and finds no support in the statute's text, the larger statutory context, or Congress's purpose in enacting the Act or the exemption.

The EPA has promulgated labeling regulations pursuant to the NCA, which charges EPA with "designat[ing] any product" that "emits noise capable of adversely affecting the public health or welfare" or that is "sold wholly or in part on the basis of its effectiveness in reducing noise." 42 U.S.C. §4907(a)(1)-(2). EPA has exercised that authority to regulate both noise-*emitting* and noise-*reducing*

41

"product[s]."  The NCA defines "product" as "any manufactured article or goods or component thereof."  *Id.* §4902(3).  Thus, absent an exemption, the NCA would plainly reach military "products" whether they emit noise (like weapons) or reduce noise (like the CAEv2), but the NCA *does* exempt, among other things, "any military weapons or equipment which are designed for combat use."  42 U.S.C. §4902(3).

That exemption fits the Combat Arms Earplug version 2 to a tee.  The product was specifically designed for the unique challenges for hearing-reduction devices in combat—hence, its name—and was sold to the military for that purpose.  "In determining the meaning of a statutory provision," courts "look first to its language, giving the words used their ordinary meaning."  *Artis v. District of Columbia*, 138 S.Ct. 594, 603 (2018).  Here, the district court did not dispute that an earplug falls within the ordinary meaning of "equipment," which is defined as "articles or implements used for a specific purpose or activity."  Black's Law Dictionary (11th ed. 2019).  And the district court did not seriously dispute that the earplugs were "designed for combat use."  The entire reason the military recruited Appellants to develop the earplug was to find a solution for soldiers who were not using hearing protection to allow for situational awareness in combat.  As the district court correctly acknowledged in another part of this MDL, "the CAEv2 earplug was a hearing protection device designed specifically for combat."  Order on 3M MIL No. 41 at 2, *Camarillorazo v. 3M Co.*, No. 7:20cv98 (S.D. Fla. Oct. 26, 2021),

Dkt.89.  That should have been the end of the matter.  *See Smith v. Marcus &*
*Millichap, Inc.*, 991 F.3d 1145, 1161 (11th Cir. 2021) ("[O]ur analysis begins with
the language of the statute," "[a]nd where the statutory language provides a clear
answer, it ends there as well.") (quoting *Hughes Aircraft Co. v. Jacobson*, 525 U.S.
432, 438 (1999)).

The surrounding text and statutory context only confirm that the CAEv2 is
"equipment" within the combat-use exemption.  First, Congress placed the modifier
"*any*" before "military weapons or equipment," 42 U.S.C. §4902(3)(B)(i) (emphasis
added), which has "an expansive meaning," and certainly warns against carving out
a species from the genus of equipment.  *Ali v. Fed. Bureau of Prisons*, 552 U.S. 214,
219 (2008).  Second, the exemption for military "equipment" is in contradistinction
from presumptively covered "products," which expressly include both noise-
emitting and noise-reducing devices.  The Supreme Court has warned courts off
interpreting exemptions narrowly, and emphasized that they should, like other text,
be interpreted fairly.  *See Encino Motorcars, LLC v. Navarro*, 138 S.Ct. 1134, 1142
(2018).  Moreover, absent some contrary indication, the scope of an exemption is
informed by the scope of the general provision to which it is an exemption.  A one-
sided exemption (noise-producing only) from a two-sided provision (noise-
producing or reducing) is neither fair nor plausible absent some textual indication
that the exemption is one-dimensional.

Other parts of the statute confirm this interpretation. The Act exempts "any rockets or equipment which are designed for research, experimental, or developmental work to be performed by [NASA]" and "any other machinery or equipment designed for use in experimental work done by or for the Federal Government." The "comparable core of meaning" uniting these three categories is that they identify products used by technically sophisticated agencies of the United States government. *Graham Cnty. Soil & Water Conservation Dist. v. U.S. ex rel. Wilson*, 559 U.S. 280, 288-89 & n.7 (2010). Exempting these products from EPA regulation makes sense given the Act's stated goal of "provid[ing] information to *the public* respecting the noise emission and noise reduction characteristics of [regulated] products." 42 U.S.C. §4901(b) (emphasis added). The military, NASA, and government laboratories can make their own informed judgments about noise-emitting or noise-reducing products in light of their specialized missions.

