IN THE

# United States Court of Appeals

FOR THE ELEVENTH CIRCUIT

Case Nos. 21-12517, 21-13131, 21-13133, 21-13135

3M COMPANY, et al.,
Defendants-Appellants,

v.

LLOYD BAKER, LUKE ESTES, STEPHEN HACKER, LEWIS KEEFER,
Plaintiffs-Appellees.

On Appeal from the United States District Court
for the Northern District of Florida
Nos. 3:19-md-2885, 7:20-cv-137, 7:20-cv-131, 7:20-cv-104

**BRIEF OF *AMICUS CURIAE* CHAMBER OF COMMERCE
OF THE UNITED STATES OF AMERICA
IN SUPPORT OF DEFENDANTS-APPELLANTS**

Tara S. Morrissey
Andrew R. Varcoe
U.S. CHAMBER LITIGATION CENTER
1615 H Street, NW
Washington, DC 20062

Adam G. Unikowsky
JENNER & BLOCK LLP
1099 New York Ave. NW Suite 900
Washington, DC 20001
(202) 639-6000
aunikowsky@jenner.com

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, *amicus curiae* certifies that it has no outstanding shares or debt securities in the hands of the public, and it does not have a parent company.  No publicly held company has a 10% or greater ownership interest in *amicus curiae*.

Pursuant to Eleventh Circuit Rule 26.1-1, *amicus curiae* certifies that, in addition to the persons and entities named in the parties' certificates of interested persons, the following individuals or entities may have an interest in the outcome of these cases:

1. Jenner & Block LLP

2. The Chamber of Commerce of the United States of America

3. Adam G. Unikowsky

4. Jonathan Urick

5. Andrew R. Varcoe

6. Tara S. Morrissey

/s/ Adam G. Unikowsky

i

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE
DISCLOSURE STATEMENT.......................................................................i

TABLE OF AUTHORITIES ....................................................................... iii

IDENTITY AND INTEREST OF AMICUS.................................................1

INTRODUCTION AND SUMMARY OF ARGUMENT .........................2

ARGUMENT ................................................................................................4

I.    Under *Boyle*, Plaintiffs' Suit is Preempted.......................................4

    A.    In *Boyle*, the Court held that state tort suits cannot be used to
        collaterally challenge discretionary government contracting
        decisions. ...........................................................................5

    B.    *Boyle*'s reasoning applies with identical force to these cases...............7

    C.    Ruling in Plaintiffs' favor would cause harmful policy
        consequences. ...................................................................10

II.   The District Court's Rationales for Distinguishing *Boyle* Do Not
    Withstand Scrutiny. ...........................................................................12

    A.    Contrary to the district court's determination, there is a powerful
        federal interest at stake in these cases..................................12

    B.    By buying the fully-designed earplugs, the Army approved the
        design of the earplugs.........................................................15

    C.    The failure-to-warn claim is also preempted. ....................18

    D.    Plaintiffs' argument based on civilian use of the earplugs should
        be rejected........................................................................19

III.  *Boyle* is necessary to protect defendants from abusive MDLs.....................22

CONCLUSION ........................................................................................24

# TABLE OF AUTHORITIES[*]

CASES

*Boyle v. United Technologies Corp.*, 487 U.S. 500 (1988) ...........................*passim*

*In re Brooklyn Navy Yard Asbestos Litigation*, 971 F.2d 831 (2d Cir. 1992) ...................................................................................................20

*Dorse v. Eagle-Picher Industries, Inc.*, 898 F.2d 1487 (11th Cir. 1990) ..........18, 20

*Foster Logging, Inc. v. United States*, 973 F.3d 1152 (11th Cir. 2020) .................17

*Henderson ex rel. Henderson v. Shinseki*, 562 U.S. 428 (2011) .............................11

*Kase v. Metalclad Insulation Corp.*, 6 Cal. App. 5th 623 (Ct. App. 2016) ......................................................................................................20

*Miller v. Diamond Shamrock Co.*, 275 F.3d 414 (5th Cir. 2001)...........................20

OTHER AUTHORITIES

U.S. Chamber of Commerce Institute for Legal Reform, ILR Briefly, *Twisted Blackjack: How MDLs Distort and Extort* (Oct. 2021), https://instituteforlegalreform.com/wp-content/uploads/2021/10/ILR-Briefly-MDL-FINAL.pdf ......................................................................22, 23

U.S. Dep't of Veterans Affairs, *VA disability compensation*, https://www.va.gov/disability/ (last updated Nov. 23, 2021).......................................11

---

[*] Authorities upon which we chiefly rely are marked with an asterisk.

