Record No. 21-12517

UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

3M CO., ET AL.,

*Defendants-Appellants*

v.

LLOYD BAKER

*Plaintiff-Appellee*

On Appeal from the United States District Court
for the Northern District of Florida

## PLAINTIFF-APPELLEE'S RESPONSE BRIEF

Noah Heinz
KELLER POSTMAN LLC
1100 Vermont Ave.
NW Fl. 12
Washington, DC 20005

David Cooper
QUINN EMANUEL
URQUHART & SULLIVAN
LLP
51 Madison Ave. 22nd Fl.
New York, NY 10010

Christopher A. Seeger
SEEGER WEISS LLP
55 Challenger Rd. 6th Fl.
Ridgefield Park, NJ
07660

O. Carter Snead
Professor of Law
University of Notre
Dame*

Bryan F. Aylstock
AYLSTOCK WITKIN
KREIS & OVERHOLTZ,
PLLC
17 E. Main St. Suite 200
Pensacola, FL 32502

Michael Sacchet
CIRESI CONLIN LLP
225 S. 6th St. Suite 4600
Minneapolis, MN 55402

Ashley Keller
*Counsel of Record*
KELLER POSTMAN LLC
2800 Ponce De Leon
Blvd., Suite 1100
Coral Gables, FL 33134
ack@kellerpostman.com
(312) 741-5222

Sean Patrick Tracey
TRACEY FOX KING &
WALTERS
440 Louisiana St.,
Suite 1901
Houston, TX 77002

June 27, 2022              *Counsel for Plaintiff-Appellee*

---

* Institutional affiliation listed for identification purposes only.

*3M Co. v. Baker*
Record No. 21-12517

## CERTIFICATE OF INTERESTED PERSONS

Under Eleventh Circuit Rule 26.1-1, counsel for Plaintiff-Appellee hereby certifies that the Certificate filed by Defendants-Appellants is complete and correct, with the addition of the following:

- Ashley Keller – (counsel for Plaintiff-Appellee)
- Noah Heinz – (counsel for Plaintiff-Appellee)
- Keller Postman LLC – (counsel for Plaintiff-Appellee)
- O. Carter Snead – (counsel for Plaintiff-Appellee)

Dated:  June 27, 2022

Respectfully submitted,

*/s/ Ashley Keller*
Ashley Keller
KELLER POSTMAN LLC
2800 Ponce De Leon Blvd.,
Suite 1100
Coral Gables, FL 33134
ack@kellerpostman.com
(312) 741-5222

*Counsel for Plaintiff-Appellee*

## STATEMENT REGARDING ORAL ARGUMENT

Baker respectfully requests oral argument.  The motion practice and trial on appeal present complex facts, procedure, and law of the sort suited to distillation at oral argument.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ....................................................C-1

STATEMENT REGARDING ORAL ARGUMENT ............................................. i

TABLE OF CONTENTS........................................................................... ii

TABLE OF AUTHORITIES ....................................................................v

INTRODUCTION ................................................................................1

STATEMENT OF THE ISSUES...............................................................3

FACTUAL BACKGROUND....................................................................3

    A.    Berger Developed the CAEv2 by Combining Aearo's Earplug with ISL's Filter. ....................................................................5

    B.    Aearo Belatedly Tested Its Design, Revealing "Problems."................6

    C.    A 2006 Procurement Contract Required Instructions and Testing 3M Never Performed............................................................8

    D.    3M Failed to Warn of the CAEv2's Serious Risks. ...........................10

    E.    Aearo Never Told the Military About the Problems Reported in the Flange Report. ..............................................................12

    F.    The Military Gave 3M Broad Leeway to Craft Its Warnings.............14

    G.    When the Military Learned About the Flange Report, It Reacted Decisively.........................................................................15

    H.    Baker Read the Fitting Tip, but Still Was Harmed By the CAEv2. ...16

PROCEDURAL BACKGROUND............................................................19

    A.    Judge Rodgers Ruled that the Government Contractor Defense Does Not Apply..................................................................19

    B.    The Court Applied EPA Regulations.................................................20

     C.     The Jury Returned a Verdict for Baker. ...............................................21

SUMMARY OF THE ARGUMENT .......................................................22

STANDARD OF REVIEW .....................................................................24

ARGUMENT .........................................................................................25

I.    The Government-Contractor Defense Does Not Bar Baker's Failure-To-Warn Claim.........................................................................................25

     A.     The United States Has No Uniquely Federal Interest in Warnings Where Its Contracts Say Nothing About Warnings. ............................25

     B.     There Is No Significant Conflict Between Any Purported Federal Interest and State Failure-to-Warn Law. ..............................................28

          1.     3M points to no reasonably precise specification that prohibits a warning.....................................................................30

          2.     Even if the interactions 3M describes were specifications, none of them prohibited 3M from warning Baker....................32

II.    3M's Noise Control Act Argument Provides No Basis to Vacate the Judgment...........................................................................................33

     A.     This Court Lacks Jurisdiction to Set Aside EPA's Regulations. ........35

     B.     The Combat Use Exception Does not Apply. .....................................37

          1.     Under the plain text, "equipment" does not cover earplugs. ....38

          2.     At minimum, EPA's interpretation was reasonable. ...............42

     C.     Any Instructional Error Was Harmless. ..............................................44

III.    Judge Rodgers Properly Dispatched Each Evidentiary Objection. ..............48

     A.     Admitting the Air Force Memo and CID Report Was Proper. ...........48

          1.     Air Force Memo.........................................................................49

2.    CID Report ................................................................................50

B.    3M's Recognition that the NRR Values Were Unsupportable Was not a Subsequent Remedial Measure. .................................................53

C.    The District Court Properly Admitted Evidence About ARC Testing. ................................................................................................55

CONCLUSION .............................................................................................57

CERTIFICATE OF COMPLIANCE ..........................................................58

CERTIFICATE OF SERVICE ....................................................................59

# TABLE OF AUTHORITIES[*]

**Cases**                                                                    **Page(s)**

*Abreu v. United States*,
   468 F.3d 20 (1st Cir. 2006).......................................................................39

*Am. Bankers Ins. Grp. v. United States*,
   408 F.3d 1328 (11th Cir. 2005) ...........................................................24

*Andrews v. Burke*,
   779 P.2d 740 (Wash. Ct. App. 1989)....................................................45

*Bearint ex rel. Bearint v. Dorrell Juv. Grp., Inc.*,
   389 F.3d 1339 (11th Cir. 2004) ...........................................................56

*Beech Aircraft v. Rainey*,
   488 U.S. 153 (1988)...............................................................................51

*\*Boyle v. United Techs. Corp.*,
   487 U.S. 500 (1988).................................................... 25, 26, 28, 29

*Caradigm USA LLC v. PruittHealth, Inc.*,
   964 F.3d 1259 (11th Cir. 2020) ...........................................................56

*Chevron, U.S.A. Inc. v. Nat. Res. Def. Council, Inc.*,
   467 U.S. 837 (1984)................................................................... 37, 38

*Corr. Servs. Corp. v. Malesko*,
   534 U.S. 61 (2001).................................................................................29

*\*Dorse v. Eagle-Picher Indus., Inc.*,
   898 F.2d 1487 (11th Cir. 1990) ...................................................... 19, 28

*Entergy Corp. v. Riverkeeper, Inc.*,
   556 U.S. 208 (2009)...............................................................................43

*FCC v. AT & T Inc.*,
   562 U.S. 397 (2011)...............................................................................41

_____

[*] Asterisks indicate authorities upon which Baker principally relies.

v

*Glassco v. Miller Equip. Co.,
966 F.2d 641 (11th Cir. 1992) ................................................................. 25, 29

*Gray v. Lockheed Aeronautical System Co.,
125 F.3d 1371 (11th Cir. 1997) ................................................................31

Guedes v. A.T.F.,
920 F.3d 1 (D.C. Cir. 2019) ................................................................38

Gustafson v. Alloyd Co.,
513 U.S. 561 (1995) ................................................................39

Johnson v. Barnes & Noble Booksellers, Inc.,
437 F.3d 1112 (11th Cir. 2006) ................................................................55

*Jones v. Otis Elevator Co.,
861 F.2d 655 (11th Cir. 1988) ................................................................. 45, 46

Kleemann v. McDonnell Douglas Corp.,
890 F.2d 698 (4th Cir. 1989) ................................................................31

Mais v. Gulf Coast Collection Bureau, Inc.,
768 F.3d 1110 (11th Cir. 2014) ................................................................36

McDonnell v. United States,
579 U.S. 550 (2016) ................................................................39

MidlevelU, Inc. v. ACI Info. Grp.,
989 F.3d 1205 (11th Cir. 2021) ................................................................. 24, 44

*PDR Network, LLC v. Carlton & Harris Chiropractic, Inc.,
139 S. Ct. 2051 (2019) ................................................................. 36, 37

Prather v. Abbott,
Lab'ys, 960 F. Supp. 2d 700 (W.D. Ky. 2013) ................................................................55

S. Grande View Dev. Co., Inc. v. City of Alabaster,
1 F.4th 1299 (11th Cir. 2021) ................................................................24

Sapuppo v. Allstate Floridian Ins. Co.,
739 F.3d 678 (11th Cir. 2014) ................................................................27

*Schwarz v. City of Treasure Island*,
    544 F.3d 1201 (11th Cir. 2008) ..........................................................27

*Tate v. Boeing Helicopters*,
    55 F.3d 1150 (6th Cir. 1995) ..............................................................28

*Texas Indus., Inc. v. Radcliff Materials, Inc.*,
    451 U.S. 630 (1981)..............................................................................25

*United States v. Almanzar*,
    634 F.3d 1214 (11th Cir. 2011) ..........................................................52

*United States v. Barton*,
    909 F.3d 1323 (11th Cir. 2018) ..........................................................48

*United States v. Dickerson*,
    248 F.3d 1036 (11th Cir. 2001) ..........................................................48

*United States v. Dominguez*,
    226 F.3d 1235 (11th Cir. 2000) ..........................................................44

*United States v. Ethyl Corp.*,
    761 F.2d 1153 (5th Cir. 1985) ............................................................36

*United States v. Gluk*,
    831 F.3d 608 (5th Cir. 2016) ..............................................................52

*United States v. New York Tel. Co.*,
    434 U.S. 159 (1977)..............................................................................37

*United States v. Walsh*,
    8 F.3d 659 (9th Cir. 1993) ..................................................................36

*Virginia Uranium, Inc. v. Warren*,
    139 S. Ct. 1894 (2019)..........................................................................25

*Yakus v. United States*,
    321 U.S. 414 (1944)..............................................................................36

*Yates v. Pinellas Hematology & Oncology, P.A.*,
    21 F.4th 1288 (11th Cir. 2021) ..........................................................49

**Statutes**

5 U.S.C. § 703 ................................................................................35

5 U.S.C. § 706 ................................................................................35

42 U.S.C. § 4901 ..................................................................... 40, 41

42 U.S.C. § 4902 ................................................................ 38, 39, 41

42 U.S.C. § 4905 ..................................................................... 40, 41

42 U.S.C. § 4907 ............................................................................40

42 U.S.C. § 4911 ............................................................................37

*42 U.S.C. § 4915 ................................................................... 35, 36

**Rules**

Fed. R. Evid. 407 ...........................................................................53

