No. 21-12517

# UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

—————————

3M COMPANY, *et al.*

*Defendants-Appellants*,

v.

LLOYD BAKER,

*Plaintiff-Appellee.*

—————————

On Appeal from the United States District Court
for the Northern District of Florida
Nos. 3:19-md-2885, 7:20-cv-137, 7:20-cv-39

—————————

## REPLY BRIEF FOR DEFENDANTS-APPELLANTS

—————————

GEORGE W. HICKS, JR.
KASDIN M. MITCHELL
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue, NW
Washington, DC 20004
(202) 389-5000

COLE CARTER
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL 60654
(312) 862-2000

PAUL D. CLEMENT
 *Counsel of Record*
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
paul.clement@clementmurphy.com

*Counsel for Defendants-Appellants*

October 20, 2022

*3M Company, et al. v. Baker*, No. 21-12517

## CERTIFICATE OF INTERESTED PERSONS
## AND CORPORATE DISCLOSURE STATEMENT

Pursuant to Eleventh Circuit Rule 26.1-1, counsel for Defendants-Appellants 3M Company, 3M Occupational Safety LLC, Aearo Holdings LLC, Aearo Intermediate LLC, Aearo Technologies LLC, and Aearo, LLC hereby certifies that the following is a complete list of the trial judge(s), all attorneys, persons, associations of persons, firms, partnerships, or corporations that have an interest in the outcome of the particular case on appeal, including subsidiaries, conglomerates, affiliates, and parent corporations, including any publicly held corporation that owns 10% or more of the party's stock, and other identifiable legal entities related to a party:

- 3M Company (**MMM**) – Defendant-Appellant

- 3M Occupational Safety LLC – wholly owned subsidiary of Defendant-Appellant 3M Company

- Aearo Holdings LLC – wholly owned subsidiary of Defendant-Appellant 3M Company

- Aearo Intermediate LLC – wholly owned subsidiary of Defendant-Appellant 3M Company

- Aearo Technologies LLC – wholly owned subsidiary of Defendant-Appellant 3M Company

- Aearo, LLC – wholly owned subsidiary of Defendant-Appellant 3M Company

- Aylstock Witkin Kreis & Overholtz – counsel for Plaintiff-Appellee

- Aylstock, Bryan Frederick – counsel for Plaintiff-Appellee

*3M Company, et al. v. Baker*, No. 21-12517

- Barr, Brian H. – counsel for MDL Plaintiffs

- Beall, Charles Franklin, Jr. – counsel for Defendants-Appellants

- Benton, Diana Clough – counsel for Defendants-Appellants

- Bhimani, Jay L. – counsel for Defendants-Appellants

- Bouk, Winston Troy – counsel for MDL Plaintiffs

- Bradley Arant Boult Cummings – counsel for Defendant-Appellant 3M Company

- Branscome, Kimberly O. – counsel for Defendants-Appellants

- Brock, Robert C. – counsel for Defendants-Appellants

- Brown & James – counsel for Plaintiff-Appellee

- Brown, Micah David – counsel for Defendants-Appellants

- Buchanan, David R. – counsel for Plaintiff-Appellee

- Burns, Michael A. – counsel for MDL Plaintiffs

- Buxner, Evan D. – counsel for MDL Plaintiffs

- Carter, Cole T. – counsel for Defendants-Appellants

- Cartmell, Thomas P. – counsel for MDL Plaintiffs

- Castiglia, Craig – counsel for Defendants-Appellants

- Ciresi Conlin LLP – counsel for Plaintiff-Appellee

- Clark Love & Hutson – counsel for Plaintiff-Appellee

- Clement, Paul D. – counsel for Defendants-Appellants

- Cooper, David M. – counsel for Plaintiff-Appellee

- Cornell, Katherine Lindsey – counsel for MDL Plaintiffs

- Czak, Steven C. – counsel for Defendants-Appellants

*3M Company, et al. v. Baker*, No. 21-12517

- DeCamp, Kyle Richard – counsel for Defendants-Appellants

- Dechert LLP – counsel for Defendants-Appellants

- De Paulo, Tabitha J. – counsel for Defendants-Appellants

- Elizabeth, Sierra – counsel for Defendants-Appellants

- Ellis, Robert P. – counsel for Defendants-Appellants

- Esfandiarifard, Saghar – counsel for Defendants-Appellants

- Estes, Luke – Plaintiff-Appellee

- Fields, Barry E. – counsel for Defendants-Appellants

- Fox, Shawn – counsel for Plaintiff-Appellee

- Gibney, Blake – counsel for Defendants-Appellants

- Glass, David M. – counsel for the United States of America

- Gori Julian & Associates – counsel for MDL Plaintiffs

- Gottlieb, Simon – counsel for Defendants-Appellants

- Gunderson, Karl B. – counsel for Defendants-Appellants

- Hacker, Stephen – Plaintiff-Appellee

- Hill, Thomas Larry – counsel for Defendants-Appellants

- Hodge, Leigh Anne – counsel for Defendant-Appellant 3M Company

- Hoekstra, Jennifer M. – counsel for MDL Plaintiffs

- Hutson, Shelley Van Natter – counsel for Plaintiff-Appellee

- Jones, Hon. Gary R. – U.S. Magistrate Judge for the Northern District of Florida