Indeed, that was the stated purpose for those exemptions. Members of Congress recognized that "[n]ational security requires that the responsible authorities be free to determine to what extent noise control objectives must be subordinated to military necessities in the use of such articles." 117 Cong. Rec. 3084 (1971) (statement of Sen. Cooper). That applies no less to tanks than earplugs. Just as it makes no sense for American soldiers to fight the enemy with tanks with big EPA warning stickers plastered on their sides, it makes no sense to fight with

44

earplugs with such warnings—especially where the military made clear beyond cavil that it does not want individual boxes with individual warning labels of the kind EPA otherwise requires and wants to do the instructing itself. *See supra* at 33-34. The EPA itself recognized the military's relative expertise, as the director of the EPA's Office of Noise Abatement and Control supported the exemption in large part due to the "extensive" and "in the main … extremely effective hearing conservation program" in the military. *See Noise Control: Hearings Before the H. Comm. On Pub. Health and Env't*, 92nd Cong. 167 (1971) (statement of Dr. Meyer). That is the very program that recruited Appellants to develop the CAEv2.

The district court eschewed all of these indicators in favor of the *noscitur a sociis* canon. According to the district court, because the exemption covers "any military weapons or equipment which are designed for combat use," 42 U.S.C. §4902(3), the *noscitur a sociis* canon requires the court to interpret "equipment" in light of the word "weapon." Because weapons *emit* noise, the term "equipment" must be limited to the subset of equipment that emits noise—and does not exempt noise-reducing equipment from a definition of "product" that expressly includes both noise-emitting and noise-reducing products.

That is, with all due respect, a complete misapplication of the *noscitur a sociis* canon. First, the canon teaches that "a word is known by the company it keeps," *McDonnell v. United States*, 136 S.Ct. 2355, 2368 (2016), and it requires a

45

meaningful amount of company to have any interpretive force. It thus applies "when a string of statutory terms raises the implication that the words grouped in a list should be given related meaning." *S.D. Warren Co. v. Maine Bd. of Env't Prot.*, 547 U.S. 370, 378 (2006). But it offers no guidance in statutory construction where the relevant statutory terms are "too few and too disparate" to give rise to a "comparable core of meaning." *Wilson*, 559 U.S. at 288-89 & n.7. That is why the Supreme Court expressly declined to apply it in *Reiter v. Sonotone Corp.*, 442 U.S. 330 (1979), when interpreting the phrase "business or property" in the Clayton Act. The Court held that "property" should be given its "naturally broad and inclusive meaning," expressly rejecting that the term should be limited to "property related to one's business." *Id.* at 338. "That strained construction," the Court observed, "would have us ignore the disjunctive 'or' and rob the term 'property' of its independent and ordinary significance." *Id.* at 338-39.

But even if the *noscitur a sociis* canon could apply to some other disjunctive pair, it cannot apply where, as here, the surrounding text provides strong reasons to interpret the two disjunctive terms as having different characteristics. When interpreting an exemption to a general provision that expressly covers two different things (both noise-emitting products and noise-reducing products) one would naturally expect a disjunctive exemption to that two-dimensional provision to be two-dimensional as well. And that is exactly how the combat-use exemption works,

as it expressly exempts both noise-emitting weapons and equipment, the latter of which logically covers (at least) the other half of the waterfront when it comes to military combat products. Indeed, the harder interpretive question would seem to be whether "equipment" covers noise-emitting military equipment *in addition to* noise-reducing military equipment, as that would risk rendering the reference to "weapons" superfluous, as weapons would seem to be the ultimate in noise-emitting military equipment. The better reading is that both noise-emitting and noise-reducing military equipment are exempted (especially given the word "any"), but the one thing that seems most obviously exempted is noise-reducing military equipment, and the prototypical example of noise-reducing equipment "designed for combat use" is the CAEv2.

The district court suggested in a footnote that, even if "equipment" were read to encompass noise-reducing products, the combat-use exemption would not apply to the CAEv2 because it "was not designed *exclusively* 'for combat use.'" *Estes*.Dkt.53 at 24 n.13 (emphasis added). But the word "exclusively" appears only in that footnote, not in the statutory text. *See, e.g.*, *HollyFrontier Cheyenne Refining, LLC v. Renewable Fuels Ass'n*, 141 S.Ct. 2172, 2179 n.1 (2021) (rejecting interpretation that would require the Court "to read words into the statute"); *Owens v. Samkle Automotive Inc.*, 425 F.3d 1318, 1321 (11th Cir. 2005) (similar). The record is clear that the CAEv2 was designed to meet the military's need for an

47

earplug that would work in combat, providing situational awareness for soldiers who previously did not wear hearing protection at all. That was the entire reason the *military* convened a meeting back in the mid-1990s that included Appellants—to discuss the development of an earplug for use in combat. That Appellants ultimately found civilian applications for the CAEv2 (and provided EPA-compliant labels for those products) does not change the undeniable fact that the earplugs were "designed for combat use." 42 U.S.C. §4902(3)(B)(i).