All parties consent to this amicus brief.

## IDENTITY AND INTEREST OF AMICUS[1]

The Chamber of Commerce of the United States of America (the "Chamber") is the world's largest business federation. It represents 300,000 direct members and indirectly represents the interests of more than three million companies and professional organizations of every size, in every industry sector, and from every region of the country. An important function of the Chamber is to represent the interests of its members in matters before Congress, the Executive Branch, and the courts. To that end, the Chamber regularly files *amicus* briefs in cases, like this one, that raise issues of concern to the Nation's business community.

The Chamber's members have a strong interest in ensuring that lower courts adhere to *Boyle v. United Technologies Corp.*, 487 U.S. 500, 504 (1988). Many of the Chamber's members sell products and services to the United States. When government contractors adhere to their contractual obligations and rely on the government's discretionary policymaking determinations, they should not have to fear liability to third parties merely because those third parties disagree with the government's safety assessments. *Boyle* protects contractors from such liability by

---

[1] Pursuant to Fed. R. App. P. 29(a)(4)(E), *amicus curiae* states that no party's counsel authored this brief in whole or in part and that no entity or person, aside from *amicus curiae*, its members, or its counsel, made any monetary contribution intended to fund the preparation or submission of this brief.

1

ensuring that government contractors are immune from tort liability when they comply in good faith with reasonably precise specifications in government contracts. The decision below, however, threatens to create a loophole in *Boyle* by permitting third parties to collaterally attack discretionary government safety decisions so long as those decisions were made after, rather than before, the product was designed. Yet *Boyle* simply does not allow federal courts to create such a loophole. Given the remarkable scope of this MDL—in which hundreds of thousands of claims have been filed—the problem created by the district court's decision is enormously consequential. The Court should hold that *Boyle* precludes the plaintiffs in these cases from second-guessing discretionary military decisions.

## INTRODUCTION AND SUMMARY OF ARGUMENT

*Boyle* requires preemption in these cases. In *Boyle*, the Supreme Court concluded that there is a "uniquely federal" interest, warranting preemption of state law, in "civil liabilities arising out of the performance of federal procurement contracts." 487 U.S. at 505-06. The Court held that "[l]iability for design defects in military equipment cannot be imposed, pursuant to state law, when (1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States." *Id.* at 512. Those criteria are met in these cases. The military approved the

earplugs supplied by 3M.  3M's earplugs conformed to contractual requirements. 3M fully advised the government of all relevant safety information.  Hence, Plaintiffs cannot seek to hold 3M liable for complying with 3M's contracts.

The district court declined to apply *Boyle* for two reasons.  First, it held there was no "uniquely federal interest" because 3M designed the earplugs before, rather than after, it entered into the procurement contract.  That holding makes little sense. The "uniquely federal interest" arises because the government made the discretionary decision that the earplugs were satisfactory.  That "federal interest" does not lessen because of the timing of the design relative to that decision.

Second, the district court held that the first *Boyle* requirement was not satisfied because the contract did not contain any design drawings or specifications.  But that requirement makes sense only when the product does not yet exist.  When, as here, the product exists at the time the contract is signed, there should be no need for the contractor to provide drawings of the finished product.  The district court questioned whether the Army had conducted a sufficiently detailed analysis of the finished product, but the court should not have scrutinized the extent of the government's analysis. Instead, it should have found preemption because the Army exercised its discretionary authority to purchase the earplugs based on its assessment that they were safe.

The district court further erred in rejecting 3M's preemption defense to Plaintiffs' failure-to-warn claim. Contrary to the district court's view, this Court's precedents do not rigidly require, as a prerequisite for preemption, that government contracts explicitly prohibit warnings. It should be sufficient for preemption to show that the government has made a discretionary decision not to require warnings—a showing 3M has made here.

Below, Plaintiffs argued that their claims were not preempted because 3M's earplugs were also sold for civilian use. If the Court reaches this argument, it should reject it. The fact that 3M sold the earplugs to *civilians* does not show that 3M should be held liable to *soldiers*. Indeed, the effect of Plaintiffs' proposed rule is that government contractors will take their products off the civilian market, an outcome that harms civilians, soldiers, and taxpayers.