Fed. R. Evid. 803 ...........................................................................50

**Regulations**

40 C.F.R. § 203.1 ...........................................................................43

40 C.F.R. § 204 ..............................................................................45

40 C.F.R. § 210.110 .................................................................. 35, 42

40 C.F.R. § 211 ..............................................................................43

40 C.F.R. § 211.104 ........................................................................34

*40 C.F.R. § 211.201 ............................................................ 33, 35, 42

*40 C.F.R. § 211.203 ................................................................ 34, 42

40 C.F.R. § 211.204-1 .....................................................................45

40 C.F.R. § 211.204-3 .....................................................................32

40 C.F.R. § 211.204-4 .....................................................................46

40 C.F.R. § 211.206-1 ................................................................ 34, 45

40 C.F.R. § 211.211 .........................................................................45

48 C.F.R. § 11.107 .............................................................................9

48 C.F.R. § 52.211-6 ..........................................................................9

48 C.F.R. § 52.211-7 ..........................................................................9

48 C.F.R. § 53.213 .............................................................................9

**Other Authorities**

39 Fed. Reg. 32609 (Mar. 21, 1974) ...........................................42

44 Fed. Reg. 56120 (Sept. 28, 1979) ...........................................42

44 Fed. Reg. 56130 (Sept. 28, 1979) ..................................... 20, 43

## INTRODUCTION

This case is about a warning that a jury unanimously found inadequate. 3M knew that its Combat Arms earplugs Version 2 (CAEv2) did not provide adequate protection without a special technique it devised in 2000 after testing the earplugs for the first time. A soldier with medium or larger ears would need to ensure the dome-like appendages called "flanges" on one side of the earplug were rolled back, not touching his outer ear while he wore the CAEv2. Without that technique, the flanges would push against the ear, subtly loosening the earplug, exposing him to dangerous levels of noise. Even applying the technique, the earplug would not protect at 190 decibels, or after repeated gunfire. The stem was too short for many soldiers' ears. 3M knew about these dangers since 2000, but never warned soldiers. When the United States learned that 3M had held back knowledge of the CAEv2's problems, it sued under the False Claims Act.

Lloyd Baker received two pairs of CAEv2s, the second in a blister pack with a tip that mentioned the fit "is also improved if the sealing rings of the outward directed plug are rolled back upon themselves." P-GEN-02962 at 35. As the jury found, that vague "tip" was inadequate to warn or inform Baker that the CAEv2 would fail to provide protection from harm unless he rolled the flanges back (much less the earplug's other limitations). He did not roll the flanges back. The poor fit and other problems caused permanent hearing loss and tinnitus, which the jury

determined was due partly to 3M's failure to warn under strict liability principles (62%) and partly to Baker's own conduct (38%).

3M does not contest that the evidence sufficiently supports the jury's failure-to-warn finding. Instead, 3M claims that the government contractor defense provides immunity for undisputedly inadequate warnings. That excuse founders at every step. There is no uniquely federal interest here because no contract touches on any warning. On the conflict prong, this Court has held that failure-to-warn claims are not subject to the government contractor defense absent specifications that *prohibit* a warning. 3M fails to identify any evidence of a specification prohibiting warnings about the CAEv2. Ignoring the written specifications that affirmatively require adequate instructions, 3M relies solely on one phone call that (even according to 3M's hearsay summary) only said not to place instructions inside bulk boxes. Building a global defense to all failure-to-warn claims on *that* is facially nonsensical: not only *could* 3M warn in other ways, it did so in this case (albeit inadequately).

3M's jury-instruction argument that Environmental Protection Agency regulations applicable to "hearing protective devices" do not apply to the CAEv2 fails because this Court is jurisdictionally barred from reviewing those regulations, and 3M's interpretation is wrong both on the plain text and especially after affording *Chevron* deference to EPA. Last, each evidentiary ruling 3M attacks was within the

court's discretion, and any harm was cured by limiting instructions. The jury's nuanced verdict (finding for 3M on claims such as design-defect and *negligent* failure-to-warn), shows it was careful, and not enflamed by prejudice toward 3M. The verdict should be affirmed.

## STATEMENT OF THE ISSUES

**1.** Whether the government contractor defense applies to 3M's failure-to-warn where the only relevant contract affirmatively required adequate instructions.

**2.** Whether this Court has jurisdiction to set aside EPA hearing protective device regulations, the regulations are contrary to the Noise Control Act (NCA), and supposed error on this issue substantially prejudiced 3M where the jury could consider the same standards and evidence without the regulations.

**3.** Whether the district court abused its discretion and prejudiced 3M in its evidentiary rulings.

## FACTUAL BACKGROUND

Lloyd Baker used Combat Arms Earplugs version 2, a two-sided, single-size earplug. He received a pair in packaging just like this:[1]

---

[1] 6/11/21 Tr. 156-59; P-GEN-02962 at 29, 34-35 (top right-hand page number).



As the package explains, the "green" (dark) end, like a conventional earplug, dampens all noises equally. The "yellow" end has a non-linear acoustic filter at its core, designed to let quiet sounds through, but dampen loud, sudden noises. The opposite side of the package gave instructions, warnings, and details. *See* P-GEN-02962 at 35. At trial, 3M discussed this packaging in its opening and closing, and cross-examined Baker using it: "You would have read the instructions on both the packaging and the information sheet that was contained within the blister pack,

4

correct? A. Yes." 6/11/21 Tr. 149:6-9. The jury unanimously decided the instructions and warnings 3M provided were inadequate. To understand why, one must understand the CAEv2.

## A. Berger Developed the CAEv2 by Combining Aearo's Earplug with ISL's Filter.

Elliott Berger was the "inventor" of the CAEv2, PX14 at 2, which he "developed jointly" with the French-German Research Institute of Saint-Louis (ISL). PX68 at 1;[2] *see also* PX11 (Knauer-85:22-25) (Aearo "came up with the [CAEv2's] design"). The chassis was Aearo's single-sided Ultrafit earplug, with a non-linear filter from ISL added as the core. Aearo and ISL worked together closely throughout the 1990s, culminating in ISL patenting (and Aearo licensing) a two-sided earplug, with the non-linear filter on one side. PX6. Their collaboration sparked inquiries from the military.

The civilian manager of the Hearing Conservation Program, Dr. Doug Ohlin, told ISL and Aearo that the Army was "interested in [a] 2-ended plug" in a December 16, 1997 meeting. DX2 at 3-4. After this meeting, Aearo made 25 sample 2-sided earplugs and sent them, unprompted, to Ohlin in March 1998. The next year, Aearo was still tweaking the earplugs, with no sales. It convened an internal "design review meeting" to discuss "reducing the length by ¼ of an inch." DX17 at 3. By April 27,

---

[2] "PX" or "DX" means Plaintiffs' or Defendants' Exhibit to their government contractor briefing.

1999, Aearo had new design drawings, reducing the earplug by .184 inches. *Compare* DX14 at 10 ("1.588") *with id.* at 11 ("1.404"). Aearo sent the redesigned earplugs with no technical drawings to Ohlin. On May 12, Ohlin wrote that "Aearo[] got back to us with acceptable production samples." DX3 at 4. Ohlin submitted a Request for National Stock Number (NSN) and Bulk Purchase of Combat Arms Earplugs. DX9.

The date of the first NSN is not in the record, but the military's first purchase was on August 18, 1999. PX47 at 001. Ohlin sent the Navy basic directions on the CAEv2, never mentioning that the flanges should be folded back. DX15. Aearo sold "feature identical" earplugs to civilians. PX19 (30(b)(6)-38:13-40:15, 51:5-24). Records show sales to non-military buyers by January 2000. PX47 at 001. The military received the same product Aearo had developed and was selling commercially. As Ohlin explained, "There is no DOD specification for the combat arms earplug." PX53.

## B. Aearo Belatedly Tested Its Design, Revealing "Problems."

Though Aearo had been selling CAEv2s to the military since August 1999, inventor Elliott Berger noted in mid-November 1999 that "[i]t recently occurred to us that we have no data on the actual version of the nonlinear earplug that we are now selling in the US." PX20. Technician Ronald Kieper conducted a test called Real-Ear Attenuation at Threshold (REAT), which is the test required by EPA

regulations and ANSI[3] §3.19 to evaluate the Noise Reduction Rating (NRR) of hearing protection. *See* PX22 ("per ANSI §3.19"; "EPA/Experimenter Fit"; "NRR (per EPA-1979)"); PX29 (same). NRR is the yardstick of hearing protection—ubiquitous, standardized, and salient. It measures hearing protection efficacy under ideal conditions. The original Ultrafit earplug had an NRR in the twenties, which is what the military assumed the CAEv2 had as well. *See* PX26 (Berger-559:5-13); PX11 (Knauer-117:10-17).

In Berger and Kieper's first test, the conventional side was earning an NRR of 11, which is "quite low," DX24 at 3—bad enough that Berger ordered "[t]esting stopped after 8 subjects" when the test protocol required 10. *Id.*; *see also* DX21. Because NRR is a logarithmic scale (like the Richter Scale), with an NRR around half the Ultrafit's, the CAEv2 blocked about one *tenth* the sound.

Berger and Kieper performed another test on the conventional side, but this time the "flanges were folded outward to allow deeper insertion." DX23 at 4. The NRR was hitting 20, so they completed the test, calculating an NRR of 22. PX29 at 5635. Berger emailed Myers the bad news on May 12, 2000: "Should I share this with Ohlin? It looks like the existing product has problems…" PX32. He explained, "the original study was stopped with 8 subjects" and "[t]he second study was with

---

[3] ANSI is the American National Standards Institute, a non-governmental organization that accredits and recognizes voluntary consensus standards, including for hearing protection.

the folded back flanges." PX32. Berger and Kieper drafted a report, called the Flange Report, on July 10, 2000, detailing those problems with the CAEv2, and claiming that folding back the flanges mitigated those problems. DX24. They never shared the report with Ohlin.

The jury heard Jeff Hamer, Berger's supervisor, react and explain the import of this report in his 30(b)(6) deposition: "the labeling test that 3M is using for Combat Arms Version 2 for the green end is not the appropriate test; isn't that true? A. It appears so." 6/10/21 Tr. 289:19-22; PX31 at 164:5-8 (same, in summary judgment record). He continued: "My opinion is that testing the product with the flange rolled back is improper." *Id.* at 290:20-21; PX31 at 165:25-166:1. "[D]on't you think in 2000, when 3M found this problem with this plug pulling out, they should have stopped and figured out what it was and stopped selling it until they solved it? A. I don't know that they didn't. Q. If they didn't, don't you think that would have been wrong? A. If they did not, yes." *Id.* 295:17-23; PX31 at 175:23-176:7. 3M indeed did not stop selling in 2000—but it did the day after Hamer's 2015 deposition. During those fifteen years, hundreds of thousands of soldiers like Baker used the earplugs without a warning of its dangers.