- Karis, Hariklia – counsel for Defendants-Appellants

- Keefer, Lewis – Plaintiff-Appellee

*3M Company, et al. v. Baker*, No. 21-12517

- Kelly, Maxwell H. – counsel for Plaintiff-Appellee

- Kim, Mary H. – counsel for Defendants-Appellants

- Kirkland & Ellis LLP – counsel for Defendants-Appellants

- Kolsky, Joshua M. – counsel for the United States of America

- Kreis, Douglass A. – counsel for Plaintiff-Appellee

- Laminack Pirtle & Martines – counsel for MDL Plaintiffs

- Leach, Garret A. – counsel for Defendants-Appellants

- Leuthauser, Nolan M. – counsel for Defendants-Appellants

- Levin Papantonio Rafferty – counsel for MDL Plaintiffs

- Marlowe, Emily B. – counsel for Plaintiff-Appellee

- Mitchell, Kasdin – counsel for Defendants-Appellants

- Morriss, F. Chadwick – counsel for Defendants-Appellants

- Mostyn Law – counsel for MDL Plaintiffs

- Moore Hill & Westmoreland – counsel for Defendants-Appellants

- Neglia, Ashley E. – counsel for Defendants-Appellants

- Nomellini, Mark J. – counsel for Defendants-Appellants

- O'Callaghan, Orla – counsel for Defendants-Appellants

- Odom, Megan L. – counsel for Plaintiff-Appellee

- Onder Law LLC – counsel for MDL Plaintiffs

- Ozurovich, Allison K. – counsel for Defendants-Appellants

- Pirtle, Thomas W. – counsel for MDL Plaintiffs

- Pulaski Law Firm – counsel for MDL Plaintiffs

*3M Company, et al. v. Baker*, No. 21-12517

- Quinn Emanuel Urquhart & Sullivan LLP – counsel for Plaintiff-Appellee

- Rafferty, Troy Alan – counsel for MDL Plaintiffs

- Rivera, Maria P. – counsel for Defendants-Appellants

- Rodgers, Hon. M. Casey – U.S. District Judge for the Northern District of Florida

- Sacchet, Michael A. – counsel for Plaintiff-Appellee

- Sandman, Patrick P. – counsel for Defendants-Appellants

- Seeger, Christopher A. – counsel for MDL Plaintiffs

- Seeger Weiss LLP – counsel for Plaintiff-Appellee

- Seeley, Caleb A. – counsel for Plaintiff-Appellee

- Tam, Jonathan S.  – counsel for Defendants-Appellants

- Tracey Fox King & Walters – counsel for Plaintiff-Appellee

- Tracey, Sean Patrick – counsel for Plaintiff-Appellee

- Van Fleteren, Haley J. – counsel for Defendants-Appellants

- Wagstaff & Cartmell – counsel for MDL Plaintiffs

- Wasdin, Nicholas F. – counsel for Defendants-Appellants

- Wilson, Quinn Robert – counsel for MDL Plaintiffs

Defendant-Appellant 3M Company states that it is a corporation whose shares are publicly traded (NYSE: **MMM**).   3M Company does not have a parent corporation and no publicly held corporation owns 10% or more of 3M's stock.

*3M Company, et al. v. Baker*, No. 21-12517

     Defendant-Appellants 3M Occupational Safety LLC, Aearo Holdings LLC,

Aearo Intermediate LLC, Aearo Technologies LLC, and Aearo, LLC state that they

are wholly owned subsidiaries of Defendant-Appellant 3M Company.

October 20, 2022

                             s/Paul D. Clement
                             Paul D. Clement

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT..................................................................CIP-1

TABLE OF AUTHORITIES..................................................................... iii

INTRODUCTION ........................................................................... 1

ARGUMENT .................................................................................. 3

I.   The Government-Contractor Defense Preempts Plaintiff's Strict-Liability Failure-To-Warn Claim.................................................... 3

    A.   The District Court's No-Uniquely-Federal-Interest Ruling Addressed Design Defects, Not Warnings, and the Government Has a "Uniquely Federal Interest" in Procuring Equipment Like the CAEv2 ............................................... 3

    B.   The Military Told Appellants Not to Send Instructions With Bulk Shipments of the CAEv2 .................................................... 6

    C.   Baker's Counterarguments Are Unpersuasive ..................................... 9

         1.   The Military Approved the "Blister Pack" Instructions ........... 9

         2.   The MPID Does Not Apply to the CAEv2 .............................. 11

         3.   The Military Made a Discretionary Judgment Not to Obtain Instructions *or* Warnings From Appellants .................. 12

    D.   Appellants Satisfy the Remaining Factors of the Government-Contractor Defense ............................................................... 13

II.  The CAEv2 Is Exempt from the Noise Control Act..................................... 17

    A.   This Court Has Jurisdiction to Interpret the Noise Control Act ................................................................................ 17

    B.   The Combat-Use Exemption Applies to Noise-Reducing Equipment Like the CAEv2 .................................................. 19

    C.   The Court's Legal Error Was Not Harmless ..................................... 21

i

III.  Numerous Evidentiary Issues Require A New Trial.................................... 24

    A.  The Vietas Letter and *Qui Tam* Report Were Inadmissible............... 24

    B.  Communications Regarding the Discontinuation of the CAEv2 Were Inadmissible ................................................... 26

    C.  Evidence About Alleged Manufacturing Issues in Mexico Is Inadmissible......................................................................... 27

CONCLUSION ................................................................................. 28

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES[*]

## Cases

*Ayres v. Gen. Motors Corp.*,
  234 F.3d 514 (11th Cir. 2000).............................................................19

*\*Boyle v. United Tech. Corp.*,
  487 U.S. 500 (1988).......................................................................3, 6

*\*Brinson v. Raytheon Co.*,
  571 F.3d 1348 (11th Cir. 2009).......................................................3, 6

*Carley v. Wheeled Coach*,
  991 F.2d 1117 (3d Cir. 1993) .............................................................6

*Dorse v. Eagle-Picher Indus.*,
  898 F.2d 1487 (11th Cir. 1990)...........................................................6

*Encino Motorcars, LLC v. Navarro*,
  138 S.Ct. 1134 (2018).......................................................................21

*FCC v. AT&T Inc.*,
  562 U.S. 397 (2011)...........................................................................19

*Graves v. 3M Co.*,
  17 F.4th 764 (8th Cir. 2021)................................................................6

*In re Agent Orange Prod. Liab. Litig.*,
  517 F.3d 76 (2d Cir. 2008)...........................................................5, 15

*Jones v. UPS Ground Freight*,
  683 F.3d 1283 (11th Cir. 2012).........................................................15

*Reiter v. Sonotone Corp.*,
  442 U.S. 330 (1979)...........................................................................20

*Richards v. Michelin Tire Corp.*,
  21 F.3d 1048 (11th Cir. 1994)...........................................................10

[*] Citations upon which Appellants primarily rely are marked with asterisks.