## B.    The Erroneous Interpretation of the Noise Control Act Is Reversible Error.

Under the proper construction of the Act, Appellants are entitled to a new trial on plaintiff's failure-to-warn claim. The district court's erroneous ruling conveyed to the jury that Appellants had broken the law by not complying with regulations that did not even apply to them. Plaintiff said as much in opening statements, arguing that Appellants "violate[d] the regulations that govern testing of hearing protection devices" when they sold the first 2,000 pairs of CAEv2 before beginning a labeling test. 6/7/21 Tr. at 36:19-25. When Elliott Berger testified that his "understanding" was that "[t]here was no requirement for an EPA label or even instructions" because the CAEv2 "was not being sold in a commercial market," the court immediately interjected with an instruction to the jury that "that is not the law," and that "the label was required on any product—the CAEv2—whether it was sold commercially or to the military." 6/9/21 Tr. at 26:8-16. Plaintiff's counsel

capitalized on that instruction in closing argument: "EPA label regulations require testing before selling. Violation. Violation. We'll see more of these as we go through. Violation after violation." 6/18/21 Tr. at 53:24-54:2. The district court's final instructions also invited the jury to "consider that certain EPA regulations … provide that certain information must have been included with every CAEv2, whether packaged individually or in bulk," "in determining whether Mr. Baker ha[d] proven his strict liability or negligence claims." *Baker*.Dkt.182 at 25. The district court's erroneous ruling on the applicability of the EPA labeling requirements infected the trial from start to finish and all but directed a verdict for plaintiff on the failure-to-warn claim.

## III. Numerous Evidentiary Issues Require A New Trial.

Throughout trial, and over Appellants' repeated objections, plaintiff's counsel introduced irrelevant and highly prejudicial issues in an attempt to distract the jury from the deficiencies of plaintiff's claims. Each of the below evidentiary errors supports a new trial, and their cumulative effect compels one and renders the verdict here (and in each follow-on trial infected by the same repeated errors) useless as a representative bellwether outcome.

### A. The Vietas Letter and *Qui Tam* Report Are Inadmissible Hearsay and Unfairly Prejudicial.

There can be no serious dispute that the Vietas letter and *qui tam* report—and especially their respective double-hearsay statements that the CAEv2 "were found

49

to be defective" and that government personnel "may not have purchased" the CAEv2 if they had known about Appellants' testing—never should have been admitted.

The district court recognized that the "found to be defective" statement in the Vietas letter was double hearsay, but nevertheless allowed the jury to "consider this document for what the Air Force knew about the earplugs, what the Air Force believed about the earplugs, and why the Air Force made the decision that it did to remove the earplugs from its inventory," as if that were a non-hearsay purpose. 6/8/21 Tr. at 199:16-19. But the statement sheds light on what the Air Force "knew or did not know" about the CAEv2 only if it is *true* that the military found the CAEv2 to be defective. And plaintiffs made no effort to disguise that they were offering the letter for the truth, referencing that the CAEv2 was "found to be defective" in their opening statement, with witness after witness, and in closing argument. *See supra* at 24-25. Moreover, Vietas's (erroneous) belief that such an investigation took place does not make plaintiffs' allegations any more or less likely.

Even if that statement were not inadmissible (it is manifestly hearsay) and were somehow minimally relevant (it manifestly is not), the unfair prejudice of admitting it would still be undeniable. *See* Fed. R. Evid. 403. The letter effectively communicates that the military already weighed in on the ultimate issue in this trial. It implies that an internal military investigation found the CAEv2 to be defective—

50

a proposition that is demonstrably false.[4]  Indeed, that is exactly the inference plaintiffs invited the jury to draw throughout the trial.  In closing argument, for example, plaintiff's counsel falsely claimed that an "[i]nvestigation [was] conducted by the Air Force" and they concluded "these are defective, get them out of people's ears." 6/18/21 Tr. at 75:4-10.  And in rebuttal, plaintiff's counsel claimed again that "Air Force already looked at all of this when they concluded this was a defective product." *Id*. at 139:3-5.  But the letter should never have been admitted and surely should not have been used by plaintiff to repeatedly suggest that the government had already made a conclusive finding that the CAEv2 was defective.