These cases are part of an MDL of astonishing scope, with claims that, if transferred to the court's active docket, would total nearly half of the pending civil cases in federal district courts. *Boyle* preemption is needed to protect government contractors from the due process violations that massive MDLs inevitably produce.

## ARGUMENT

### I.    Under *Boyle*, Plaintiffs' Suit is Preempted.

In *Boyle v. United Technologies Corp.*, 487 U.S. 500, 504 (1988), the Supreme Court held that federal law preempted certain state tort claims arising from

alleged design defects in military equipment provided by defendant contractors. *Boyle* requires finding preemption in these cases.

### A. In *Boyle*, the Court held that state tort suits cannot be used to collaterally challenge discretionary government contracting decisions.

In *Boyle*, the plaintiff filed a products-liability suit against the manufacturer of a military helicopter. The Supreme Court explained that areas "involving uniquely federal interests are so committed by the Constitution and laws of the United States to federal control that state law is pre-empted and replaced, where necessary, by federal law of a content prescribed (absent explicit statutory directive) by the courts—so-called 'federal common law.'" 487 U.S. at 504 (citation and internal quotation marks omitted). The Court stated that the tort claim "border[ed] upon two areas that … involve such 'uniquely federal interests.'" *Id.* The first was government contracting. As the Court explained, government contracts are governed by federal law, and although the case before the Court involved a tort claim brought by a third party, "it arises out of performance of the contract." *Id.* at 505. The second was civil liability for government officials. "[T]he scope of that liability is controlled by federal law," and although "[t]he present case involves an independent contractor performing its obligation under a procurement contract, rather than an official performing his duty as a federal employee, … there is obviously implicated the same interest in getting the Government's work done." *Id.*

Applying those principles, the Court determined that there is a "uniquely federal" interest in "civil liabilities arising out of the performance of federal procurement contracts." *Id.* at 505-06. "The imposition of liability on Government contractors will directly affect the terms of Government contracts: either the contractor will decline to manufacture the design specified by the Government, or it will raise its price." *Id.* at 507.

Having found a "uniquely federal interest," the Court addressed the circumstances under which state law would be preempted. First, the Court explained, a necessary condition for preemption is that "the state-imposed duty of care that is the asserted basis of the contractor's liability … is precisely contrary to the duty imposed by the Government contract." *Id.* at 509. But, the Court held, that was not a sufficient condition for preemption. *Id.* Instead, state law would be preempted only if a contract reflected the exercise of the government's discretion. The Court noted that federal law exempts federal employees from tort liability based on the exercise of a "discretionary function." *Id.* at 511 (quoting 28 U.S.C. § 2680(a)). The Court determined that "the selection of the appropriate design for military equipment to be used by our Armed Forces is assuredly a discretionary function within the meaning of this provision," requiring consideration of the "trade-off between greater safety and greater combat effectiveness." *Id.* The Court noted that "permitting 'second-guessing' of these judgments through state tort suits against

6

contractors would produce the same effect sought to be avoided by the FTCA exemption." *Id.* (citation omitted). "The financial burden of judgments against the contractors would ultimately be passed through, substantially if not totally, to the United States itself, since defense contractors will predictably raise their prices to cover, or to insure against, contingent liability for the Government-ordered designs." *Id.* at 511-12.

The Court adopted a three-part test for determining preemption: "Liability for design defects in military equipment cannot be imposed, pursuant to state law, when (1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States." *Id.* at 512. The first two conditions "assure[d] that the suit is within the area where the policy of the 'discretionary function' would be frustrated," while the third served to avoid the "incentive for the manufacturer to withhold knowledge of risks." *Id.*

### B. *Boyle*'s reasoning applies with identical force to these cases.

Plaintiffs seek to collaterally challenge a discretionary government contracting decision via a tort suit against a government contractor. That is exactly the type of suit that is preempted under *Boyle*.

Plaintiffs allege that the Combat Arms version 2 earplugs contain a design defect and that 3M failed to warn them of the alleged defect. The record establishes, however, that 3M hewed to the terms of its contracts, which were the product of discretionary government decisionmaking. Plaintiffs' suit is, as a practical matter, an attack on the military's discretionary determination that the earplugs were satisfactory and that warnings were unnecessary and unwanted.