## C. A 2006 Procurement Contract Required Instructions and Testing 3M Never Performed.

In 2006, the military first executed a procurement contract, using Standard Form 1449, PX37 at 2, PX10 at 804-13, which is a "simplified acquisition

procedure[]" for "commercial products."  48 C.F.R. §53.213.  The form incorporated

basic specifications by reference:

> SECTION C-DESCRIPTION/SPECIFICATION
> ITEM IDENTIFICATION
> PLUG, EAR, COMBAT ARMS, DOUBLE-ENDED, 50 PAIR:
> SWEPT-BACK TRIPLE-FLANGE STYLE. OLIVE DRAB END
> PROTECTS USER FROM CONTINUOUS NOISE; YELLOW END
> PROTECTS USER FROM MILITARY WEAPONS NOISE.
>
> SHALL BE IN ACCOR[D]ANCE WITH MEDICAL
> PROCUREMENT ITEM DESCRIPTION NO. 2 DATED 16 JULY
> 2006.
>
> PRESERVATION, PACKAGING, PACKING LABELING AND
> MARKING FOR 6515-01-466-2710 SHALL BE AS
> SPECIFIED IN MEDICAL PROCUREMENT ITEM
> DESCRIPTION NO. 2.

PX37 at 35.  The Medical Procurement Item Description Number 2 (MPID) in turn

specified "Aearo Corporation's P/N 370-1000, or equal.  'Equal' items shall possess

the salient characteristics as specified herein."  PX37 at 41.[4]  It authorized the

"Contracting Officer" (not Ohlin) to "evaluate 'equal' products."  PX37 at 49.  The

"salient characteristics" mandated that the earplugs be accompanied by "instructions

explaining the proper use and handling of the ear plugs" specifically "on a suitable

---

[4] "Brand Name or Equal" is defined in 48 C.F.R. §11.107(a) and 48 C.F.R. §52.211-6.  The principal alternative is "Government-Unique Standards," but, even there, the government allows "Alternatives to Government-Unique Standards" that are accepted if they "meet the Government's requirements."  *See* 48 C.F.R. §§11.107(b), 52.211-7.  There is no record evidence of any applicable government-unique standard in this case.

sheet of paper which shall be placed *inside* the unit package" or "*on* the unit container."  PX37 at 41-42 (emphasis added).  The MPID also required that the "yellow end" be "empirically shown" to give "protection at sound-pressure levels up to 190 dBP(peak), even after the user has been exposed to 100 free-field noise impulses of 190 dBP(peak), minimum."  PX37 at 42.

### D. 3M Failed to Warn of the CAEv2's Serious Risks.

At trial, there was extensive evidence on what warnings were lacking:

> That the plug was too short for proper insertion; that the flanges may cause the plug to imperceptibl[y] loosen[]; and because the plug is too short, it would be difficult to fit medium and large ear canals; the geometry of the human ear canal may prevent proper fit; the only way that the NRR of 22 was obtained was by folding back the flanges of some or all people; we are not sure whether it was some or all of them based on the data provided; the yellow end of this product should only be used for infrequent gunfire; and this is the most variable (unreliable) plug we have ever tested.

6/10/21 Tr. 184:13-22 (Lustig).  Dr. Lustig testified that 3M's "failure to do that rendered this product defective."  *Id.* at 185:4-6.

The Flange Report found that the earplug loosened if the flanges are not pulled back.  It explained that "[w]hen the inward pressure on the plug was released, the yellow plug's flanges tended to return to their original shape and this sometimes loosened the plug, often imperceptibly to the subject."  DX24 at 3; *see also* 6/9/21 Tr. 65:17-66:12 (Berger at trial, same).  This loosening is imperceptible on the non-linear side because at low volumes a loose earplug and fitted earplug sound the same

(since the non-linear filter lets low-level noise through). The Flange Report also found the stem was too short for medium and large ears. It said, "plug is too short for proper insertion," and "the plug is so short, it was difficult for the experimenter to insert the plug deeply into some subjects' earcanals, especially those subjects with medium and larger earcanals." DX24 at 3. Berger re-confirmed that finding at trial. 6/9/21 Tr. 301:15-303:13; *see also, e.g.*, 6/8/21 Tr. 116:20-117:12; 129:11-130:3; (bioacoustical expert McKinley).

Despite the express MPID requirement of empirically shown protection up to 190 decibels after 100 shots, 3M's own documents show the yellow, non-linear side never met that standard. In 2010 Berger was "unconvinced" that studies taken to date demonstrated that *any* earplug using the ISL filter was "protective at 190 dBP for at least 100 exposures," and even the unconvincing studies were done on a different earplug. P-GEN-109 at 2 ("its mounting in the plug is different as is the length of the plug"). Beyond recognizing that "CAEs will not reduce 190 dB explosions to a safe level," internal emails between 3M's technical specialists and audiologist recognized that "CAE is not the optimal choice for a gun range." P-GEN-124 at 1, 2.

3M does not appeal on sufficiency grounds, so the jury's determination that the warnings were inadequate is unchallenged.

**E. Aearo Never Told the Military About the Problems Reported in the Flange Report.**

3M concedes it *never* sent the Flange Report to the military,[5] *see, e.g.*, PX80 (Berger-206:12-13)—a damning fact it obscures by claiming, "Aearo told the military about the flange report's *conclusions*." Op.Br. at 39 (emphasis added). But the only "conclusion" that 3M contends reached the military is a "fitting tip," Op.Br. at 12. And that tip had the wrong content, wrong emphasis, and lacked context. For warnings (as for statutes and contracts) "The difference between the almost-right word and the right word is really a large matter—it's the difference between the 'lightning-bug' and the 'lightning.'" J. Bartlett, *Familiar Quotations* 527 (16th ed. 1992) (Mark Twain).

The fitting tip is the lightning-bug: none of the variants of the "tip" adequately instructed or warned. To see why, consider that all agree the "fitting tip" reached Baker on the CAEv2 blister pack, but 3M does not argue the warning he saw was adequate as a matter of law (because it plainly was not). The Army wallet card 3M emphasizes suggested, without context, "For very large ear canals,"—not medium or larger—"fold opposing plug back." DX41. Ohlin supposedly also told

---

[5] Some 3M witnesses stood by that decision: "Q. So you think it's okay to conceal the information that says the Combat Arms plug is too short for proper insertion? You think that's okay to conceal that from the government? A. Yes." 6/11/21 Tr. 317:10-21.

audiologists "if you needed to, you could fold back the flange on the earplug to get a good fit."  DX58 at 98:2-3; *id.* at 98:1 ("I don't remember his exact words").[6]

The military plainly did not appreciate the gravity of the fitting tip—exactly what one would expect from partial information.  A 70-page official Army Manual titled "Personal Hearing Protective Devices Their Fitting, Care and Use" discussed the CAEv2.  PX64 at 13-16, 30-31.  The manual had a chapter on fit and included specific instructions and pictures showing insertion without folding flanges back:

**Proper and Improper Fit of the Double-Ended Combat Arms Earplug** (Figures 53 and 54, respectively)**.**

    

*Figure 53*                    *Figure 54*

*Proper (left) and Improper (right) Insertion of the Double-Ended Combat Arms Earplug*

---

[6] 3M cites DX66 to claim audiologists knew flanges should be rolled back, Op.Br. at 10, but the source is a *3M employee* who submitted a made-for-litigation declaration.  As Plaintiffs protested below, this is improper, inadmissible evidence because it sidesteps the *Touhy* process for testimony by former federal employees, without which there is no authorization to testify.  *See* Dkt.1089 at 9 n.5.  The district court did not reference this improper declaration in its summary judgment order.  Seeing the problem, 3M improperly bolsters its point with *trial* testimony, Op.Br. at 10-11, but that testimony was not before the district court at summary judgment.

13

PX64 at 31. The 70-page manual nowhere mentions folding flanges.[7] 3M cites irrelevant military testing between 2001 and 2015, but none of that testing used folded flanges, which is inexplicable if Aearo told the military the basic conclusions of the Flange Report. *See* DX7, DX45-52 (cited in Op.Br. at 16).

### F. The Military Gave 3M Broad Leeway to Craft Its Warnings.

The military never required or prohibited any particular warning. The MPID required "instructions explaining the proper use and handling of the ear plugs," but left the content up to 3M. PX37 at 41-42. Far from dictating content, Ohlin ran the military's wallet card by Myers and Berger. DX39. As for the supposed prohibition on instructions, Ohlin's emails make clear that he prioritized getting the instructions right: "I'm all for clear instructions, but what is the cost of individual packaging? … How much will this add? My concern for any earplug issue is that they are going to be handed out without proper instructions." *E.g.*, DX38.

The blister pack warning Baker saw was unambiguously crafted by 3M. 3M "prepared the attached insert" and emailed the insert to Ohlin, asking if he had any "comments"; but 3M ultimately chose how to incorporate his one comment, and passed on the label to Marc Santoro for his "final review." DX43 at 1. 3M

---

[7] 3M incorrectly claims that when "no flanges were folded back, the CAEv2 exceeded the government's mean attenuation expectations at every frequency." Op.Br. at 40 n.3. This contradicts even Berger's position and ignores that the mean attenuation fell below the *minimum* for about three test subjects out of eight at each frequency. DX21 at 5.

emphasized its warning in closing argument: "Mr. Baker had that information directly from 3M…. [To] decide whether 3M warned Mr. Baker about information, remember that Mr. Baker's second pair came in a blister pack. It had information on the outside and the inside." 6/18/21 Tr. 130:10-14. No shred of evidence suggests the military ever dictated the content of warnings or instructions for the CAEv2.

### G. When the Military Learned About the Flange Report, It Reacted Decisively.

Though the "fitting tip" lightning-bug did not illuminate CAEv2's problems, the lightning of the Flange Report did. 3M discontinued the CAEv2 *the day after* disclosing the Flange Report as a deposition exhibit. PX31 (Oct. 7, 2015 deposition); PX38 (Oct. 8, 2015 email: "Please cease shipping immediately"). Following that disclosure, the United States intervened in a False Claims Act suit against 3M, alleging that "3M, and its predecessor Aearo, knew that the CAEv2 was too short for proper insertion in users' ears and, therefore, did not perform as well in certain individuals. Additionally, the United States alleges that 3M did not disclose this information to the United States and delivered the CAEv2 to the United States knowing that the product contained defects that impaired the CAEv2's serviceability." *United States ex rel. Moldex-Metric, Inc. v. 3M Co.*, 3:16cv1533, ECF.No. 23-1 ¶C (D.S.C. May 12, 2016). 3M settled for $9,100,000; the United States did not withdraw its allegations. *Id.*

15

The United States' investigation confirmed it did not know about the CAEv2's problems. The United States conducted "numerous interviews and record reviews" on CAEv2 "testing results and the contracting process." P-GEN-0009 at 2. The conclusion: "[H]ad they known about the February 2000 test results (i.e. that the CAE was too short for proper insertion in the users' ears and, therefore, did not perform well in certain individuals) … they may not have purchased the items." *Id.* 3M put an excerpt of the Report into the record as DX13. Unsurprisingly, the Army Public Health Center Division Chief said "the manufacturer should have informed the military of this problem, so that the military could [have] advised the sold[i]ers of the slippage problem.… Because of the manufacturer's failure to inform, the US Government doesn't know what it is really receiving." DX13 at 4. The Air Force recalled the CAEv2 from inventory. P-GEN-2586.

## H. Baker Read the Fitting Tip, but Still Was Harmed By the CAEv2.

Following both of his grandfathers, Lloyd Baker enlisted in the Army, serving on active duty from 2005 through 2009 and in the reserves after that. 6/11/21 Tr. 64, 66, 222. Before serving, he had no hearing loss or tinnitus. 6/11/21 Tr. 71:4-12. Just after Thanksgiving 2005,[8] Baker received a second pair of CAEv2 with packaging and instructions—a pair of earplugs he still has today, and which were admitted into evidence. 6/11/21 Tr. 71-77; P-GEN-15067 (Baker's CAEv2s). The

---

[8] The trial record gives more than one possible date, but all agree he received them.