*Tate v. Boeing Helicopters*,
    55 F.3d 1150 (6th Cir. 1995) .................................................................10

*United States v. Bellomo*,
    176 F.3d 580 (2d Cir. 1999) ...................................................................8

*United States v. Cruz*,
    805 F.2d 1464 (11th Cir. 1986) ..............................................................8

*United States v. Dominguez*,
    226 F.3d 1235 (11th Cir. 2000) ............................................................23

*United Techs. Corp. v. Mazer*,
    556 F.3d 1260 (11th Cir. 2009) ............................................................25

*Yee v. City of Escondido*,
    503 U.S. 519 (1992) ...............................................................................5

**Statutes**

42 U.S.C. §4901(a)(2) ..................................................................................20

42 U.S.C. §4902(3) ......................................................................................20

42 U.S.C. §4902(3)(B) .................................................................................18

42 U.S.C. §4905(a)(1) ..................................................................................20

42 U.S.C. §4915(a) ................................................................................ 18, 19

**Regulations**

40 C.F.R. §211.102(h) .................................................................................18

40 C.F.R. §211.201 .....................................................................................18

## INTRODUCTION

The jury rejected all of Baker's claims save one, his failure-to-warn claim. The reason a skeptical jury sided with Baker on that lone claim is not difficult to fathom. By wrongly depriving Appellants of their most important defense and incorrectly instructing the jury that Appellants violated a clear legal duty to provide Baker with instructions and a Noise Reduction Rating label for the CAEv2, based on a fundamental misreading of the relevant statute, the district court effectively directed judgment for Baker on the failure-to-warn count. The district court then reinforced those fundamental errors with a series of other prejudicial errors. The combined effect is an erroneous verdict that is useless as a bellwether, as it reflects only the district court's errors, not the true value of the underlying claims. For the reasons explained here and in 3M's briefing in the companion *EHK* case, the judgment must be reversed or vacated.

The government-contractor defense should have ended Baker's failure-to-warn claim at the outset because there is no dispute that the military told Appellants not to provide any direct supplier-to-soldier information with their bulk shipments of the CAEv2 and later developed its own instructions to distribute to soldiers. Baker cannot second-guess the military's decision to train and instruct soldiers like him by itself, rather than relying on written information from Appellants. The defense still forecloses Baker's claim if he received instructions inside an individual package of

the CAEv2. The military reviewed those exact instructions, requested a change, and approved the final version. Neither Baker nor the jury can substitute their judgments for the military's determination that the instructions were adequate.

Having improperly deprived Appellants of their principal defense, the district court then effectively directed a verdict on the failure-to-warn claim by telling the jury that Appellants had a legal obligation to include a label with instructions and an NRR with every pair of the CAEv2 even if shipped in bulk. Appellants had no such obligation because the CAEv2 were exempt from the federal labeling regulations as "equipment … designed for combat use." Unable to defend the district court's contrary construction, Baker rests primarily on a newly minted jurisdictional argument that has no application to this case.

Even apart from those fundamental errors, a new trial would be required here because of an array of highly prejudicial evidentiary errors. The district court admitted hearsay documents that plaintiffs used to give the jury the false impression that the military had concluded the CAEv2 was unsafe; emails related to the discontinuation of the CAEv2, which should have been barred as evidence of a subsequent remedial measure; and hours upon hours of harmful testimony regarding irrelevant allegations about manufacturing irregularities in Mexico. Any one of these errors, standing on its own, would require a new trial. Combined, they leave no question that the judgment below cannot stand.

2

## ARGUMENT

I. **The Government-Contractor Defense Preempts Plaintiff's Strict-Liability Failure-To-Warn Claim.**

A. **The District Court's No-Uniquely-Federal-Interest Ruling Addressed Design Defects, Not Warnings, and the Government Has a "Uniquely Federal Interest" in Procuring Equipment Like the CAEv2.**

The Supreme Court and this Court have held, without qualification, that "the procurement of equipment by the United States is an area of uniquely federal interest." *Brinson v. Raytheon Co.*, 571 F.3d 1348, 1351 (11th Cir. 2009) (quoting *Boyle v. United Tech. Corp.*, 487 U.S. 500, 507 (1988)). Undeterred, the district court rejected Appellants' government-contractor defense concerning design features at the threshold by holding that the government's "uniquely federal interest" in procuring equipment extends *only* to a "procurement contract containing a design component"; a mere "purchase order" is insufficient. Dkt.1280 at 31-32.

That holding is wrong, *see infra*; *EHK*.Opening.Br.31-33; *EHK*.Reply.Br.3-5, but since it concerned the design-defect claim (and related claims) on which Appellants prevailed below, it is largely beside the point with respect to Baker's appeal. Remarkably, however, Baker suggests that this no-uniquely-federal-interest holding independently supported the district court's rejection of Appellants' government-contractor defense and Appellants forfeited any objection to this holding on appeal. Resp.Br.26-27. That is nonsense. Appellants did not stress this aspect of the district court's erroneous government-contractor analysis because it

3

was not directly relevant to Baker's sole surviving claim. The court discussed the "uniquely federal interest" issue only in the context of design-defect claims, which in Baker's case the jury rejected. The supposed "complication" that required a threshold inquiry into the government's interest, according to the district court, was "that the parties' dispute concerns a *design defect*." Dkt.1280 at 26 (emphasis added); *see also id*. at 27 (asking whether the government's interest is "sufficiently implicated when there is no government contract *with a design component* requiring contractor performance" (emphasis added)). The district court did not renew its no-uniquely-federal-interest analysis when it refused to apply the government-contractor defense to failure-to-warn claims for independent reasons, which were fully addressed in Appellants' opening brief here. Opening.Br.33-41. Indeed, extending that analysis from design-defect issues would make no sense, because in expressly eschewing supplier-to-soldier instructions because the military preferred to train soldiers itself, the military was self-evidently furthering a uniquely federal interest. Simply put, Appellants did not separately assail the district court's mistaken no-uniquely-federal-interest holding in its opening brief for the obvious and sufficient reason that it did not support Baker's sole surviving claim.

But Baker's forfeiture argument is unavailing for two further reasons. First, Appellants fully addressed the district court's mistaken analysis in their contemporaneously-filed opening brief in the *EHK* appeal. *EHK*.Opening.Br.31-33.

4

Second, Appellants plainly appealed the district court's rejection of their government-contractor defense. To the extent plaintiffs (incorrectly) perceive the no-uniquely-federal-interest holding to support the district court's failure-to-warn ruling, that is just an argument about a fully preserved defense. Preservation applies to claims and defenses, not arguments, *Yee v. City of Escondido*, 503 U.S. 519, 534-35 (1992), and the parties have now joined issue.