The district court likewise recognized the hearsay character of the *qui tam* report, but nevertheless admitted the summary of the investigator's interviews on the ground that it was a factual finding and thus satisfied the public-records exception. Fed. R. Evid. 803(8).  But the summary simply repeated the statements of the interviewees, which the district court correctly excluded as "inadmissible hearsay within hearsay." Dkt.1693 at 8.  If the underlying statements are excluded, then so

---

[4] Appellants took Col. Vietas's deposition in Minnesota state-court litigation involving the CAEv2.  His testimony underscores all the reasons the hearsay is inadmissible.  He testified that the "sole basis" for his statement that the CAEv2 "were found to be defective" was a "press release" announcing that the Department of Justice had settled the False Claims Act claims against 3M.  *Blum*.Dkt.88-1 at 30:3-25, 35:9-16, 49:14-23.  That press release, in turn, contained the critical disclaimer that the settlement resolved "allegations only" and that "there has been no determination of liability." *Blum*.Dkt.88-2.

must be the investigator's summary of those statements. Placing "otherwise inadmissible hearsay statements by third parties into a government report does not make the statements admissible." *United Techs. Corp. v. Mazer*, 556 F.3d 1260, 1278 (11th Cir. 2009).

Indeed, the district court's decision to admit the summary but exclude the underlying notes resulted in the worst of both worlds for Appellants, who were unable to point out that the military audiologists interviewed *were* aware that the flange-fold technique could be used to resolve fitting issues. P-Gen-10 at 257. Instead, plaintiff was able to take the summary out of its context and falsely insist, by using the report in tandem with the Vietas letter, that the military had already concluded that Appellants had withheld information demonstrating the CAEv2 was defective.

The prejudicial effect of these errors were magnified by the district court's erroneous rulings related to the government-contractor defense. This case should have never gone to the jury because both the alleged defect and the absence of direct supplier-to-soldier instructions result from discretionary military decisions. But the district court sent the case to the jury and severely limited Appellants' efforts to give the jury a fair view of the military's involvement and knowledge. The district court then allowed the plaintiffs to fill that artificial gap with hearsay evidence that should have never been admitted and gave the jury a profoundly skewed view of what the

government knew and when they knew it.  The product of that profoundly distorted

trial cannot be allowed to stand.

### B. Communications Regarding the Discontinuation of the CAEv2 Are Inadmissible.

Appellants were further prejudiced here by the erroneous admission of the

2015 email from the business director of 3M's hearing protection division stating

"[w]e cannot ship any further products with current labeling" and "we cannot

distribute this with the current NRR on the package."  P-Gen-128 at 1, 3.  As the

district court held, the bulk of the email is "plainly" inadmissible because it relates

to the discontinuation of the CAEv2, which qualifies as a subsequent remedial

measure.  Dkt.1693 at 12-13; *see* Fed. R. Evid. 407.  The court's justification for

treating the two most prejudicial statements differently—that they are "not

intertwined with discontinuation, nor do they lead to the conclusion that the product

was discontinued"—is incoherent on its face.  *McCombs*.Dkt.105-1 at 7; *see*

*Baker*.Dkt.129 at 1 (adopting prior ruling).  Those statements are as intertwined with

the cancellation decision as one can get.  They are the very *reasons* the business

director gave for cancelling the CAEv2 orders.  And the statements themselves refer

to ceasing all shipments of the earplugs.  Deeming those statements "not

intertwined" with the discontinuation is akin to saying an appellate decision's

reasoning is "not intertwined" with its disposition of the appeal.

Moreover, because those statements are inextricable from the discontinuation of the product, plaintiff's counsel was able to use the statements to elicit testimony that the CAEv2 was, in fact, withdrawn from the market in 2015. 6/9/21 Tr. at 10:7-12 ("I know that in [2015] the product was removed from the market."). And plaintiff's counsel directly (and falsely) asserted in closing that the company decided it "c[ould]n't distribute the product" any longer because it was "defective." 6/18/21 Tr. at 139:14-17. Federal Rule of Evidence 407 exists to preclude such arguments.