As 3M's brief explains, Aearo (3M's predecessor) developed the earplugs in question and sent samples for review to Doug Ohlin, the manager of the Army's Hearing Conservation Program and chair of the Defense Department's Hearing Conservation Working Group. 3M Br. 34.[2] After Ohlin concluded that the earplugs were too long, 3M shortened them. *Id.* Ohlin then recommended the shortened samples for bulk purchase, and the military followed that recommendation. *Id.* Starting in 2006, the military placed purchase orders for the Combat Arms version 2 earplugs.

There appears to be no dispute that 3M complied with the terms of its contracts. Plaintiffs do not allege that 3M failed to deliver Combat Arms version 2 earplugs, or that the earplugs contained manufacturing defects that resulted in their nonconformance to the earplugs' specifications. Instead, Plaintiffs seek to impose

---

[2] "3M Br." refers to 3M's brief in Nos. 21-13131, 21-13133, and 21-13135 (Estes, Hacker, and Keefer).

liability on 3M for doing exactly what 3M's contract required 3M to do: deliver Combat Arms version 2 earplugs.  Moreover, the military's decision to purchase those earplugs plainly reflected the exercise of discretion.  The military did not order the earplugs until Ohlin analyzed them extensively and even requested changes. Plaintiffs' suit is, at core, a challenge to the military's discretionary decision to order the Combat Arms version 2 earplugs.

*Boyle*'s three-part test is therefore satisfied.  First, the military did not merely approve "reasonably precise specifications," 487 U.S. at 512; it approved the exact model of earplugs it ultimately received.  Second, 3M sent the military the earplugs that the military approved and ordered.  Third, as 3M explains (3M Br. at 37-39), the military had all the information it needed to determine whether the earplugs were sufficiently safe.  The military determined that they were—which, under *Boyle*, should be the end of Plaintiffs' case.

The same goes for Plaintiffs' failure-to-warn claim.  The record shows that the military made the reasoned, discretionary decision that the earplugs should not include 3M-written warnings.  The military elected to train its own soldiers on how to use the earplugs and to draft its own wallet card containing instructions and safety warnings.  3M Br. at 40-41.  It even went as far as to forbid 3M from shipping earplugs containing wallet cards.  *Id.*  Imposing liability on 3M because 3M followed

the military's instructions would result in the exact type of liability that *Boyle* forbids.

### C. Ruling in Plaintiffs' favor would cause harmful policy consequences.

If the Court imposes liability here, the adverse consequences of government contractor liability predicted in *Boyle* will come to fruition. As *Boyle* explained, "permitting 'second-guessing'" of the military's discretionary judgments "through state tort suits against contractors would produce the same effect sought to be avoided by the FTCA exemption." 487 U.S. at 511. "The financial burden of judgments against the contractors would ultimately be passed through, substantially if not totally, to the United States itself, since defense contractors will predictably raise their prices to cover, or to insure against, contingent liability for the Government-ordered designs." *Id.* at 511-12.

That is exactly what will happen if the Court rules for Plaintiffs in these cases. As explained further below, *infra* Part III, this is one of the biggest MDLs in American history. Any future contractor selling items in bulk to the military will know that it may face the prospect of massive liability if plaintiffs' lawyers someday disagree with the military's determination that a product is safe. To protect against such liability, every item sold by a military contractor will include a mark-up for the expected cost of funding litigation brought by plaintiff's lawyers who reject the military's conclusions. Taxpayers should not be forced to bear these costs.

10

Congress has chosen a different mechanism for advancing the important interest of ensuring that injured soldiers obtain compensation for their injuries. Pursuant to federal law, the Department of Veterans Affairs (the "VA") "offers a monthly tax-free payment to Veterans who got sick or injured while serving in the military and to Veterans whose service made an existing condition worse." U.S. Dep't of Veterans Affairs, *VA disability compensation*, https://www.va.gov/disability/ (last updated Nov. 23, 2021). A person "may qualify for VA disability benefits for physical conditions (like a chronic illness or injury) and mental health conditions (like PTSD) that developed before, during, or after service." *Id.* The VA's "process is designed to function throughout with a high degree of informality and solicitude for the claimant." *Henderson ex rel. Henderson v. Shinseki*, 562 U.S. 428, 431 (2011) (quotation marks omitted). "A veteran faces no time limit for filing a claim, and once a claim is filed, the VA's process for adjudicating it at the regional office and the Board is ex parte and nonadversarial." *Id.* at 431-32. "The VA has a statutory duty to assist veterans in developing the evidence necessary to substantiate their claims," and "when evaluating claims, the VA must give veterans the 'benefit of the doubt' whenever positive and negative evidence on a material issue is roughly equal." *Id.*