16

following are the warnings and instructions Baker read:[9]



---

[9] P-GEN-02962 at 35.

It includes "Attenuation Data" calculated under ANSI §3.19; it mentions EPA regulations twice; it notes that "Fitting … is also improved if the sealing rings of the outward directed plug are rolled back upon themselves." Baker felt protected and never folded the flanges back. 6/11/21 Tr. 101.

The CAEv2 caused Baker's hearing loss and tinnitus. In December 2005, Baker noticed muffled hearing after firing indoors during a training exercise while wearing the CAEv2s. 6/11/21 Tr. 83-84. On leave over Christmas, in the first quiet rest he had in weeks, he noticed ringing in his ears. 6/11/21 Tr. 85. Over the next few years, he deployed to Germany and Iraq, using the CAEv2s throughout his tours and training. 6/11/21 Tr. 88, 101. He was ultimately diagnosed with hearing loss and tinnitus. 6/11/21 Tr. 111:20-22. It has continued to get worse. He has children, but testified he cannot "hear my child crying in the middle of the night." 6/11/21 Tr. 114:13-18. At trial, he told the jury the ringing in his ears was "the loudest thing in the room right now, it's louder than my own voice." 6/11/21 Tr. 118:9-12. And he knows "[t]he tinnitus will get louder as I get older and the hearing loss will progress." 6/11/21 Tr. 116:16-19.

3M does not challenge the jury's determination that 3M's failure to warn caused Baker's hearing loss and tinnitus.

## PROCEDURAL BACKGROUND

Baker was one of thousands of soldiers with hearing loss and tinnitus who sued 3M. The Judicial Panel on Multidistrict Litigation consolidated all cases before Judge Rodgers in the Northern District of Florida.

### A. Judge Rodgers Ruled that the Government Contractor Defense Does Not Apply.

After discovery, both sides moved for summary judgment on the government contractor defense. Dkt.1071, 1072. The district court granted Plaintiffs' motion and denied Defendants' in a thorough, well-reasoned decision. Dkt.1280.

The court rejected the government contractor defense with a pair of alternative holdings. First: "the uniquely federal interests underlying the creation of a federal common law defense in the context of federal procurement contracts … simply do not exist in the absence of a government contract." Dkt.1280 at 29. Second, on the conflict prong, the court also ruled for Baker because no "specifications … contain any prohibition against health warnings on the product." *Dorse v. Eagle-Picher Indus., Inc.*, 898 F.2d 1487, 1489 (11th Cir. 1990); Dkt.1280 at 44-45. The court reached the same result under 3M's preferred test, finding "no evidence—none— that the Army prohibited Aearo from warning of alleged dangers inherent in the use of the CAEv2." Dkt.1280 at 53. With two independent bases resolved, the court declined to reach whether the CAEv2s conformed to any specifications and whether 3M warned the government of the dangers.

19

## B. The Court Applied EPA Regulations.

Part of 3M's negligent conduct involved violating EPA regulations. Before this litigation, no one doubted those regulations—for "hearing protective devices"—applied to military earplugs. During notice-and-comment, EPA reported that "major consumption of hearing protectors is in the military and industrial segments of the market." *Estes*.Dkt.41-52 at 47. After learning that, "The Agency explored the possibility of conflict with Department of Defense Military Specifications (DOD MIL. SPEC.) on product and product package labeling." 44 Fed. Reg. 56130, 56133 (Sept. 28, 1979) (final rule preamble). After robust interagency review, "DOD MIL. SPEC, experts assured us that there were no apparent conflicts, and that if conflict should develop, the specifications would be changed to incorporate the Agency's regulatory requirements." *Id.* No one challenged EPA's regulations in the D.C. Circuit, the exclusive venue for such a challenge.

3M argued the CAEv2 were designed for combat use, and so the Act did not apply, but the district court rejected that argument. *Estes*.Dkt.53 at 23-24. Following DOD and EPA's conclusion decades earlier, the district court held that the combat use exception applies to loud things like guns, trucks, and so forth, not hearing protective devices. Under Washington law (which applies here), violations of regulations do not demonstrate breach but can be considered, and so the district court set forth the text of four regulations. *Baker*.Dkt.182 at 25. It then instructed

20

that Baker claimed 3M violated the regulations by labeling the CAEv2 with an inaccurate NRR value, failing to follow ANSI §3.19 testing procedures, and failing to "provide instructions as to the proper insertion or placement of the CAEv2." *Baker*.Dkt.182 at 26.

### C. The Jury Returned a Verdict for Baker.

At trial, 3M continued its fruitless attempt to blame the government, this time as a superseding cause, sophisticated intermediary, or one of the entities to whom the jury could apportion blame. 3M argued the government knew all about CAEv2's defects, prompting Baker to introduce (and the district court to admit) an Air Force Memorandum, P-GEN-2586, and summary pages from a Criminal Investigative Command report, P-GEN-0009, which showed the military did not know about the defects. The district court gave careful limiting instructions not to consider the documents for their truth. *E.g.*, 6/8/21 Tr. 199:14-19; 6/10/21 Tr. 272:7-11, 273:7-8; 6/8/21 Tr. 215:13-24.

3M objected to evidence about quality-control lapses with its acoustic resistance checker (ARC box), but the court ruled those were directly relevant to the negligence claim, failure to warn, and to refute 3M's false claims of world-class quality. Dkt.1695 at 19; *Baker*.Dkt.209 at 3. 3M objected only under Rules 401 and 403 (not 404), and the district court properly denied the objection. The district court also properly overruled a Rule 407 objection and admitted two statements from a

21

series of emails from 2015 in which 3M employees noted that the product could not be sold with the NRR value as-is.

Hearing the extensive evidence about the CAEv2's risks—which 3M knew about for decades—the jury returned a verdict for Baker on failure-to-warn, but no other counts. The court instructed that the jury could apportion fault to Baker for "negligently using the product." *Baker*.Dkt.182 at 39. The jury awarded compensatory damages, but found Baker 38% at fault for his injuries, and 3M 62% at fault. *Baker*.Dkt.183 at 4.

## SUMMARY OF THE ARGUMENT

**I.** The district court correctly held that 3M cannot satisfy the elements of the government contractor defense. The Supreme Court explained that this implied, federal-common-law defense is narrow, applying only where a contractor cannot comply both with state law and its contractual obligations to the government. 3M could.

First, there is no federal procurement contract addressing the state-law duty in question (the duty to instruct and warn adequately of the CAEv2's risks), and so no uniquely federal interest arising from that contract that could conflict with state-law duties. 3M forfeited any argument against the district court's ruling on this point.

Second, if there were a uniquely federal interest, it would not conflict with state law because there is no specification that prohibited 3M from adequately

instructing or warning Baker, which is required to invoke the defense under binding precedent from this Court. There are no conflicting specifications because the MPID affirmatively requires adequate instructions. If the specifications are supposed to be something else, such as Ohlin's phone call, the defense would fail because even 3M's hearsay account of that phone call does not suggest that it somehow overruled the written specifications or actually prohibited warnings. Indeed, 3M did warn Baker, inadequately, using the blister pack, and there is no evidence that the government allowed 3M to warn but required it to do so inadequately.

**II.** The district court properly instructed the jury that EPA regulations govern the CAEv2 because the regulations by their terms apply to all hearing protective devices. 3M's attempt to nullify the regulation is jurisdictionally barred, defies the plain language of the NCA, cannot overcome *Chevron* deference, and in any case would be harmless error. The very same standards and evidence were at issue whether the jury received this instruction or not.

**III.** The district court gamely resolved hundreds—if not thousands—of evidentiary rulings, and the three 3M challenges were well within its discretion. 3M challenges the Air Force Memo on hearsay grounds, but lodged no contemporaneous objection. The Memo showed the Air Force's knowledge, an important non-hearsay purpose, and rebutted 3M's false, but repeated, claim that the military knew about the CAEv2's defects. The CID report is admissible under Rule 803(8) as a summary

of an investigation.  The emails admitting the CAEv2 labeling was inadequate were properly admitted because they directly show a problem with the label, and so do not fall under Rule 407.  The acoustic resistance checker evidence was proper to show negligence and to rebut 3M's claims of excellence.  None of 3M's arguments plausibly show error, especially after curative instructions.  Most of the challenged evidence goes to the design of the CAEv2 anyway, and 3M won that claim.

## STANDARD OF REVIEW

"This court reviews … cross-motions for summary judgment *de novo*, applying the same legal standards used by the district court." *Am. Bankers Ins. Grp. v. United States*, 408 F.3d 1328, 1331 (11th Cir. 2005).  The Court "review[s] jury instructions *de novo* to determine whether they misstate the law," "subject to harmless error review." *MidlevelU, Inc. v. ACI Info. Grp.*, 989 F.3d 1205, 1215 (11th Cir. 2021).  Preserved objections to "[e]videntiary rulings are reviewed under an abuse of discretion standard," but "even a clearly erroneous evidentiary ruling will be affirmed if harmless." *S. Grande View Dev. Co., Inc. v. City of Alabaster*, 1 F.4th 1299, 1305 (11th Cir. 2021).

## ARGUMENT

## I.    THE GOVERNMENT-CONTRACTOR DEFENSE DOES NOT BAR BAKER'S FAILURE-TO-WARN CLAIM.

The district court ruled for Baker on the government contractor defense on alternative grounds: there was no uniquely federal interest and there was no conflict. Both grounds are correct.

### A. The United States Has No Uniquely Federal Interest in Warnings Where Its Contracts Say Nothing About Warnings.

Federal common law arises "only in such narrow areas as those concerned with the rights and obligations of the United States, interstate and international disputes implicating the conflicting rights of States or our relations with foreign nations, and admiralty cases." *Texas Indus., Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 641 (1981). And because federal preemption arrogates power from sovereign states, courts applying federal common law must "respect not only what Congress wrote but, as importantly, what it didn't write." *Virginia Uranium, Inc. v. Warren*, 139 S. Ct. 1894, 1900 (2019) (Gorsuch, J., plurality).

This Court has followed that rule to reject attempts to apply the government-contractor defense loosely to failure-to-warn claims. *E.g.*, *Glassco v. Miller Equip. Co.*, 966 F.2d 641, 643-44 (11th Cir. 1992). It should follow that sober course again.

In *Boyle v. United Techs. Corp.*, 487 U.S. 500 (1988), the Supreme Court held that federal common law exists only on topics of "uniquely federal interest." *Id.* at

25

504. The Court analogized from two uniquely federal interests (the government's rights and obligations under its contracts and federal officer immunity) to identify a third uniquely federal interest in "civil liabilities arising out of the performance of federal procurement contracts." *Id.* at 506. Because the defense focuses on "the performance of federal procurement contracts," *id.*, the relevant "performance" must turn on specific "terms of Government contracts," *id.* at 507. Where a defendant posits that "performance" of a contract precluded a warning, there can only be a uniquely federal interest if a contract term addresses warnings or, at minimum, the feature to be warned about.