The district court's denial of a uniquely federal interest is indefensible even as to the design-defect claims the jury rejected. *Boyle* did "not hold that a conflicting, express contractual duty was required." *In re Agent Orange Prod. Liab. Litig.*, 517 F.3d 76, 96 (2d Cir. 2008). Moreover, the design here was embodied in the "procurement contract" in the sense *Boyle* used the term. Opening.Br.32. Thus, even if a conflicting contractual duty were required, Appellants had one. Under the purchase orders the military placed for CAEv2 products, Appellants had a contractual duty to provide exactly the product the military had told them it wanted: the CAEv2, shipped in bulk, without anything else in the box. Because state tort law, at least as understood by Baker, would have required Appellants to provide the military a different product than the one requested and supplied under the purchase orders, it is preempted.

Baker claims that the military had no uniquely federal interest in the design of the CAEv2 simply because the earplug was also sold commercially. Resp.Br.27.

But the CAEv2 was not an off-the-shelf product developed without military input. That is especially true as to the warnings, where the military declined to have the same instructions as the civilian product. Baker's theory is wrong in any event, as numerous courts have recognized. *See, e.g.*, *Carley v. Wheeled Coach*, 991 F.2d 1117, 1124 (3d Cir. 1993). The military has a uniquely federal interest in procuring the equipment it needs even if the equipment is also available to civilians.

**B. The Military Told Appellants Not to Send Instructions With Bulk Shipments of the CAEv2.**

The courts of appeals agree that the application of *Boyle*'s government-contractor defense applies to failure-to-warn claims in only "slightly modified" form. *Graves v. 3M Co.*, 17 F.4th 764, 772 (8th Cir. 2021) (collecting cases). As in the design-defect context, the key question is whether the government "considered" the warnings at issue, if any, and made an informed, discretionary judgment to approve them. *Brinson*, 571 F.3d at 1355 (emphasis omitted) (quoting *Boyle*, 487 U.S. at 512). Baker nevertheless argues that the single-sentence *per curiam* affirmance in *Dorse v. Eagle-Picher Industries*, 898 F.2d 1487 (11th Cir. 1990), created a lopsided circuit split wherein this Court stands alone by requiring defendants to show that the government *affirmatively prohibited* a particular warning, not just that the government considered and approved the warnings or lack thereof. Resp.Br.28-30.

Plaintiffs are wrong. *Dorse* certainly did not create a categorical rule demanding a government prohibition against warnings in every failure-to-warn case. In *Dorse*, there was no evidence of what the Navy wanted from the asbestos supplier other than the applicable contract, so the fact that the contract lacked a prohibition on warning about the risks of asbestos was dispositive. *Dorse* did not address a situation like this one, where Aearo and the military repeatedly discussed what information should accompany the CAEv2, and the military communicated its decisions in phone calls and emails.

The undisputed evidence shows that the military made a discretionary judgment not to obtain direct supplier-to-soldier instructions from Appellants. Thus, even if a prohibition were required, Ohlin supplied one when he told Aearo "not to include instructions in th[e] box" in which bulk packages of the CAEv2 were shipped because "[h]e felt that personal training was the most effective way to train the soldiers." Ex.62 at 326:22-327:10.[1]

Plaintiffs assert without argument that this testimony regarding Ohlin's out-of-court statements is hearsay. *See* Resp.Br.30. But Ohlin was not asserting

---

[1] Baker refers to testimony by a "30(b)(6) witness"—*not* Marc Santoro, the Aearo employee whom the government told not to include instructions—that "*I* don't ever recall them telling us that we couldn't include something." Resp.Br.30 n.11 (emphasis added). But that 30(b)(6) witness was designated to *identify* written instructions created by Aearo, not to testify about instruction-related discussions between the government and Santoro or other Aearo employees.

anything when he said "not to include instructions in th[e] box"; he was telling Aearo what to do. Such a directive is "not even capable of being true or false," and is thus not hearsay. *United States v. Cruz*, 805 F.2d 1464, 1478 (11th Cir. 1986); *United States v. Bellomo*, 176 F.3d 580, 586 (2d Cir. 1999) ("Statements offered as evidence of commands … directed to the witness, rather than for the truth of the matter asserted therein, are not hearsay."). Indeed, even the district court agreed this testimony was not hearsay. *See Keefer*.Dkt.132-1 at 378.

Ohlin did not waver in his judgment that individual instructions were not worth the trouble. When military audiologists expressed concern that soldiers were using the yellow end in steady-state noise, Aearo proposed providing individual instructions with the CAEv2, but Ohlin remained skeptical. Ohlin asked Aearo: "I'm all for clear instructions, but what is the cost of individual packaging?" Ex. 38. In addition, Ohlin noted that "soldiers are going to do what is in their comfort zone and not necessarily what they have been told or what instructions on a package [are] going to tell them." *Id.* Soon afterwards, however, military officials decided to issue instructions with the CAEv2 and asked Ohlin's office "to develop a laminated, wallet-sized instruction card." Ex.39.

The evidence shows that the military initially told Aearo not to provide any information with the CAEv2 because it wanted to rely on in-person training, and later opted to develop its own written instructions rather than obtaining them from

the manufacturer.  Baker cannot fault Appellants for deferring to the military's decision to give soldiers the information they needed to use the CAEv2 directly, without any manufacturer involvement.

### C. Baker's Counterarguments Are Unpersuasive.

#### 1. The Military Approved the "Blister Pack" Instructions.

The vast majority of CAEv2 were sent to the military in bulk shipments without individual-package instructions, and Baker's failure-to-warn argument below targeted the absence of instructions for bulk earplugs.  Appellants also sent the military relatively small numbers of individually-packaged CAEv2 for sale at retail stores on Army bases, with each "blister pack" containing instructions drafted by Appellants.  Ex.62 at 183:4-184:8.  Baker claims that the second pair of CAEv2 he received was packaged individually in one such "blister pack" with Appellants' instructions.  *E.g.*, Resp.Br.1.  As a threshold matter, it is far from clear that Baker received and relied on Appellants' instructions contained in the blister pack; in his trial testimony, he equivocated about whether he actually received or reviewed them.  *See* 6/11/21 Tr. 156:16-162:24, 165:7-169:3.