Those statements regarding the discontinuation of the CAEv2, together with the Vietas letter and *qui tam* report, were the core of plaintiff's trial presentation. Unable to present evidence that anything was actually wrong with the CAEv2, plaintiff could support his case only by introducing irrelevant, prejudicial, and inadmissible documents. Appellants are entitled to a new trial.

## C. Evidence About Alleged Manufacturing Issues In Mexico Is Inadmissible.

Finally, the copious evidence concerning quality control in manufacturing facilities in Mexico is inadmissible for the simple reason that there is no manufacturing-defect claim in these cases, or in the MDL more generally. The district court acknowledged as much, 4/26/2021 *EHK*.Tr. at 358:24-359:4, and plaintiffs' own expert confirmed that there was no evidence that any out-of-specification earplug was ever shipped to anyone, including plaintiff, 6/15/21 Tr. at 241:3-8. But the court nonetheless permitted plaintiff (and most bellwether plaintiffs

to date) to elicit hours of testimony suggesting that there were "chronic" problems at Aearo's manufacturing facility in Mexico, and that as many as 80% of CAEv2 failed Aearo's internal quality-control tests.

The district court's rationale for allowing plaintiff to admit this evidence and pursue this prejudicial path does not withstand scrutiny. The court explained that it saw the manufacturing evidence as "relevant to the operation of the lab. So you have a lab in Indianapolis that oversaw all of the quality control for this earplug, and in my opinion … it's relevant how that lab dealt with these quality issues." 4/26/2021 *EHK*.Tr. at 358:12-16. But the ARC box testing was performed in Mexico, not in Indianapolis. Whether a different group of people at a different facility in a different country struggled with a different sort of test is in no way a reflection of the quality of the testing Appellants conducted in Indianapolis.

Moreover, even if the manufacturing evidence did somehow bear on the professionalism of the Aearo laboratory a thousand miles away in a different country, Rules 403 and 404(b)(1) would bar its admission. According to the district court's rationale, the plaintiff could introduce the ARC-box evidence to show that Appellants' "overall quality assurance process for the CAEv2 was substandard." Dkt.1695 at 18-19. In other words, the plaintiffs could introduce evidence of supposed quality-control failures in *manufacturing*, even though the plaintiff does

not claim those problems affected him in any way, to suggest there were *also* quality-control failures in *designing* the CAEv2.

That conflates the timeline (the CAEv2 was obviously designed before it was manufactured) and is precisely what Rule 403 and 404 prohibit. Plaintiff simply may not introduce otherwise irrelevant manufacturing issues to prove that Appellants *generally* had poor quality control, and thus that Appellants' quality control must have faltered in some way that actually affected them. *See, e.g.*, *In re Tylenol (Acetaminophen) Mktg., Sales Pracs. & Prods. Liab. Litig.*, 181 F.Supp.3d 278, 299 (E.D. Pa. 2016) (excluding evidence of quality-control issues at manufacturing facility because "plaintiff asserts a design defect claim, not a manufacturing defect claim"). It is understandable why plaintiff wants to focus on this irrelevant and highly prejudicial evidence (and inject the false notion that U.S. servicemembers were given equipment manufactured in substandard fashion in Mexico) in light of his weak case on the claims he actually brought, but that is not how the Federal Rules of Evidence work.

## CONCLUSION

For the foregoing reasons, the Court should reverse the district court's judgment, or at a minimum vacate the judgment and remand for a new trial.

Respectfully submitted,

s/Paul D. Clement

COLE CARTER
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL 60654
(312) 862-2000

PAUL D. CLEMENT
  *Counsel of Record*
KASDIN M. MITCHELL
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue, NW
Washington, DC 20004
(202) 389-5000
paul.clement@kirkland.com

*Counsel for Defendants-Appellants*

February 25, 2022

57

## CERTIFICATE OF COMPLIANCE

1.  This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 13,000 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and 11th Cir. R. 32-4.

2.  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6), because it has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point Times New Roman type.

February 25, 2022

<u>s/Paul D. Clement</u>
Paul D. Clement

## CERTIFICATE OF SERVICE

I hereby certify that on February 25, 2022, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Eleventh Circuit by using the CM/ECF system. I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

s/Paul D. Clement
Paul D. Clement