Weighty policy reasons support Congress's decision to channel disabled veterans' claims for compensation through the VA, rather than through tort suits

11

against third party contractors. The VA's process permits veterans to be compensated based on the extent of their disability, rather than based on the fault of a manufacturer that followed the government's instructions. It ensures that claims will be adjudicated by a single agency under a consistent set of standards, rather than by juries. It is non-adversarial, and prevents taxpayer money from being expended on a mark-up that will ultimately flow to both plaintiff's and defendant's counsel in product liability litigation. And it allows the military to retain discretionary decision-making authority on the appropriate balance between safety, efficiency, and price. Although Congress could have struck a different balance with respect to the relevant policy considerations, Congress has not done so, and *Boyle*—both its logic and its holding —continues to apply in cases like this one.

## II. The District Court's Rationales for Distinguishing *Boyle* Do Not Withstand Scrutiny.

The district court offered several theories for distinguishing *Boyle*. None is persuasive.

### A. Contrary to the district court's determination, there is a powerful federal interest at stake in these cases.

The district court first reasoned that there is no "uniquely federal" interest that would warrant preemption. The district court observed that at the time Aearo designed and then redesigned the earplugs, "it had no procurement contract with the Army." Dkt. 1280 at 26. Therefore, in the district court's view, "nothing explicit or

implicit in the *Boyle* holding extends its application to private companies designing products or otherwise operating without a government contract." *Id.* at 28-29. The court acknowledged that "the Army *wanted* Aearo's earplug, and, at one point, even went so far as to make clear that it would not commit to purchasing the earplugs unless" the earplugs were modified to suit the Army's needs. *Id.* at 32. "But, the design already existed—it came into existence without any input from the Army, and Aearo's subsequent actions changing the length of the [earplugs'] stem were not compelled by the terms of any government contract." *Id.*

This reasoning is misguided. The "uniquely federal interest" arose from the Army's decision to enter into a contract with Aearo to buy the earplugs. Whether that decision occurred before or after Aearo designed the earplugs is irrelevant. There is no doubt that the Army made a discretionary decision that the earplugs were satisfactory; that the procurement contract was premised on the Army's view that the earplugs were satisfactory; and that Plaintiffs are challenging the safety of the earplugs obtained *via the procurement contract*. That is sufficient to implicate a federal interest, regardless of the timing of the design relative to the procurement contract.

In reaching a contrary conclusion, the district court reasoned that the "costs of potential liability to third-parties cannot be passed along to the government where it has no contractual relationship with a private company in connection with the design

13

of a product." *Id.* at 29.  That reasoning is mistaken.  After the product is designed, the contractor can and will increase the cost of the product to compensate for the risk of potential liability in the event that a future plaintiff disagrees with the government's assessment that the product is appropriate for military use.  This is no different from the mark-up that would occur in a contract containing design specifications.  The federal interest in the two cases is identical.

Moreover, if government contractors face the risk of liability when they sell pre-designed products, contractors might refuse to sell such products and instead insist that government contracts contain custom specifications.  That outcome would harm the government's interests: it would reduce the government's purchasing options while causing prices to go up, given that the government would be responsible for funding the contractor's design costs.  It would also make products less safe, as contractors could not rely on safety testing conducted on civilian products.  There is a strong federal interest in avoiding these outcomes—which is a powerful reason to reject the district court's narrow view of *Boyle*.

Taking a different tack, the district court concluded that there is no federal interest because "[e]ven after the Army began using the [earplugs], there was no contract establishing, adopting, or even describing the design of the product." *Id.* at 26; *see id.* at 32 ("[N]one of the Army's purchase orders … including a design component.").  This in no way undermines 3M's argument that there is a unique

14

federal interest at stake. Whether there was an explicit "design component" or not, the uniquely federal interest arises from the government's discretionary decision to enter into the procurement contract—which, in these cases, involved the government's request that the contractor change the design of the relevant product (which is the very design choice that Plaintiffs claim to be defective). As noted above, permitting liability against 3M would simply require 3M to increase its prices and would have the practical effect of imposing liability on the government based on its discretionary decisions. This effect on the government's pocketbook is no less severe in cases where the contract lacks an express "design component."