The district court correctly applied that rule here. It held that because 3M could point to no substantive contract addressing any relevant feature of the product, "uniquely federal interests that *Boyle* sought to protect are not impacted *in this litigation*." Dkt.1280 at 32 (emphasis added). In fact, 3M relies on no contract on appeal, and has not even placed a contract it contends is relevant in the record. *See generally* Op.Br. App'x Vols. I-XII. No defect in this case touches on the "obligations to and rights of the United States" under its contracts. *Boyle*, 487 U.S. at 504. 3M cannot, therefore, demonstrate that imposing "liability … w[ould] directly affect the *terms* of Government *contracts*." *Id.* at 507 (emphasis added).

3M forfeited any appeal of this correct holding. An appellant seeking "reversal of a district court judgment that is based on multiple, independent grounds"

26

must demonstrate "that every stated ground for the judgment against him is incorrect." *Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 680 (11th Cir. 2014). Far from demonstrating error, 3M uses the term "uniquely federal interest" just once, in its legal background section, Op.Br. at 4, and proffers *no argument* that the district court erred on this threshold issue. 3M perhaps assumed that, because "design" comes up far more in the first section of the district court's opinion, that section was *limited* to designs. But this would be incoherent. If there is *no federal procurement contract*—and so no uniquely federal interest—the defense applies to no claims. By "fail[ing] to challenge properly on appeal one of the grounds on which the district court based its judgment, [3M] is deemed to have abandoned any challenge of that ground, and it follows that the judgment is due to be affirmed." *Sapuppo*, 739 F.3d at 680.

Alternatively, there is no uniquely federal interest because the CAEv2 was a commercial product. *See* Dkt.1072 at 11-13 (making this argument for "failure-to-warn claims"). The district court did not "address the merits of Plaintiffs' commercial availability argument." Dkt.1280 at 27 n.23. 3M did not brief this issue. Because the "district court never addressed the issue and the parties' arguments on appeal did not focus on it," the Court should remand if it does not affirm. *Schwarz v. City of Treasure Island*, 544 F.3d 1201, 1228 (11th Cir. 2008).

**B. There Is No Significant Conflict Between Any Purported Federal Interest and State Failure-to-Warn Law.**

Finding a uniquely federal interest "merely establish[es] a necessary, not a sufficient, condition." *Boyle*, 487 U.S. at 507. State law still applies unless it "significant[ly] conflict[s]" with federal common law. *Id.* The Court fashioned a three-part rule for conflict:

> (1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States.

*Id.* at 512. *Boyle's* test was articulated in a design-defect case, but its principles apply to the failure-to-warn context as well. In *Dorse v. Eagle-Picher Indus., Inc.*, this Court adopted and republished the district court's sound ruling. 898 F.2d 1487 (11th Cir. 1990). Applying *Boyle*'s conflict principles, this Court rejected the government contractor defense because the written "Navy Department specifications d[id] not contain any prohibition against health warnings on the product." *Id.* at 1489. That provides a bright-line rule for this case: 3M can only prevail by identifying specifications that prohibited an adequate warning. The very precedents 3M cites have recognized that the *Dorse* rule is stringent, "requir[ing] a higher level of government involvement" than the test 3M prefers. *Tate v. Boeing Helicopters*, 55 F.3d 1150, 1157 (6th Cir. 1995) (citing *Dorse*, 898 F.2d at 1489).

28

There is no doubt on what *Dorse* says, and any doubt that it applies was removed by *Glassco*, 966 F.2d at 644, which held that "*Dorse* pertains to whether the government contractor defense is available with respect to a duty to warn claim," and "reverse[d] the grant of summary judgment" for the defendant as "inconsistent with *Dorse v. Eagle-Picher Industries, Inc.*" *Id.* at 644 & n.4. The district court in *Glassco* erred in precisely the way 3M urges here, applying *Boyle* loosely rather than following the simple rule from *Dorse*.[10] 3M's arguments defy this Court's precedents, and must be rejected.

Moreover, *Dorse* is just an application of the conflict-preemption principle that the government contractor defense grants immunity only where the government "direct[s] a contractor to do the very thing that is the subject of the claim." *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 74 n.6 (2001); *see also Boyle*, 487 U.S. at 509 (if "[t]he contractor could comply with both its contractual obligations and the state-prescribed duty of care," then "[n]o one suggests that state law would generally be pre-empted"). *Dorse* recognizes that design features are mutually exclusive in a way warnings rarely are, and so, unlike with designs, specifying one set of warnings does not automatically preempt an additional warning. Unless the government directed

---

[10] The district court "obtained and reviewed the [*Glassco*] district court's summary judgment order," Dkt.1280 at 50 n.43, which is not widely available, and so is included in the appendix to this brief.

29

the contractor *not* to warn, such that it could not comply with its obligations to the government if it did warn, there is no conflict.

      *1. 3M points to no reasonably precise specification that prohibits a warning.*

Applying the correct test, this case is simple, because no specification prohibiting CAEv2 warnings exists. To the contrary, the only written specification is the MPID, which affirmatively requires adequate instructions. PX37 at 41-42 (requiring "instructions" on a "sheet of paper which shall be placed inside the unit package" or "on the [50-]unit container").

3M's only response to this straightforward truth is to repeatedly cite a single exhibit, which reflects self-serving hearsay by one 3M employee about a phone call he once had with Ohlin. *See* Op.Br. at 33-34 (citing DX62). Ohlin—who died before this suit—supposedly said on this call "not to include instructions" inside the bulk box for CAEv2s. Op.Br. at 33 (quoting DX62 at 326). The 3M employee did not "recall if anyone else was on the call," or when it occurred. DX62 at 327-28.[11]

---

[11] This directly contradicted the MPID, and even 3M's 30(b)(6) witness disagreed. PX51 at 287:3-288:7 ("[A]re you saying the Army actually denied you the right to give an instruction or a warning …?" "I don't ever recall them telling us that we couldn't include something."). Plus, requiring 3M not to provide adequate instructions would be highly out of character for Ohlin, who told 3M: "My concern for any earplug issue is that they are going to be handed out without proper instructions." DX38.

Regardless of whether it happened, one-off phone calls are not *specifications*. Ohlin certainly did not think any call he had with 3M was a specification. PX9(Ohlin-168:17-23) ("I don't know of any specification for the Combat Arms Earplug."); PX53 ("There is no DOD specification for the combat arms earplug."). Plus, Ohlin was not a contracting officer and lacked authority to override the MPID.

The insufficient specifications for the S-3 Navy plane are instructive. *Gray v. Lockheed Aeronautical System Co.*, 125 F.3d 1371 (11th Cir. 1997). Lockheed wrote 54 pages of specifications for the servo (a part that links the pilot to movable wing flaps) and "incorporated it into its bid to the Navy for the S-3's contract." *Id.* at 1378. Those specifications gave "the general requirements for the aileron servo, *i.e.*, automatic reversion if both hydraulic systems fail, and servos with manual reversion on ailerons," but were insufficient because "[t]he ultimate design of the product is determined *not only* by the original procurement and contract specifications, *but also* by specific, quantitative engineering analysis developed during the actual production process." *Id.* (quoting *Kleemann v. McDonnell Douglas Corp.*, 890 F.2d 698, 702 (4th Cir. 1989)) (emphasis added). And so, "although the narrative may embody some aspects of the servo's specifications, it does not comprise the *precise design specifications* that the *Boyle* test requires." *Id.* (emphasis added).

The comparison of the insufficient 54-page description with the dubious phone call 3M proffers is so absurd as not to need belaboring. Notably, the absence of *any* reasonably precise specification of a warning—much less a contractual specification prohibiting a warning—spells doom for 3M whether applying *Dorse* or another circuit's test.

### 2. *Even if the interactions 3M describes were specifications, none of them prohibited 3M from warning Baker.*

Even if 3M were correct on what Ohlin said and whether it was a specification, the defense does not apply. First, the call concerned "instructions"—*i.e.*, how to use the CAEv2—not a safety warning of its risks. 3M has not argued that Ohlin decided no *warnings* should be included, *see* Op.Br. at 47-51 (discussing only his comment on instructions); he undisputedly did *not know* warnings were needed. Second—as the district court correctly noted—3M could have put warnings on the outside of the bulk box. 3M's only response is to scoff, ridiculing the "possibility of providing useless instructions on the outside of a bulk shipment box." Op.Br. at 37. Its scorn is unjustified. EPA regulations and the MPID both require instructions or warnings to be placed on the outside of bulk boxes. PX37 at 41-43; 40 C.F.R. §211.204-3 & -4. When regulators and the military require instructions and warnings on the outside of a bulk box, doing so can hardly be called useless.

Finally, even if 3M were right about bulk boxes, there is a further problem: Baker received and read the blister pack 3M drafted. Obviously, 3M was not barred

from warning him, because it *did* warn him.  The jury found that warning inadequate, which 3M has not challenged on appeal.  3M provides no explanation of why it could not have changed the content of the blister pack to warn adequately.  No one contends Ohlin called years ago to demand that the warning be inadequate, and nothing in the government contractor defense shields a contractor from liability for providing an inadequate warning when it could have provided an adequate one.

***

After ruling against 3M on "the first element of the *Boyle* three-part test," the district court did "not address the remaining two elements," Dkt.1280 at 34 n.28, which would require an "even deeper dive into even murkier factual waters," Dkt.1329 at 11 n.5.  No Eleventh Circuit case has discussed how to evaluate compliance with specifications or ensuring the military was aware of relevant risks for a failure-to-warn case.  If this Court vacates the district court's order, it should remand.

## II.    3M'S NOISE CONTROL ACT ARGUMENT PROVIDES NO BASIS TO VACATE THE JUDGMENT.

After notice-and-comment rulemaking, EPA promulgated labeling regulations under the NCA for "hearing protective devices" in September 1979. These regulations "apply to *all hearing protective devices* manufactured after [1980]," 40 C.F.R. §211.201 (emphasis added), and require specific information, determined through standardized testing, to appear on the label of such devices, *see*

33

40 C.F.R. §211.104. "[H]earing protective devices" are "[a]ny device or material, capable of being worn on the head or in the ear canal, that is sold wholly or in part on the basis of its ability to reduce the level of sound entering the ear," 40 C.F.R. §211.203(m), which unambiguously covers the CAEv2.

Under Washington state law, violating a "regulation is not necessarily negligence, but may be considered … in determining strict liability and/or negligence." *Baker*.Dkt.182 at 26. The district court properly quoted four specific EPA regulations. *See id.* at 25 (quoting 40 C.F.R. §§211.206-1(a), 211.211, 211.204-1(b)(1), 211.204-4(e)). 3M has long recognized that EPA regulations apply to the CAEv2,[12] and does not base its argument here on anything in the regulation. Instead, it argues the regulations are contrary to the text of the NCA.

That argument fails for multiple reasons. First, the NCA funnels all challenges to agency regulations through the D.C. Circuit, meaning this Court lacks jurisdiction to set the regulation aside. Second, Baker prevails under either the plain text of the NCA or *Chevron* deference if the term "equipment" is ambiguous. Third, any error was harmless.

---

[12] Berger concluded "the NRR must be on all products, including those sold to the military" after he "researched this topic extensively." PX35 at 2. He noted that Federal Register responses to comments specifically flagged "hearing protectors sold to the military," never suggesting the military was "exempt." *Id.* at 7. Hamer—Berger's supervisor—agreed that EPA "require[s] that all hearing protection devices carry an NRR." 6/10/21 Tr. 281:12-23.