Regardless, if Baker did rely on Appellants' instructions, the application of the government-contractor defense would be even more straightforward than it is for the bulk shipments of the CAEv2.  As Appellants have explained, Ohlin reviewed Appellants' blister-pack instructions, which included the flange-fold fitting tip, and

suggested an additional instruction that Appellants adopted. *See* Opening.Br.16 (citing Ex.43). The record is clear as can be that Ohlin "exercised [his] discretion and approved the warnings" that appeared with the blister pack. *Tate v. Boeing Helicopters*, 55 F.3d 1150, 1157 (6th Cir. 1995).

Even if the government-contractor defense did not apply to the blister-pack instructions, Appellants would still, at a minimum, be entitled to a new trial on Baker's failure-to-warn claim. Baker received two pairs of CAEv2, only one of which came in a blister pack. The jury's conclusion that Appellants were strictly liable for failure to warn could have rested solely on Baker's first pair, which was not accompanied by any instructions at all. *See* 6/11/21 Tr. 74:10-14. That is especially likely given the district court's erroneous instruction that the law required instructions to accompany every set of earplugs, whether or not shipped in bulk. The law of this Court is clear that, "[w]here … two or more claims are submitted to the jury in a single interrogatory, a new trial may be required if *either* of the claims was erroneously submitted, as there is no way to be sure that the jury's verdict was not predicated solely on the invalid claim." *Richards v. Michelin Tire Corp.*, 21 F.3d 1048, 1055 (11th Cir. 1994) (emphasis added). Because there is "no way to be sure" whether the jury's verdict rested on a purportedly valid theory based on the blister pack CAEv2, or an invalid, preempted theory based on the non-blister pack CAEv2, the verdict must be vacated.

### 2.  The MPID Does Not Apply to the CAEv2.

In the face of uncontroverted evidence that the military specifically instructed Appellants not to provide instructions, Baker repeatedly invokes a 2006 "Medical Procurement Item Description" (MPID) referred to in an "indefinite-quantity contract" that Aearo bid for in 2006.  Ex.55 at 9, 45.  The MPID covered "double-ended earplugs" and called for "Aearo Corporation's P/N 370-1000, or equal."  *Id*. at 51.  It stipulated that "'[e]qual' items shall possess the salient characteristics as specified herein," and one of those "salient characteristics" provided that "[i]llustrated instructions explaining the proper use and handling of the ear plugs shall be supplied with each unit."  *Id*. at 51-52.

Even putting aside that any contradiction between Ohlin and the MPID would create a factual dispute that would preclude summary judgment for Baker on the government-contractor defense, Baker's reliance on the MPID founders on the fact that the "salient characteristics" laid out in the MPID apply only to the substitute products and not the CAEv2.  Indeed, *plaintiffs themselves* argued in the district court that "the 'salient characteristics' of the plug apply to 'equal items,' not the CAEv2."  Dkt.1072 at 20.  The purpose of the MPID, as its authors in military procurement explained, was to allow competitors to bid on the contract.  Ex.53 at 3.  If competitors had emerged, it is likely they too would have been told to dispense with the instructions included with the product for civilian sales so that the military

11

could do its own instructing, but no competitors emerged.  In all events, any implications lurking in the MPID do not alter the reality that Appellants were repeatedly told that instructing soldiers on proper use in combat was the military's job.

It should come as no surprise that the MPID's instructions requirement did not apply to the CAEv2, because the military had already created hundreds of thousands of CAEv2 wallet cards by the time the MPID was issued in 2006.  The military obviously had no need for a single "sheet of paper," whether in the inside or outside of the box of CAEv2, with duplicative instructions.  An instruction sheet might have been useful for military audiologists unloading boxes of new, competing dual-ended earplugs (although the single sheet per box never could have reached every individual soldier), but the audiologists did not need an instruction sheet for a device they already knew well.

### 3. The Military Made a Discretionary Judgment Not to Obtain Instructions *or* Warnings From Appellants.

Baker also argues that, even if the military determined it did not need *instructions* from Appellants, it said nothing to preclude Appellants from providing written *warnings* with the CAEv2.  This formalistic distinction between instructions and warnings gets Baker nowhere.  Ohlin told Appellants to ship "50 pair in a plastic bag, *with nothing else in there*, inside a box."  Ex.62 at 326:15-18 (emphasis added).  He wanted no information from Appellants, whether in the form of warnings or

instructions, because the military intended to train soldiers to use the CAEv2 on its own. The relevant point is that the military had the information it needed—that some individuals may need to fold back the flanges of the CAEv2 to get a secure fit—and decided to communicate the information to soldiers itself, rather than relying on Appellants. The information could have been communicated equally effectively as a warning or an instruction, but in either case *the military* wanted to convey it. Appellants cannot be held liable for the military's directive not to provide any further information regarding the CAEv2.

### D. Appellants Satisfy the Remaining Factors of the Government-Contractor Defense.

Ohlin's instruction not to provide written information with bulk shipments of the CAEv2 and the military's later creation of the wallet card establish that the military made a discretionary decision to instruct soldiers to use the CAEv2 directly, rather than relying on information from Appellants. And to the extent relevant in Baker's case, Ohlin's direct review and alteration of the blister-pack instructions is clear evidence that the military made a decision to approve those instructions for use by the relatively small number of soldiers who acquired individually packaged

CAEv2. Appellants are thus entitled to summary judgment on the first element of the government-contractor defense for any failure-to-warn claims.[2]

Although the district court reached only the first element of the defense, this Court should proceed to resolve the second and third in Appellants' favor. Appellants' entitlement to the defense is beyond reasonable dispute. There is no reason to remand the district court, risking another erroneous decision that would subject Appellants to extraordinary settlement pressure and millions more in litigation costs, all as a penalty for working with the United States military to develop a first-of-its-kind earplug.

As for the second factor of the government-contractor test, there is no dispute that the instructions for the CAEv2 "conformed" to the approved specifications. Consistent with the military's directions, Appellants did not provide any additional information with bulk shipments of the CAEv2. And the instructions in the blister packs—in particular the flange-fold fitting tip—were exactly the same as those Ohlin approved. *Compare* P-Gen-2962 at 32-33, *with* Ex.43 at 4.