### B. By buying the fully-designed earplugs, the Army approved the design of the earplugs.

*Boyle*'s first requirement for preemption is that "the United States approved reasonably precise specifications." 487 U.S. at 512. The district court found this requirement was not satisfied because "there is no evidence that the Army ever issued or received 'detailed, quantitative' descriptions or drawings of the individual component parts of the [earplugs], or of how those parts should or would be integrated together into a finished product." Dkt. 1280 at 37.

The district court's reasoning is unpersuasive. The Army does not need a description or drawing of a product that it already has. The Army signs contracts containing descriptions and drawings when the final product does not yet exist. Such

descriptions and drawings are not needed when the Army can simply review the actual finished product in deciding whether to enter into a contract to purchase it.

Hence, the Army did not merely approve "reasonably precise specifications"; it approved *exact* specifications. "Reasonably precise specifications" means that the product called for in the contract is reasonably close to the product that the Army will ultimately receive, with the contractor retaining little discretion to fill in the gaps. Here, the product called for in the contract is *exactly* what the Army ultimately received, and there were *no* gaps.

Indeed, the primary effect of the district court's decision, if upheld, would be to induce government contractors to pointlessly include design drawings and descriptions in their procurement contracts with the government. Any time a contractor sells a widget, it would gratuitously supply descriptions of the very widget the government is receiving. This would be useless, and contractors should not be forced to undertake useless actions to protect themselves from liability.

Below, the district court acknowledged 3M's argument that "the Army received something 'far better' than design drawings when Aearo provided it with production samples." Dkt. 1280 at 39. But the court rejected it on the basis that "Dr. Ohlin never received the existing detailed design drawings or descriptions, and there is no evidence that he evaluated the second production sample in any

16

meaningful way." *Id.* at 40.  The court declined to "speculate about what he may or may not have done to evaluate that sample." *Id.*

The district court's assessment of the record is mistaken.  As 3M's brief explains, Dr. Ohlin engaged in extensive review of the earplugs.  3M Br. at 33-36.  But more importantly, the extent of Dr. Ohlin's review is immaterial.  It is undisputed that he possessed, and had the opportunity to review, the final product— which is indeed far better than mere design drawings.  Dr. Ohlin made the discretionary decision to approve the earplugs, and that should be the end of the analysis.

Under the discretionary-function exception to the Federal Tort Claims Act, which underpinned the Supreme Court's reasoning in *Boyle*, courts may not look behind discretionary decisions to assess the quality of the decisionmaking process.  It is the type of the decision—not the quality of the reasoning—that counts.  So long as a decision "by its nature, involves an exercise of discretion and considerations of social, economic, political, and public policy," the government's decisions are "shielded from judicial second-guessing." *Foster Logging, Inc. v. United States*, 973 F.3d 1152, 1167 (11th Cir. 2020).

Hence, the district court was right not to "speculate about what [Dr. Ohlin] may or may not have done to evaluate that sample."  3M Br. at 40.  But this should have meant that the tort suit *was* preempted, not that it was not.  When the Army

17

examined Aearo's production samples and concluded that they were safe enough to give them to hundreds of thousands of soldiers, it undoubtedly made a discretionary decision of broad social and economic significance. That decision is therefore shielded from judicial scrutiny, regardless of how much time and effort Dr. Ohlin actually put in.

### C. The failure-to-warn claim is also preempted.

The district court further erred in rejecting 3M's *Boyle* defense to Plaintiffs' failure-to-warn claim. The court first interpreted *Dorse v. Eagle-Picher Industries, Inc.*, 898 F.2d 1487 (11th Cir. 1990), as standing for the proposition that failure-to-warn claims are preempted only when "a federal government contract affirmatively prohibits a warning or contains specific warning requirements that significantly conflict with those required by state law." Dkt. 1280 at 50. The Chamber agrees with 3M that the district court overread this Court's 32-year-old one-sentence per curiam decision adopting a district court order, which in turn merely declined to find preemption based on the absence of an affirmative warning on the specific facts of that case. 3M Br. at 42.