34

### A. This Court Lacks Jurisdiction to Set Aside EPA's Regulations.

3M's brief proceeds on the assumption that if the NCA does not apply to the CAEv2, then EPA regulations do not apply, but that premise is mistaken. The regulations at issue carefully define their object: "all hearing protective devices manufactured after [1980]." 40 C.F.R. §211.201. There is no combat use exception in the regulation. *See* 40 C.F.R. §210.110 (listing exemptions). A party to whom a regulation applies generally cannot defend by pressing its preferred interpretation of the underlying statute *de novo*. The proper path is to challenge the regulation as contrary to law under the Administrative Procedure Act. 5 U.S.C. §706(2). The APA renders regulations "subject to judicial review in civil or criminal proceedings for judicial enforcement." 5 U.S.C. §703.

3M's statutory argument could be construed to challenge the regulation under the APA, but if so runs into a jurisdictional bar. Under 42 U.S.C. §4915(a), pre-enforcement challenges to "labeling regulation[s] under section 4907 … may be filed only in the [D.C. Circuit]." 42 U.S.C. §4915(a). 3M agrees that the regulations at issue were "promulgated" under "§4907(a)(1)-(2)." Op.Br. at 41. This case is not a *pre*-enforcement challenge, but the jurisdictional section requires that "[a]ction of [the EPA] Administrator with respect to which review *could have* been obtained under this subsection shall not be subject to judicial review in civil or criminal proceedings for enforcement." *Id.* (emphasis added). In other words, under the

statute, if *pre-enforcement* review was available, section 4915(a) renders it the *exclusive* avenue to challenge the regulation, changing the ordinary rule that a party can challenge a regulation after being sued.

Because review of 3M's challenge could have been obtained in a pre-enforcement challenge, section 4915(a) bars its argument to this Court. 3M's arguments are the traditional stuff of pre-enforcement challenges: a purely legal argument that follows from a comparison of the statute's and regulation's text. That challenge could have been brought years ago in the D.C. Circuit. Had that occurred, EPA would have defended its longstanding regulation, and any ruling would apply nationally, rather than to individuals litigating the validity of a federal regulation as a small part of a case. Since it did not, this Court lacks jurisdiction to invalidate the regulations. *See Mais v. Gulf Coast Collection Bureau, Inc.*, 768 F.3d 1110, 1120 (11th Cir. 2014) ("[W]hichever way it is done, to ask the district court to decide whether the regulations are valid violates the statutory requirements.") (citation omitted).

Courts regularly enforce similar jurisdictional provisions. *See Yakus v. United States*, 321 U.S. 414, 436 (1944); *United States v. Ethyl Corp.*, 761 F.2d 1153, 1155 (5th Cir. 1985); *United States v. Walsh*, 8 F.3d 659, 664 (9th Cir. 1993). The NCA's statutory text is a carbon copy of text from statutes where Congress unambiguously intends to bar review. *PDR Network, LLC v. Carlton & Harris Chiropractic, Inc.*,

36

139 S. Ct. 2051, 2059 (2019) (Kavanaugh, J., concurring in judgment) (reviewing identical text under CERCLA, the Clean Air Act, and the Clean Water Act).

3M may argue this action is not one for "enforcement," but it is. The NCA expressly contemplates that a private party may "under … common law … seek enforcement of any noise control requirement." 42 U.S.C. §4911(e). That is exactly what Baker is doing here. His suit is a classic "private enforcement suit." *PDR Network, LLC*, 139 S. Ct. at 2055 (repeatedly describing a private lawsuit as enforcement of a regulation). What matters is not whether the government is involved, but whether a lawsuit has commenced (enforcement) or not (pre-enforcement). Were it otherwise, 5 U.S.C. §703 would not apply to suits like these, which is the predicate for judicial review of regulations under the APA in the first place.

The Court cannot set aside the regulation, and so 3M's statutory argument is unavailable to set aside the judgment.[13]

## B. The Combat Use Exception Does not Apply.

Assuming this Court has jurisdiction, the proper question is whether EPA's decision to regulate all hearing protective devices passes muster under *Chevron,*

---

[13] This jurisdictional issue was not briefed below, but jurisdiction can be raised at any point, and "the prevailing party may defend a judgment on any ground which the law and the record permit that would not expand the relief it has been granted." *United States v. New York Tel. Co.*, 434 U.S. 159, 166 n.8 (1977).

*U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984).[14]

Under that familiar regime, step one asks "whether Congress has directly spoken to

the precise question at issue." *Id.* at 842. But "if the statute is silent or ambiguous

with respect to the specific issue," step two asks "whether the agency's answer is

based on a permissible construction of the statute." *Id.* at 843. Here, the "precise

question at issue" is whether EPA could regulate the CAEv2's label, or whether it

was statutorily exempt from regulation as "military weapons or equipment which

are designed for combat use." 42 U.S.C. §4902(3)(B). Under either step, the

regulations stand.

### *1. Under the plain text, "equipment" does not cover earplugs.*

The term "equipment" consistently refers to noise-emitting articles, and bears

that meaning in the combat use exception. The statutory exception 3M invokes turns

on the definition of "product," which includes "any manufactured article or goods

or component thereof" except:

> (A) any aircraft, aircraft engine, propeller, or appliance…; or
> (B)(i) any military **weapons** or **equipment** which are designed for
> combat use; (ii) any **rockets** or **equipment** which are designed for
> research, experimental, or developmental work to be performed by the
> National Aeronautics and Space Administration; or (iii) to the extent
> provided by regulations of the Administrator, any other **machinery** or

---

[14] 3M challenges *Estes*.Dkt.53, *see* Op.Br. at 20, which focuses on the plain text, but
the briefing addressed agency deference. *See Estes*.Dkt.41 at 31. This Court is not
limited to the district court's reasoning, but has a duty to apply proper "doctrine
about statutory meaning." *Guedes v. A.T.F.*, 920 F.3d 1, 22 (D.C. Cir. 2019).

**equipment** designed for use in experimental work done by or for the Federal Government.

42 U.S.C. §4902(3)(B) (emphasis added). Under the *noscitur a sociis* canon: "a word is known by the company it keeps." *McDonnell v. United States*, 579 U.S. 550, 569 (2016). Courts rely on this canon when a general term might otherwise give "unintended breadth to the Acts of Congress." *Gustafson v. Alloyd Co.*, 513 U.S. 561, 575 (1995) (citation omitted). Here, "equipment" is in the company of "weapons," "rockets," "machinery," and "aircraft engine[s]," all of which make noise. The only Court of Appeals to construe these terms (addressing section 4903) understood the term "equipment" to apply to noise-making products. *See Abreu v. United States*, 468 F.3d 20, 33 (1st Cir. 2006) ("The federal requirements applicable to *noise emissions by products*, however, expressly exclude 'any military weapons or equipment which are designed for combat use.'" (emphasis added)).

3M describes the NCA's substantive provisions as a "two-sided prohibition (noise-producing or reducing)," Op.Br. at 43, but maintains this view only by the myopia of its statutory analysis. Zooming out, the statute requires EPA to identify and report on noise sources (§4904), promulgate binding "noise emission standards" (§4905), and require labeling and recordkeeping by manufacturers (§§4907, 4912). It tells all agencies to follow local noise ordinances (§4903) and procure low-noise-emission products (§4914). All of these provisions focus on noise emission. The *only* provision that addresses noise-reducing products—and therefore the only

39

provision 3M mentions in its brief—is section 4907.  But section 4907 does not use the term "equipment," and so sheds no light on that term's meaning.  Under section 4907, the EPA "Administrator shall by regulation designate any product (or class thereof) … sold wholly or in part on the basis of its effectiveness in reducing noise," 42 U.S.C. §4907(a), and the "regulations shall specify" "its effectiveness in reducing noise" including "the methods and units of measurement to be used," *id.* §4907(b).  Nothing in section 4907 suggests that noise-*reducing* products are "equipment" exempt from those labeling regulations.

The first section of the NCA reconfirms that "equipment" means a product that *produces* noise.  It includes a congressional finding "that the major sources of noise include transportation vehicles and equipment, machinery, appliances, and other products in commerce."  42 U.S.C. §4901(a)(2).  Echoing its finding, Congress required EPA to propose regulations applying to any "major source of noise … in one of the following categories:"

> (i) Construction equipment.
> (ii) Transportation equipment (including recreational vehicles and related equipment).
> (iii) Any motor or engine (including any equipment of which an engine or motor is an integral part).
> (iv) Electrical or electronic equipment.

42 U.S.C. §4905(a)(1) (emphasis added).  Standards promulgated on "equipment" under section 4905 are the remedy for the finding in section 4901 that "equipment" is a major source of noise.

The parallel use of "equipment" in this central provision confirms that "equipment" as used in the combat use exception of section 4902 is not referring to noise-reducing products.  Start with the presumption that "identical words and phrases within the same statute should normally be given the same meaning." *FCC v. AT & T Inc.*, 562 U.S. 397, 408 (2011) (citation omitted).  Here, sections 4901 and 4905 use the term "equipment" six times, and in each instance the word refers *only* to noisy products.  When Congress chose to exempt "equipment" from the labeling provision, each time separated by a disjunctive that placed the word alongside a noisy product, it meant the same thing: noise-*emitting* products were exempt.  *See AT & T Inc.*, 562 U.S. at 409.

This straight-forward interpretation of "equipment" is bolstered by the logic of the provisions.  Congress has good reason to exempt the military from mandatory standards requiring noise reduction that could impair performance.  One obvious concern is section 4905(a)(1)(iii), which requires standards on "any equipment of which an engine or motor is an integral part."  That appears to cover, for example, the Stryker personnel carriers Baker drove in Iraq. *Cf.* 6/11/21 Tr. 93-98.  Relatedly, section 4914 makes federal procurement standards even higher.  The government must procure "low-noise-emission product[s]" (that is, "significantly below … standards … under section 4905") if the products are "no more than 125 per centum" of the conventional price. *Id.* §4914(a), (c).  Congress sensibly did not want to

41

require the military to pay more for quieter Strykers. The combat use exception forecloses that requirement, consistent with longstanding exceptions military vehicles have from pollution emissions standards. *See, e.g.*, 39 Fed. Reg. 32609, 32612 (Mar. 21, 1974). There is no similar logic to exempting noise-reducing products from labeling requirements. The NCA's text, structure, and logic establish that the CAEv2 falls outside the combat use exception.

### 2. At minimum, EPA's interpretation was reasonable.

EPA regulations unambiguously apply to "hearing protective devices," 40 C.F.R. §211.201, and have no exception for combat use. *See* 40 C.F.R. §211.203(m) (defining "hearing protective devices"); 40 C.F.R. §210.110 (listing exemptions).

That text is the result of a careful choice. "In all, the Agency received 735 written comments by the close of the comment period, and took oral testimony from 51 individuals, organizations and businesses at the three public hearings." 44 Fed. Reg. 56120, 56120 (Sept. 28, 1979). It learned that "major consumption of hearing protectors is in the military and industrial segments of the market." *Estes*.Dkt.41-52 at 47. One commenter "asserted that there was conflict between Department of Defense medical purchase packaging requirements and [proposed] labeling requirements." *Id.* at 69. In response, EPA "worked closely with representatives of the Department of Defense," and its ultimate regulations "received concurrence from all parties*." Id.* at 70. After interagency coordination, "DOD MIL. SPEC. experts

42

assured us that there were no apparent conflicts, and that if conflict should develop, the specifications would be changed to incorporate the Agency's regulatory requirements." 44 Fed. Reg. 56130, 56133 (Sept. 28, 1979) (final rule preamble). That the MPID and EPA regulations to this day require the same thing illustrates productive interagency cooperation.