On the third factor, there should also be no dispute that Appellants gave the military all the information about the CAEv2 that was "substantial enough to

---

[2] As more fully set forth in the *EHK* briefing, there is, at a minimum, no basis for granting *Baker* (or other plaintiffs) summary judgment on the defense, as the evidence at least creates a genuine factual issue.

influence [the military's] decision." *In re Agent Orange*, 517 F.3d at 99.  This entire litigation was predicated on the idea that Aearo withheld the findings of the Flange Report from the military, but discovery has made clear that Aearo disclosed all of the material information the report contained.

The key takeaway from the Flange Report is that some users may need to fold back the flanges to get a good fit with the CAEv2, and the undisputed evidence demonstrates that Aearo informed the military of that fact.  The current head of the Army Hearing Program, Lieutenant Colonel John Merkley, testified that Ohlin instructed a meeting of "most military audiologists" that "if you needed to, you could fold back the flange on the earplug get a good fit," and that Ohlin did not "limit [the advice] to one particular size ear canal."  Ex.58 at 98:2-3, 99:4-8, 106:18-107:2.  The prior head of the Army Hearing Program, Lieutenant Colonel Eric Fallon, corroborated that testimony in a written declaration.[3]  That military testimony is consistent with the testimony of Aearo's Elliott Berger, who repeatedly testified that he informed Ohlin of "the fact that the shortened earplug was creating a problem in

---

[3] Plaintiffs have argued that Lieutenant Colonel Fallon's declaration is inadmissible, but "a district court may consider a hearsay statement in passing on a motion for summary judgment if the statement could be reduced to admissible evidence at trial." *Jones v. UPS Ground Freight*, 683 F.3d 1283, 1293-94 (11th Cir. 2012).  Lieutenant Colonel Fallon has now testified to the fact that he was aware that "if you had trouble fitting the Combat Arms Earplug and you determined that it may be because that third opposing flange was causing that problem, you could roll that flange back to see if you could get a good fit."  4/27/21 *EHK* Tr. 305:5-8.

15

the initial test" and the Flange Report's conclusion that "rolling back the flanges would be important for some people."  Ex.59 at 297:13-22, 337:8-18.

Baker responds to this evidence of military knowledge by pointing to a single Army training manual that did not mention the flange-fold fitting technique.  *See* Resp.Br.13.  But the fact that the Army did not mention the flange fold in one particular publication does not call into question the unequivocal evidence that senior audiologists like Ohlin, Merkley, and Fallon were aware of the technique and the reasons for it.  Baker also relies on the *qui tam* report as evidence the military did not know about the findings of the Flange Report, but the two hearing conservation specialists interviewed were aware that "if the earplug touched one part of the ear … it could push out of the ear" and "recommended that personnel flip the first flange back so that this would not occur."  P-Gen-10 at 258.

Unable to seriously contend that the military was unaware that some individuals might need to fold back the opposing flanges of the CAEv2 to get a good fit, Baker instead argues the military "did not appreciate the gravity of the fitting tip."  Resp.Br.13.  But Baker does not explain what the true "gravity" of the fitting tip is, and how the truth differed from the military's understanding.  If Baker is suggesting that the first REAT test of the CAEv2, on which no flanges were folded back, shows a gravely concerning level of performance that the military would not have tolerated, he is wrong.  Even on that first test, the CAEv2 met the military's

minimum mean attenuation expectations for dual-ended earplugs at every frequency. *Compare* Ex.21 at 5, *with* Ex.55 at 44.  Baker's only response to that fact is to point out that three of the eight subjects on the first test had mean attenuation below the minimum.  Resp.Br.14 n.7.  But the military chose to set a minimum for the test as a whole, not a minimum for each subject.  The necessary implication of choosing an overall minimum was that some individual subjects might have results below the minimum.

The military was aware of the only material piece of information included in the Flange Report:  that some individuals may need to fold back the opposing flanges of the CAEv2 to get a good fit.  Because Baker has not provided any reasonable basis for disputing that fact, this Court should enter summary judgment that the government-contractor defense bars his failure-to-warn claim.

## II.  The CAEv2 Is Exempt from the Noise Control Act.

### A.  This Court Has Jurisdiction to Interpret the Noise Control Act.

The district court clearly erred and badly prejudiced Appellants by instructing the jury that the CAEv2 was subject to EPA regulations requiring instructions and an NRR label (which Appellants indisputably did not provide).  Making matters worse, Baker (like other plaintiffs) seized upon this determination to repeatedly brand Appellants as lawbreakers throughout the trial.  But none of this should have happened, because the CAEv2 was subject to the express statutory exemption from

the regulations for "any military weapons or equipment which are designed for combat use."  42 U.S.C. §4902(3)(B).

Baker attempts to shield this erroneous ruling from review by contending that this Court lacks jurisdiction to apply the statutory combat-use exemption to the CAEv2.  Resp.Br.35-37.  The EPA's labeling regulations apply to "all hearing protective devices manufactured after [1980]," 40 C.F.R. §211.201, Baker points out, and any challenge to the scope of the regulations should have been brought in the D.C. Circuit "within ninety days from the date of … promulgation."  42 U.S.C. §4915(a).  This argument is meritless.

First, Baker's jurisdictional argument rests on the false premise that EPA decided the combat-use exemption should not apply to noise-reducing equipment and that Appellants are now belatedly trying to challenge that agency decision.  But EPA has never made such a determination; in fact, EPA's regulations say nothing about on the scope of the statutory exemption.  *See* 40 C.F.R. §211.102(h).  Because the regulations simply fail to address the statutory exemption, the federal courts are free to address its scope, unencumbered by claims for *Chevron* deference or frivolous arguments that a regulatory challenge belongs in the D.C. Circuit.[4]

---

[4] Further belying plaintiffs' claim, the labeling regulations for noise-*emitting* products also do not mention the combat-use exemption, yet plaintiffs concede the exemption's application to such equipment.

18

Second, even if Appellants were challenging EPA's regulations, the jurisdictional bar invoked by Baker—purportedly requiring any challenge to the scope of the regulations to have been brought in the D.C. Circuit "within ninety days from the date of … promulgation," 42 U.S.C. §4915(a)—applies only in government enforcement actions and only where a timely pre-enforcement challenge could have been brought.  Here, the CAEv2 was still 20 years away when the regulations were issued in 1979, and the idea that Appellants are foreclosed from arguing about the scope of the regulations (not to mention the statutory exemption) in the context of a private-plaintiff negligence per se action is frivolous.  *See Ayres v. Gen. Motors Corp.*, 234 F.3d 514, 522 n.19 (11th Cir. 2000) ("[A] state negligence case in which a violation of [federal law] was used as evidence of the defendant's negligence is not the same as an action to enforce the act's notification requirements.").