Moreover, the legal standard adopted by the district court makes little sense. The Army provided specific guidance to 3M that warnings were unwanted and that the Army would train soldiers on safety protocols by itself. The Army was perfectly aware—indeed it requested—that 3M not provide safety warnings. It is difficult to

18

understand why 3M's failure to memorialize this guidance into the written procurement contract should affect the *Boyle* analysis. Whether in the contract or not, the warnings were, in the Army's discretionary view, unnecessary. Plaintiffs' suit is therefore necessarily a collateral attack on that discretionary decision.

The district court insisted that the Army's instruction not to provide warnings *inside* the boxes can be ignored, because 3M always had the option of putting warnings *outside* the boxes. Dkt. 1280 at 53-54. A contractor that adopted this sort of hyper-technical interpretation of the government's instructions would not last in the procurement business for long. 3M knew that the Army was going to instruct soldiers on safety. It asked 3M not to include instructions in the boxes for that exact reason. 3M therefore knew that soldiers, required to obey orders, would follow the guidance the Army gave them, not 3M's guidance on the box that they would likely never see that was crafted for purposes of avoiding tort liability. It benefits neither the government, nor contractors, nor soldiers to oblige contractors to ignore the government's guidance and print useless small print on boxes that the soldiers will likely never see and be commanded to ignore.

### D. Plaintiffs' argument based on civilian use of the earplugs should be rejected.

In the district court, Plaintiffs argued that *Boyle* preemption should not apply because 3M sells a similar version of the earplugs to civilian users on the commercial

market. The district court did not resolve this argument. Dkt. 1280 at 27 & n.23. If this Court reaches the issue, it should reject Plaintiffs' argument.

Plaintiffs do not merely contend that 3M's civilian sales should render 3M potentially liable to *civilian* users. Instead, Plaintiffs take the position that sales to *civilians* should open the door to liability to *military* plaintiffs. That position contradicts precedent and makes little sense.

To begin, this and other courts have rejected Plaintiffs' proposed rule. "[N]o court has held that the supplier of an off-the-shelf item is ineligible for protection under the military contractor defense." *Miller v. Diamond Shamrock Co.*, 275 F.3d 414, 419 (5th Cir. 2001). And there is abundant contrary authority. In *Dorse*, for instance, the plaintiffs brought a garden-variety products liability suit against the manufacturer of cement containing asbestos. 898 F.2d at 1489. The district court's decision that was summarily affirmed noted that "the procurement of asbestos in World War II for naval ships is undeniably an area of uniquely federal interest." *Id.* Likewise, in *In re Brooklyn Navy Yard Asbestos Litigation*, 971 F.2d 831 (2d Cir. 1992), the court upheld a *Boyle* defense in a products liability case where the asbestos products at issue "were essentially off the shelf items." *Id.* at 839 (quotation marks omitted); *see also Kase v. Metalclad Insulation Corp.*, 6 Cal. App. 5th 623, 627-28 (Ct. App. 2016) (holding that products that have "long been sold

20

commercially" can qualify for *Boyle* preemption defense so long as the government makes "a considered evaluation of and affirmative judgment call about the design").

Plaintiffs' proposed rule also conflicts with *Boyle*'s reasoning. *Boyle* held that when the government makes a reasoned decision to approve a particular design, a contractor cannot be held liable for following the government's instructions. As *Boyle* explained, a plaintiff seeking to impose liability on the government in that scenario is, as a practical matter, collaterally attacking the contracting officer's discretionary decision to approve the design. 487 U.S. at 511-12. That reasoning remains equally valid regardless of whether the contractor also sells the same product to third parties.

Likewise, *Boyle* explained that permitting liability for government contractors will merely induce them to add a mark-up to their prices for the cost of settling future lawsuits challenging the government-approved design. *See id.* The need for that mark-up does not go away when the contractor also sells the same product to civilians.

The practical effect of Plaintiffs' proposed rule is that contractors will take their products off the civilian market to avoid the risk of liability to military plaintiffs. That outcome would harm every stakeholder and benefit no one. It would harm civilians by taking useful products off the market. It would harm taxpayers by preventing military contractors from offsetting their costs via civilian sales, which

would in turn force those contractors to increase their prices. It would also harm soldiers' safety. A contractor selling to civilians—and hence facing potential lawsuits from those civilians—has a powerful incentive to make its products safer regardless of whether it faces the additional threat of liability to military plaintiffs. Moreover, if a product contains a latent defect, the defect is more likely to be exposed if the product is in widespread use. In sum, there is neither a doctrinal nor a policy basis for denying a *Boyle* defense to contractors who also sell to civilians.