Under *Chevron*, EPA's determination that hearing protective devices do not fall within the combat-use exception "governs if it is a reasonable interpretation of the statute—not necessarily the only possible interpretation, nor even the interpretation deemed *most* reasonable by the courts." *Entergy Corp. v. Riverkeeper, Inc.*, 556 U.S. 208, 218 (2009). At minimum, the term "equipment" in the combat-use exception is silent or ambiguous and *could* mean the same thing "equipment" means in the rest of the statute. EPA recognized that logic, exempting equipment designed for combat use from its low-noise-emissions-products regulation, 40 C.F.R. §203.1(a)(4)(ii)(a), but not its noise-reduction labeling regulations, 40 C.F.R. §211. That conclusion was reasonable, and this Court should defer to it.

**C. Any Instructional Error Was Harmless.**

"Jury instructions are subject to harmless error review." *MidlevelU, Inc.*, 989 F.3d at 1215 (internal quotation marks omitted).[15]  Here, any error was harmless for three reasons.

First, the split verdict confirms the EPA regulations were not determinative. The court instructed the jury on the same EPA regulations for all "strict liability or negligence claims," 6/18/21 Tr. 31:20, which included design defect, negligent failure-to-warn, and strict liability failure-to-warn, but the jury ruled *for 3M* on two of them.  Indeed, the *only* relevant difference in the elements for the two failure-to-warn counts is that negligence required a deviation from the ordinary standard of care, while strict liability failure-to-warn did not.  *See id.* at 29:9-19.  A "split verdict evidences that the jury necessarily must have considered the charges individually and assessed the strength of the evidence as to each charge."  *United States v. Dominguez*, 226 F.3d 1235, 1248 (11th Cir. 2000).   If the regulations were

---

[15] If 3M means to challenge more than the jury instruction, it failed to preserve that challenge.  *Compare* 6/15/21 Tr. 15:20-21 (stating an "objection to the negligence per se instruction") *and Baker*.Dkt.198 at 13 (the "instruction was thus in error"); *with* 6/7/21 Tr. 36 (opening, no relevant objection); 6/9/21 Tr. 26 (Berger testimony, no objection); *and* 6/18/21 Tr. 53 (closing, no objection).  *See MidlevelU, Inc.*, 989 F.3d at 1219 (Where a defendant "fails to explain a specific objection to any evidentiary ruling, [] it has abandoned that issue.").  To the extent 3M is arguing that the jury imposed liability based on its pre-2000 sale of untested CAEv2 to the military, that would have patently violated the court's causation instruction, since Baker did not use those earplugs.

dispositive, Baker would have won on all counts where the regulations applied. The instruction concerning the standard of care—*i.e.*, that EPA regulations may be relevant (though not determinative) of that standard—plainly was not the basis for the jury's finding in Baker's favor on the strict liability failure-to-warn claim.

Second, even if the regulations were not binding on 3M because of the combat use exception, the instruction stated only that they could be considered relevant, and for that purpose, they were "probably admissible as an industry standard." *Jones v. Otis Elevator Co.*, 861 F.2d 655, 661 (11th Cir. 1988); *see also Andrews v. Burke*, 779 P.2d 740, 742 (Wash. Ct. App. 1989). The regulations did not require much: testing under ANSI §3.19 (40 C.F.R. §211.206-1(a)); including "mean attenuation" on the label (40 C.F.R. §211.211); stating the NRR correctly (40 C.F.R. §211.204-1(b)(1)); giving instructions (40 C.F.R. §204-4(e)). The instructions explained that Baker "claims that 3M violated" the regulations in three ways: no accurate NRR; testing out-of-compliance with ANSI §3.19, and no adequate instructions. *Baker*.Dkt.182 at 26.

ANSI §3.19 was a relevant standard of care either way, and the MPID required the same thing as the EPA regulations did. *Compare* PX37 at 42 (CAEv2s must "be tested in accordance with ANSI §3.19") *with* 40 C.F.R. § 211.206-1 (same); PX37 at 41-43 (requiring "instructions explaining the proper use and handling of the ear plugs" be "placed inside the unit package" or "on the unit container," defined as "50

45

pairs") *with* 40 C.F.R. § 211.204-4 (for "bulk packaging" "supporting information must be affixed to the bulk container"). 3M's Flange Report testing protocol was "NRR (per EPA-1979)," or, equivalently, "ANSI 3.19." *See* PX22, PX29. And the label Baker saw used "Wording required by EPA" and noted "EPA has selected the NRR as the measure of a hearing protector's noise reducing capabilities." P-GEN-02962 at 35.

Given those facts, there was no plausible way for 3M to dispute that the substance of the EPA regulations was *relevant to negligence*, which is all the instruction said. Indeed, 3M has never proffered the defense that it could freely use inaccurate NRRs or that ANSI §3.19 was irrelevant. 3M has argued that it was not required to include instructions with the CAEv2, but its quarrel on that is not with EPA regulations but bedrock failure-to-warn law it agrees applies, under which a product is defective if "adequate warnings and/or instructions were not provided with the product." *Baker*.Dkt.182 at 19. In *Jones*, the court found a negligence *per se* instruction harmless, 861 F.2d at 661—here, as 3M recognized, the regulations were only "evidence," unlike "other states" in which "it was, you know, a silver bullet, if we violated it, we're liable." 6/15/21 Tr. 17. Because the same basic standards would have applied anyway, any instructional error was harmless.

Third, "the existence of an ordinance was not necessary to substantiate the jury's verdict for the plaintiff," *Jones*, 861 F.2d at 661, because there was ample

failure-to-warn evidence without it. The trial lasted two weeks, involved multiple expert witnesses, and extensive company documents. For example, the MPID required that the "yellow end" be "empirically shown" to give "protection at sound-pressure levels up to 190 dBP(peak), even after the user has been exposed to 100 free-field noise impulses of 190 dBP(peak), minimum." PX37 at 42. 3M never empirically showed this—to the contrary, in 2010 Berger was "unconvinced" that studies taken to date demonstrated that *any* earplug using the ISL filter was "protective at 190 dBP for at least 100 exposures," and even the unconvincing studies were done on a different earplug. P-GEN-109 at 2 ("its mounting in the plug is different as is the length of the plug"). 3M employees admitted, "CAE is not the optimal choice for a gun range," and "CAEs will not reduce 190 dB explosions to a safe level." P-GEN-124 at 1, 2. 3M never told soldiers that. 3M also never told soldiers, including Baker, that the CAEv2 would not provide adequate protection unless the flanges were folded back. Indeed, 3M does not even attempt to dispute that the evidence—without the regulations—was more than sufficient to support the verdict. Viewing all the evidence, the district court—which sat through the trial—denied 3M's motion for a new trial in part for lack of any prejudice. *Baker*.Dkt.209 at 3. This Court should not second-guess that finding.

47

## III.  JUDGE RODGERS PROPERLY DISPATCHED EACH EVIDENTIARY OBJECTION.

When reviewing evidence objections, this Court asks "only whether the trial court abused its discretion in making its gatekeeping [evidentiary] determination." *United States v. Barton*, 909 F.3d 1323, 1335 (11th Cir. 2018). A purported error is harmless when it "had no substantial influence on the outcome and sufficient evidence uninfected by error supports the verdict." *United States v. Dickerson*, 248 F.3d 1036, 1048 (11th Cir. 2001).

Of the hundreds of evidentiary issues that arose before and during trial, 3M appeals three, none of which were erroneous.  And aside from hand waving at a "profoundly distorted trial," Op.Br. at 67, 3M has not shown that these rulings, individually or collectively, warrant undoing a jury trial inundated with unchallenged and un-appealed evidence supporting the verdict.

### A. Admitting the Air Force Memo and CID Report Was Proper.

3M first takes issue with two exhibits showing the military's knowledge of the CAEv2's performance and efficacy: 1) the Air Force Memorandum reflecting instructions to remove the CAEv2 from inventory upon learning that 3M concealed testing information from the government, P-GEN-2586; and 2) the Criminal Investigative Command report concluding the CAEv2 stem was too short, the government did not know about 3M's testing, and that it may not have purchased the earplugs if it had known, P-GEN-0009.  Both exhibits were highly probative of

48

Baker's claims and 3M's sophisticated intermediary and apportionment defenses; neither was hearsay.

The simplest reason to reject 3M's arguments on both is that any error was harmless. The jury ruled *for 3M* on the design defect claim, presumably not crediting evidence that the CAEv2 was defective, whether properly or improperly admitted. While products with inadequate warnings are "defective" in a sense, that would not be a reason to recall them (Air Force Memo) or "get them out of people's ears," Op.Br. at 51 (quoting 6/18/21 Tr. 75:4-10). One would simply change the warning.

### 1. *Air Force Memo.*

3M appears to have failed to preserve a hearsay objection—its brief certainly does not point to one.[16] Since it cannot point to an objection for the first time on reply, this Court should "decline[] to conduct a plain error analysis *sua sponte*." *Yates v. Pinellas Hematology & Oncology, P.A.*, 21 F.4th 1288, 1298 (11th Cir. 2021).

---

[16] *See* Op.Br. at 50 (citing 6/8/21 Tr. 199, with no objection). At trial, 3M did not object, but did request, *after* admission: "And we would just ask, Your Honor, for the instruction." 6/8/21 Tr. at 196:22-23. 3M's pre-trial objections to P-GEN-02586 appear at *Baker*.Dkt.129-1 at ECF 18, which objects on 403, and incorporates "3M MIL #06" and "#16." This presumably means 3M's Omnibus Motion *in Limine*, Dkt.1664, but that motion says nothing about the Air Force Memo. *See also Estes*.Dkt.70 (order addressing the omnibus motion). 3M moved for reconsideration of the same exhibit-list order in a related case, *again* only on Rule 403, never mentioning hearsay. *See McCombs*, 7:20cv94, Dkt.120.

The district court admitted the memo pre-trial "only for the jury's consideration of [the] military's knowledge of problems with the CAEv2." *Baker*.Dkt.129-1 at 18. At trial, the court admitted the memo "to rebut Defendants' repeated contentions that the military (including the Air Force) knew everything about the CAEv2 through experience, testing in military labs, communications from Defendants, and that the military was satisfied with the CAEv2's performance." *Baker*.Dkt.209 at 4; *see also* 6/7/21 Tr. 8:13-15 (government fault at issue); 110:1-17 (comments about government knowledge in opening).[17]

This approach demonstrated caution and restraint, as the Memorandum—signed by the Headquarter of the U.S. Air Force and the Associate Chief of the Air Force Medical Readiness Agency and setting out the office's routine activities—was also admissible as a public record for its truth. *See* Fed. R. Evid. 803(8)(A)(i); *cf. Hacker*.Dkt.141 at 2-4 (admitting Ohlin Emails under Rule 803(8)); *Blum*.Dkt.99 at 5 (explaining why the public records exception likely applies).