## B. The Combat-Use Exemption Applies to Noise-Reducing Equipment Like the CAEv2.

On the merits, Baker does not really defend the district court's application of the *noscitur a sociis* canon, which the court believed required it to interpret "equipment" in light of the word "weapon."  Instead, Baker seeks refuge in another doctrine—that "identical words and phrases within the same statute should normally be given the same meaning," *FCC v. AT&T Inc.*, 562 U.S. 397, 408 (2011).  *See* Resp.Br.41-43.  That argument fares no better than the reasoning Baker abandons.

19

Baker points to the other statutory exemptions from the definition of regulated "product[s]": "any rockets or *equipment*" used by NASA, and "any other machinery or *equipment* designed for use in experimental work done by or for the Federal Government," 42 U.S.C. §4902(3) (emphases added), and posits that "equipment" there is limited to noise-emitting equipment. But the argument for limiting the term "equipment" to noise-emitting devices is no more persuasive for these exemptions than it is for the combat-use exemption. Even though rockets and machinery emit noise, that is no reason to "ignore the disjunctive 'or' and rob the term ['equipment'] of its independent and ordinary significance," especially given that these are disjunctive exemptions to requirements imposed on noise-emitting and noise-reducing products alike. *Reiter v. Sonotone Corp.*, 442 U.S. 330, 338-39 (1979). Noise-reducing equipment designed for use in research by or for the federal government is (quite sensibly) exempted from EPA regulation, just like noise-reducing equipment designed for use in combat by the U.S. military.

Baker next points to provisions in the Noise Control Act that identify "transportation vehicles and equipment," "construction equipment," and "electrical or electronic equipment," among other categories, as "major sources of noise." 42 U.S.C. §4901(a)(2); *id*. §4905(a)(1). But that helps explain why the exemptions' references to equipment are not limited to noise-reducing equipment, even though that two-sided conception of equipment renders the references to specific kinds of

20

noise-emitting equipment—like weapons and rockets—redundant. And the fact that equipment like products can be either noise-emitting or noise-reducing does not limit an unmodified reference to equipment to the former. Baker bears a heavy burden of proof in attempting to rob "equipment" of its naturally broad meaning in this context, and he does not come close to meeting it.

In the end, Baker has no real defense to the district court's anomalous decision to render one-dimensional an exemption to two-dimensional requirements that apply equally to noise-emitting and noise-reducing products. The Supreme Court has admonished courts to read exemptions "fair[ly]," *Encino Motorcars, LLC v. Navarro*, 138 S.Ct. 1134, 1142 (2018), and the only fair reading of an exemption for "weapons or equipment used in combat" extends to noise-reducing equipment in general, and the CAEv2 in particular.

## C. The Court's Legal Error Was Not Harmless.

The district court's instruction that the EPA labeling regulations applied to the CAEv2 prejudiced Appellants' defense to Baker's strict-liability failure-to-warn claim and likely explains why the jury sided with Baker as to that claim alone. The court told the jury that it could consider Appellants' compliance with the regulations when deciding Baker's strict-liability claims. *Baker.*Dkt.182 at 25. And it was undisputed that Appellants had *not* complied with the district court's (mis)understanding of the regulations by not including instructions with CAEv2 that,

like the first pair Baker received, were shipped in bulk. The jury thus started its deliberations on the strict-liability failure-to-warn claim from the premise that Appellants violated a legal duty to provide instructions with Baker's first pair of CAEv2.

Baker argues that the district court's instruction must have been harmless because the jury was told the regulations were relevant to negligence as well as strict liability, yet Appellants prevailed on the negligent failure-to-warn claim. Resp.Br.44-45. But Appellants' success on the negligence claim does not make it any less likely that the labeling regulations were responsible for their loss on the strict-liability claim. It would have been perfectly logical for the jury to conclude that Appellants exercised ordinary care in deciding not to include duplicative, unwanted instructions with the CAEv2, but nonetheless to find Appellants strictly liable because a rule is a rule, even if unreasonable, and the district court told them that instructions must be provided with every pair.

The case on which Baker relies, moreover, does not set any sort of heightened standard for assessing the prejudice of an erroneous instruction when the jury returns a split verdict. That case involved a claim that the jury had improperly engaged in premature deliberations, and this Court simply observed that the split verdict was evidence the jury "reached a reasoned conclusion free of undue influence and did not decide the case before the close of evidence." *United States v. Dominguez*, 226

F.3d 1235, 1248 (11th Cir. 2000).  *Dominguez* does not stand for the illogical proposition that, when a jury renders a split verdict, its deliberations were necessarily untainted by improper instructions or evidence.

Baker contends that, even if the court were wrong to instruct the jury that the labeling regulations applied to the CAEv2, the regulations still would have been admissible as industry standards.  Resp.Br.45.  But Baker has not attempted to show that the regulations reflect the standard practices of hearing-protector manufacturers in the military market.  And, in fact, they do not.  Manufacturers typically do not provide instructions with hearing protectors sold to the military because the military prefers to handle training on its own.  *See* Ex.66 at ¶17.  And the testing standard called for by the regulations, ANSI S3.19, has been retracted by the private organization that authored it and replaced with a new standard, which is what the military's own laboratories use when they REAT test hearing protectors.  *See* Ex.7 at 15.

The district court's instruction regarding the EPA regulations necessarily implied that Appellants had violated a legal duty to provide soldiers like Baker with information about the proper use of the CAEv2.  That improper instruction obviously prejudiced Appellants in their defense to Baker's strict-liability failure-to-warn claim, and Appellants are entitled to a new trial as a result.

## III. Numerous Evidentiary Issues Require A New Trial.

### A.  The Vietas Letter and *Qui Tam* Report Were Inadmissible.

Baker does not dispute that he made liberal use of the July 2019 letter authored by Air Force Colonel Jay Vietas, in particular its false hearsay statement that the CAEv2 "were found to be defective."  P-Gen-2586.  Baker suggests that Appellants forfeited any hearsay argument, but even plaintiffs' counsel conceded that the document was hearsay,[5] and the list of objections to the document that Appellants submitted before trial incorporated a motion in limine that expressly stated a hearsay objection.  *See Estes*.Dkt.115-1 at 24 (citing "3M MIL #06" (Dkt.1664 at 4-8)).  The district court plainly understood Appellants to be making a hearsay objection.  *Id*.