### III. *Boyle* is necessary to protect defendants from abusive MDLs.

The MDL that includes these cases is of remarkable scope. As of July 2021, the MDL contained 241,387 pending claims on the court's administrative docket. U.S. Chamber of Commerce Institute for Legal Reform, ILR Briefly, *Twisted Blackjack: How MDLs Distort and Extort* at 3 (Oct. 2021), https://instituteforlegal reform.com/wp-content/uploads/2021/10/ILR-Briefly-MDL-FINAL.pdf. To put that number in perspective, as of July 2021, there were 553,059 total private civil actions pending in all district courts. *Id.* This means that, if these administrative claims are transferred to the court's active MDL docket, they would compose an astonishing 43.6% of all pending private civil actions in federal district courts.

MDLs of this scope result in the breakdown of basic principles of civil litigation. In ordinary civil litigation, the defendant can file a motion to dismiss addressing specific defects in the plaintiff's complaint. If the complaint withstands

a motion to dismiss, the defendant can investigate the plaintiff's claim, determine whether it has factual support, and if not, file a motion for summary judgment.

This is not possible when there are nearly a quarter-million claims. These claims are filed using a perfunctory short-form complaint. Defendants do not have the ability to individually investigate cases, and courts do not have the ability to individually adjudicate them. Accordingly, motions to dismiss individual cases (or even motions for more definite statements) are generally impossible, and in many MDLs, are not even permitted. *Twisted Blackjack*, *supra*, at 4. In addition, outside of "bellwether" cases, defendants cannot get discovery from plaintiffs. *Id.*

The result is a snowball effect. The more cases appear in an MDL, the harder it is for the defendant and the court to individually analyze each one of them. And the harder it is to separate the wheat from the chaff, the greater incentive for a plaintiff's lawyer to add a complaint to the enormous pile, knowing that the complaint will not be investigated but that merely getting a complaint on file might assist the lawyer in obtaining a piece of a global settlement. Indeed, because of this dynamic, it has been estimated that between 20 and 30 percent, and sometimes as high as 50 percent, of claims filed in MDLs are frivolous, either because the plaintiff did not use the product in question or because the claim is time-barred. *Id.* at 5.

Neither plaintiffs nor defendants get due process in MDLs like this one. Commonly, the district court pressures the parties to enter into a global settlement,

and the defendant has little choice but to buckle in view of the massive number of unvetted claims. A settlement fund is then created, with a generous share going to the plaintiffs' lawyers and smaller shares going to individual claimants—with deserving and undeserving claimants receiving equal amounts, given the impossibility of determining who is who.

*Boyle* preemption serves as an important bulwark against such unwieldy MDLs. The government is the Nation's largest employer, and it purchases enormous numbers of goods and services from American businesses. Accordingly, a single product can be distributed to hundreds of thousands of federal employees or, as here, members of the military. If a product is allegedly defective, then contractors face a risk of unwieldy and destructive MDLs like this one—and will face the need to mark up their prices to protect against such liability. *Boyle* preemption protects defendants and taxpayers from such litigation, and the Court should apply *Boyle* according to its terms in these cases.

## CONCLUSION

The judgments of the district court should be reversed.

24

March 4, 2022

Tara S. Morrissey
Andrew R. Varcoe
U.S. CHAMBER LITIGATION CENTER
1615 H Street, NW
Washington, DC 20062

Respectfully submitted,

/s/ Adam G. Unikowsky
Adam G. Unikowsky
JENNER & BLOCK LLP
1099 New York Ave., NW Suite 900
Washington, DC 20001
(202) 639-6000
aunikowsky@jenner.com

## CERTIFICATE OF COMPLIANCE

This document complies with the type-volume limit of Fed. R. App. P. 29(a)(5) and 11th Cir. R. 35-8 because it contains 5,595 words, excluding the parts of the document exempted by Fed. R. App. P. 32(f) and 11th Cir. R. 29-3.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 2013 in 14-point Times New Roman Font.

/s/ Adam G. Unikowsky

## CERTIFICATE OF SERVICE

I hereby certify that on this 4th day of March, 2022, a true and correct copy of the foregoing Brief was served on all counsel of record in this appeal via CM/ECF.

/s/ Adam G. Unikowsky