    2. *CID Report.*

The CID report was also highly probative of the military's knowledge, as it was specifically commissioned to "determine whether or not the United States

---

[17] 3M "strategically opted not to obtain Vietas' testimony" during discovery, *Blum*.Dkt.99 at 4, and his deposition is not in the record. 3M defied the district court's orders months after trial by taking it in a separate proceeding. The transcript further confirmed that the Air Force Memo is highly probative of the Air Force's knowledge and state-of-mind. *See Blum*.Dkt.91. at 5-8.

government and the Army knew about Defendants' test results from 2000 and whether that was material to their decision to purchase the CAEv2." Dkt.1693 at 7 (citing Coleman Dep. Tr. 26:7-29:9, 53:22-54:10); *Baker*.Dkt.129-1 at 3; *Baker*.Dkt.209 at 3-4 (post-trial order). Factual findings and related conclusions contained within an authorized investigative report like the CID report are admissible for their truth when they satisfy Rule 803(8)'s trustworthiness requirement. *See Beech Aircraft v. Rainey*, 488 U.S. 153, 170 (1988).

3M has never disputed the trustworthiness of the CID report. Instead, 3M argued below and regurgitates here a blatant mischaracterization of the report—that it "simply repeated the interviewees' statements." Op.Br. at 51. To the contrary, as the district court recognized, the investigation was conducted to "provide the United States Attorney's Office 'fact-based, unbiased investigative findings that reflect impartiality.'" Dkt.1693 at 7 (citing Coleman Dep. Tr. 26:7-29:9, 53:22-54:10). To that end, Special Agent Coleman analyzed and weighed numerous written materials and sworn depositions from Defendants' witnesses alongside her interviews of government personnel, which "*confirmed* that had they known about the February 2000 test results … on the CAE they may not have purchased the items." *Id.* (emphasis in original); *see also* P-GEN-0009 at 2-4. Ultimately, "the final report was approved by SA Coleman's supervising agent and was circulated outside of the CID," which "is exactly the sort of 'factual findings from a legally authorized

51

investigation' that 803(8)[A](iii) is designed to exclude from the prohibition on hearsay." Dkt.1693 at 6-8 (quoting *United States v. Gluk*, 831 F.3d 608, 613 (5th Cir. 2016)).

3M's complaints about "the district court's decision to admit the summary but exclude the underlying notes" are nonsense. Op.Br. at 52. Facing the same issues it addressed in the Estes, Hacker and Keefer trial of 3M's launching misleading attacks on the report while demanding it not be admitted, the court again required 3M to decide whether to open the door or toe the line—3M chose the latter. 6/8/21 Tr. 214:5-215:9 ("I may conduct some cross on it, but I am sticking to the language of the document and not going out of those boundaries[.]"). The district court cannot be blamed for 3M's foisting the "worst of both worlds" on itself. Op.Br. at 52.

3M can show no prejudice from the Air Force memo or CID report because the jury heard other evidence conveying the same information, which 3M has not appealed. *See, e.g.*, P-GEN-2602. Moreover, the district court cured any potential prejudice with contemporaneous and repeated instructions not to consider the statement "were found to be defective" for its truth. *See* 6/8/21 Tr. 199:14-19; 6/10/21 Tr. 272:7-11, 273:7-8. *See also* 6/8/21 Tr. 215:13-24 (CID report, same). Courts presume juries follow instructions. *See United States v. Almanzar*, 634 F.3d 1214, 1222 (11th Cir. 2011).

## B. 3M's Recognition that the NRR Values Were Unsupportable Was not a Subsequent Remedial Measure.

The district court was correct and precise in construing Rule 407. That rule explains that "[w]hen measures are taken that would have made an earlier injury or harm less likely to occur, evidence *of the subsequent measures* is not admissible to prove … culpable conduct." Fed. R. Evid. 407 (emphasis added). The essence of Rule 407 is preventing the unwarranted inference that simply because some later measure occurred, the prior state of affairs was negligent. But merely because a remedial measure follows an admission of negligence does not mean the *admission* must be excluded. Consider the statement: "The CAEv2 is defective, and so we recalled it." Under 3M's logic, this would be inadmissible, since it gives "the very *reasons*" for the recall. Op.Br. at 53. But the stated reasons, as opposed to the remedial measure itself, are fair game for the jury's consideration.

That principle applies here. The court redacted statements like, "The business team has put this product on hold." P-GEN-128 at 5. That statement is a classic 407 problem, because nothing in the statement *other than* the inference from the "hold" suggests an issue with the product. By contrast, the statements "[w]e cannot ship any further products with current labeling" and "we cannot distribute this with the current NRR on the package," P-GEN-128 at 1, 3, acknowledge that the labeling is deficient directly. They do not mention the eventually undertaken remedial measures, and so fall outside of Rule 407's orbit. In any event, 3M *did not* recall the

53

CAEv2 (for example, they did not notify anyone), as it told the jury in closing: "No, the company didn't recall the product, nor have they been ordered to recall the product." 6/18/21 Tr. 122:5-6.

Any error admitting this evidence was in any event harmless. First, this evidence is cumulative. Myers testified that in 2015: "Q. I mean, you were a person that was out telling people to stop shipping these and destroy them, right? A. The language I used was, 'Please dispose of them.'" 6/15/22 Tr. 289:17-19. 3M does not now appeal admission of this equivalent statement. The Air Force Memo similarly shows a recall (by the Air Force) and is not subject to a 407 challenge.

Second, this evidence was a small part of a two-week trial. The closing theme was not about these emails: "When we started this two weeks ago almost, Mr. Tracey began with three truths. Three truths: That 3M sold its new unusual Combat Arms Earplug without first testing it. First truth. When 3M finally did test, the tests showed its Combat Arms Earplug didn't work. And after that, 3M hid the truth for 15 years." 6/18/21 Tr. 48:13-19. Experts and other witnesses testified extensively about the warning deficiencies. *E.g.*, 6/10/21 Tr. 115, 148-49, 174, 139, 184, 191 (Lustig); 6/8/21 Tr. 87-88, 116; (McKinley); 6/14/21 Tr. 94, 96, 127, 175 (Packer). There is no reason to think the jury gave great weight to the 2015 emails.

Third, the jury ruled for 3M on design defect, meaning it did not accept that the product was defective beyond the label. That means the jury *did not believe* the

product needed to be withdrawn, only that *compliant* warnings should be added.  The discontinuation plainly had no bearing on the jury's verdict, and so there is no "substantial and ineradicable doubt as to whether the jury was properly guided in its deliberations." *Johnson v. Barnes & Noble Booksellers, Inc.*, 437 F.3d 1112, 1115 (11th Cir. 2006).

### C. The District Court Properly Admitted Evidence About ARC Testing.

Despite making no contemporaneous Rule 404 objection, 3M next contends that evidence of quality-control issues with 3M's ARC box was prior-bad-act evidence.  The only plain error here is 3M's mischaracterization of the ruling, which did not admit the ARC testing as propensity evidence but correctly found it *directly* relevant to Baker's claims.  Dkt.1695 at 19; *Baker*.Dkt.209 at 3 (referencing "reasons stated in the Court's prior Orders," likely referring to *Keefer*.Dkt.177 at 3-4, *Hacker*.Dkt.194 at 3-4, and *Estes*.Dkt.175 at 3-4).  For example, as a part of the MPID's "100 percent … acoustical impedance test" requirement, 3M's ARC-box testing was relevant to the Baker's negligence claims.  *Hacker*.Dkt.194 at 4 ("A failure to conduct adequate safety tests tends to show that a manufacturer did not exercise reasonable care in its production of the product.") (quoting *Prather v. Abbott Lab'ys*, 960 F. Supp. 2d 700, 713 (W.D. Ky. 2013)).  The issues revealed by the ARC testing and subsequent waivers also demonstrate 3M's failure to warn and circumstantial evidence of its motive, knowledge, and intent for the fraud claims.

The ARC-testing revealed chronic problems with the CAEv2s that 3M failed to correct for many years, opting instead to issue waivers of its own rules.  *See, e.g.*, P-GEN-2449; P-GEN-55; 6/8/21 Tr. 168:14-169:22.  Moreover, 3M itself put the "overall quality assurance process for the CAEv2," Dkt.1695 at 18-19, at issue by introducing evidence of how "proud" Berger was of his work on the CAEv2, 6/9/21 Tr. 185:2-16; that he is the "chair" of an ANSI working group setting hearing protection standards, *id.* 187:12-18; and the certifications of their "accredited laboratory," *id.* 195:17-18, which Baker was entitled to rebut with the ARC-testing issues.  *See Bearint ex rel. Bearint v. Dorrell Juv. Grp., Inc.*, 389 F.3d 1339, 1349 (11th Cir. 2004) ("This Circuit recognizes the concept of 'curative admissibility'— also called 'opening the door' or 'fighting fire with fire.'" (citation omitted)).

Last, 3M fails to explain how the evidence affected the trial's outcome*, see Caradigm USA LLC v. PruittHealth, Inc.*, 964 F.3d 1259, 1276 (11th Cir. 2020), though the vague theory it offers makes no sense.  3M bases its prejudice argument on a supposedly illicit link between "quality-control failures in *manufacturing*" and "quality-control failures in *designing* the CAEv2."  Op.Br. at 56.  But any conceivable prejudice on quality-control failures in the CAEv2's design are conclusively harmless because 3M won on the design defect claim.  Where it lost— failure-to-warn—there was no prejudice.

## CONCLUSION

This Court should affirm the judgment.

Dated: June 27, 2022                    Respectfully submitted,

                                        */s/ Ashley Keller*

Noah Heinz                O. Carter Snead           Ashley Keller
KELLER POSTMAN LLC        Professor of Law          KELLER POSTMAN LLC
1100 Vermont Ave.         University of Notre Dame  2800 Ponce De Leon
NW Fl. 12                                           Blvd., Suite 1100
Washington, DC 20005      Bryan F. Aylstock         Coral Gables, FL 33134
                          AYLSTOCK WITKIN KREIS     ack@kellerpostman.com
David Cooper              & OVERHOLTZ, PLLC         (312) 741-5222
QUINN EMANUEL             17 E. Main St. Suite 200
URQUHART & SULLIVAN       Pensacola, FL 32502
LLP                                                 Sean Patrick Tracey
51 Madison Ave. 22nd Fl.  Michael Sacchet           TRACEY FOX KING &
New York, NY 10010        CIRESI CONLIN LLP         WALTERS
                          225 S. 6th St. Suite 4600 440 Louisiana St.,
Christopher A. Seeger     Minneapolis, MN 55402     Suite 1901
SEEGER WEISS LLP                                    Houston, TX 77002
55 Challenger Rd. 6th Fl.
Ridgefield Park, NJ
07660

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 12,920 words, excluding the parts exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a) because it has been prepared in a proportionately spaced typeface using Microsoft Word Times New Roman 14-point font.

Dated: June 27, 2022

/s/ Ashley Keller
Ashley Keller
*Counsel for Plaintiff-Appellee*

**CERTIFICATE OF SERVICE**

On June 27, 2022, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Eleventh Circuit by using the CM/ECF system.  All participants in this case are registered CM/ECF users, and service will be accomplished by the CM/ECF system.

*/s/ Ashley Keller*
Ashley Keller
*Counsel for Plaintiff-Appellee*

59