Baker repeats the district court's argument that the "were found to be defective" statement was admissible to rebut the many positive test results on the CAEv2 from military laboratories.  *EHK* 4/1/21 Tr. 3:7-23.  But the statement is probative of the military's knowledge of problems with the CAEv2 only if it is *true* that the CAEv2 was found to be defective.

Baker suggests that the Vietas letter is subject to the public-record hearsay exception, relying on an order the district court issued in a later bellwether trial.  But the district court acknowledged in that order that, even if the letter "as a whole" were

---

[5] In a subsequent bellwether trial, plaintiffs' counsel agreed "[t]here is no dispute" that "[t]he statement is hearsay."  *Vaughn* 4/19/22 Tr. 9:20-24.

a public record and thus not hearsay, there was still "the single hearsay statement that '[t]hese earplugs were found to be defective.'"  *Blum.*Dkt.99 at 5.

Baker also used the summary of the *qui tam* report to suggest the military had conducted an investigation and concluded Appellants concealed known defects in the CAEv2.  But the investigator's summary simply related the hearsay statements of the interviewees.  P-Gen-10 at 6-7.  Placing hearsay statements into a government report, without any additional analysis or fact-finding, does not transform them into admissible evidence.  *See United Techs. Corp. v. Mazer*, 556 F.3d 1260, 1278 (11th Cir. 2009).

The sole basis the district court gave for allowing the jury to hear a summary of hearsay was that "interviews of US government personnel *confirmed* that had they known" about Aearo's testing, they "may not have purchased" the CAEv2.  Dkt.1693 at 7 (emphasis in original).  The court's added emphasis appears to suggest that the investigator could have had an independent basis for the information in the report, and that the hearsay interviews merely "confirmed" that prior understanding.  But that is erroneous; the investigator agreed in a deposition that she was "just summarizing" what the witnesses said.  Coleman Tr. 236:11-17.

The Vietas letter and *qui tam* report were both relevant to Baker's strict-liability failure-to-warn claim, and Appellants' success on the design-defect claims does not prove that these documents had no prejudicial effect.  The jury could have

25

concluded that the CAEv2 did have real fitting issues, in reliance on the Vietas letter and *qui tam* report, but also concluded the design was *not* defective because any issues could be easily remedied by the flange-fold fitting tip.  Any CAEv2 not accompanied by the fitting tip, like Baker's first pair, would not be "reasonably safe," however, and Appellants would thus be strictly liable for a failure to warn. 6/18/21 Tr. 28:18.

## B. Communications Regarding the Discontinuation of the CAEv2 Were Inadmissible.

Contrary to Baker's argument, the statements "[w]e cannot ship any further products with current labeling" and "we cannot distribute this with the current NRR on the package" cannot be treated as standalone "admission[s]," separated from the discontinuation of the CAEv2.  Resp.Br.53.  The statements do not "admit" anything at all.  They are directives to stop distributing the CAEv2 in their current form.  There is no way to describe the statements as anything other than evidence of the remedial measure of discontinuation, which is inadmissible.

The admission of the statements undoubtedly prejudiced Appellants' defense to Baker's strict-liability failure-to-warn claim.  Although Baker's counsel repeatedly (and improperly) argued that the company's discontinuation of the CAEv2 proved the earplugs were "defective," the prejudicial statements pertain more to the information that accompanied the CAEv2 than its design—specifically, the "current labeling" and the "current NRR on the package."  The jury could have

plausibly concluded that the company stopped distributing the CAEv2 with the "current labeling" because it had determined the CAEv2 was not "reasonably safe" with the existing instructions and warnings—a conclusion that would have required judgment for Baker on the strict-liability failure-to-warn claim. 6/18/21 Tr. 28:18.[6]

## C. Evidence About Alleged Manufacturing Issues in Mexico Is Inadmissible.

Baker expends little effort defending the district court's decision to admit hours of testimony about the quality-control testing performed on the CAEv2 in Mexico, because no defense is possible. The evidence was plainly irrelevant because Baker did not allege he was injured by a badly manufactured earplug. Baker repeats the district court's assertion that the evidence was relevant to the operation of the Indianapolis lab, but that is erroneous as a matter of logic and geography. The quality-control *manufacturing* testing in *Mexico* has nothing to do with the REAT *design* testing in *Indianapolis*.

The admission of the manufacturing evidence prejudiced Appellants on Baker's strict-liability failure-to-warn claim. Baker himself argues that the evidence showed Appellants' "failure to warn" about the alleged quality-control issues in

---

[6] Baker also argues the admission of the statements in the email was harmless because they were cumulative of other testimony. Resp.Br.54. But Baker was able to play that testimony only because the court wrongly overruled Appellants' objection that the testimony should be excluded as evidence of the discontinuation, just like the statements in the email. *See Keefer*.Dkt.164-1 at 41.

manufacturing.  Resp.Br.55.  The jury readily could have rested its verdict on that theory, even though Baker concededly did not claim that those supposed quality-control issues harmed him in any way.

## CONCLUSION

For the foregoing reasons, the Court should reverse the judgment of the district court, or at a minimum vacate the judgment and remand for a new trial.

Respectfully submitted,

GEORGE H. HICKS
KASDIN M. MITCHELL
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue, NW
Washington, DC 20004
(202) 389-5000

COLE CARTER
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL 60654
(312) 862-2000

October 20, 2022

s/Paul D. Clement
PAUL D. CLEMENT
 *Counsel of Record*
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
paul.clement@clementmurphy.com

*Counsel for Appellants*

28

## CERTIFICATE OF COMPLIANCE

1.  This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 6,434 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and 11th Cir. R. 32-4.

2.  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6), because it has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point Times New Roman type.

October 20, 2022

s/Paul D. Clement
Paul D. Clement

## CERTIFICATE OF SERVICE

I hereby certify that on October 20, 2022, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Eleventh Circuit by using the CM/ECF system.  I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

s/Paul D. Clement
Paul D. Clement