Nos. 21-12517, 21-13131, 21-13133, 21-13135

---

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

---

3M COMPANY. ET AL.,
*Defendants-Appellants*,

v.

LLOYD BAKER, LUKE ESTES, STEPHEN HACKER, LEWIS KEEFER,
*Plaintiffs-Appellees*.

---

On Appeal from the United States District Court

for the Northern District of Florida

Nos. 3:19-md-2885, 7:20-cv-137, 7:20-cv-131, 7:20-cv-104

---

## BRIEF OF *AMICUS CURIAE* MILITARY ORDER OF THE PURPLE HEART IN SUPPORT OF PLAINTIFFS-APPELLEES

---

Patrick N. Strawbridge
  *Counsel of Record*
CONSOVOY MCCARTHY PLLC
Ten Post Office Square
8th Floor South PMB #706
Boston, MA 02109
(617) 227-0548
patrick@consovoymccarthy.com

James F. Hasson
CONSOVOY MCCARTHY PLLC
1600 Wilson Boulevard
Suite 700
Arlington, VA 22209
(703) 243-9423

Dated: July 11, 2022

*Counsel for Amicus Curiae*

## <u>AMENDED CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT</u>

Per Rule 26.1 and 11th Cir. R. 26-1.1, *amicus curiae* certifies that in addition to the persons and entities named in the parties' certificates of interested persons, the following individuals or entities may have an interest in the outcome of this appeal:

1.  Consovoy McCarthy PLLC

2.  James Hasson

3.  Military Order of the Purple Heart

4.  Patrick Strawbridge

*Amicus* Military Order of the Purple Heart has no parent company. No publicly held company owns 10% or more of its stock.

Dated: July 11, 2022                    Respectfully submitted,

                                        */s/ Patrick Strawbridge*

# **TABLE OF CONTENTS**

TABLE OF CITATIONS ............................................................... iii

IDENTITY AND INTEREST OF AMICUS CURIAE ...........................................1

STATEMENT OF THE ISSUE ..............................................................2

INTRODUCTION AND SUMMARY OF ARGUMENT .......................................2

   I.   3M's failure to report the defects in the CAEv2 inflicted lifelong injuries on combat-wounded veterans.........................................................4

   II.  3M is not entitled to a government contractor defense. ...............................14

CONCLUSION ........................................................................19

CERTIFICATE OF COMPLIANCE ....................................................20

CERTIFICATE OF SERVICE.............................................................20

# <u>TABLE OF CITATIONS</u>

## CASES

*Boyle v. United Technologies Corp.*, 487 U.S. 500 (1988) ............................ passim

*Dorse v. Eagle-Picher Industries, Inc.*, 898 F.2d 1487 (11th Cir. 1990) ......3, 15, 16

*Glassco v. Miller Equipment Co.*, 966 F.2d 641 (11th Cir. 1992) ...................15, 16

*In re Joint E. & S. Dist. New York Asbestos Litig.*, 897 F.2d 626, 631 (2d Cir. 1990) ...........................................................................................................16, 17

## OTHER AUTHORITIES

Kay Miller, *Hearing Loss Widespread Among Post-9/11 Veterans*, The Center for Public Integrity, (Aug. 29, 2013), https://bit.ly/3zXTen1 .....................................5

U.S. Army Special Operations Command, *160th Special Operations Aviation Regiment (Airborne)*, https://bit.ly/39LOTbM (last accessed June 20, 2022) .......6

## IDENTITY AND INTEREST OF AMICUS CURIAE

*Amicus curiae* is the Military Order of the Purple Heart (the "Order").[1] Established in 1932, the Order is a 501(c)(3) non-profit that supports American veterans and their families. Over the past sixty years, the Order has funded programs and services to help veterans transition from the battlefield to the home front, including academic scholarships, grants for service dogs, medical research, and treatment for Post-Traumatic Stress Disorder (PTSD) and Traumatic Brain Injury (TBI).

The Order has a compelling interest in the Court's resolution of this case because its members include combat-wounded veterans who suffered hearing loss and other injuries while using hearing protection provided by 3M. The Order exists to help veterans and their families recover from exactly the sorts of injuries that 3M inflicted on thousands of servicemen and women. To that end, the Order regularly files amicus briefs in cases, like this one, that raise issues of concern to the veteran community.

The Order's members have a significant interest in ensuring that companies

---

[1] No party's counsel authored this brief in whole or in part, and no party or party's counsel contributed money that was intended to fund preparing or submitting this brief; and no person other than *amicus*, its members, or its counsel contributed money that was intended to fund the preparation or submission of this brief. *Amicus* consulted with the parties before filing this motion; both consented to *amicus*'s participation in this case.

1

like 3M cannot avoid liability for their misconduct by manipulating the Supreme Court's decision in *Boyle v. United Technologies Corp.*, 487 U.S. 500, 504 (1988). Military contractors should not be allowed to conceal design defects and then cloak themselves in the government's sovereign immunity when their actions are discovered. This case has critical implications for the safety of American troops and veterans, and the Order respectfully submits that its participation as *amicus* will aid the Court in the resolution of this matter.

## STATEMENT OF THE ISSUE

Whether a government contractor is entitled to liability under *Boyle*, when the contractor sells defective equipment to the U.S. military and chooses not to warn the end users of that equipment—American troops in war zones—about the safety risks of those defects.

## INTRODUCTION AND SUMMARY OF ARGUMENT

3M desperately wants this case to be about anything other than the thousands of veterans suffering lifelong injuries because it placed profits over patriotism. On appeal, it challenges a scattershot of discretionary evidentiary rulings and the district court's conclusion that it was not entitled to a government contractor defense. Despite 3M's attempt to muddy the waters, this case is only about two things: (1) 3M's knowing failure to warn the U.S. Government or American servicemembers

that the ear protection it provided (the "CAEv2") was defective; and (2) the permanent injuries that 3M inflicted on veterans who trusted its product.

3M claims that it is entitled to government contractor immunity under *Boyle* simply because the government purchased its product—even though 3M designed the product before soliciting a contract from the government, knew the product was unsafe when used as advertised, and decided not to warn anyone about the risks. Eleventh Circuit precedent and common sense say otherwise. The district court properly rejected 3M's argument, *see generally* Dkt. 1280, and this Court should affirm. As a threshold matter, the Eleventh Circuit has already held that *Boyle* does not apply to failure-to-warn cases. *See Dorse v. Eagle-Picher Industries, Inc.*, 898 F.2d 1487, 1488 (11th Cir. 1990). But even if *Boyle* did apply, 3M still would not qualify for the government contractor defense.

It is undisputed that 3M knew that a design flaw placed servicemembers at risk of hearing loss if they used the CAEv2 as envisioned in its contract with the Army. *See* Dkt. 1280 at 14-15. It is likewise undisputed that 3M did not tell *anybody* about this defect until it was forced to do so during discovery in an unrelated lawsuit. *See* Dkt. 1280 at 15. Granting immunity to 3M under these circumstances would create perverse incentives for other defense contractors to conceal defects and expose more servicemembers to the harm the Order's members have suffered. Thus,

3

3M's government contractor defense fails even if the more lenient standard from *Boyle* applies. *Cf. Boyle*, 487 U.S. at 512 (government contractors are entitled to immunity only if they "warn[] the United States about the dangers in the use of the equipment that [are] known to the supplier but not to the United States").

At bottom 3M wants to avoid any discussion of the real-world harm caused by its actions. *Amicus* is all-too-aware of that harm—many of its members are among the injured. Some of those injured members were subjected to medical review boards and forced to transfer to other components of the service. Others had their careers cut short entirely. All of them suffered serious hearing loss, a persistent ringing in their ears, or both. These injuries have affected their post-retirement careers in the civilian workforce, their family relationships, their social lives, and their mental health. 3M wants to walk away from this matter without addressing these concrete harms; the veterans who used 3M's ear protection do not have that option.

## ARGUMENT

**I.    3M's failure to report the defects in the CAEv2 inflicted lifelong injuries on combat-wounded veterans.**

In July 2000, 3M realized that "the CAEv2 had problems unless the user instructions were revised." Dkt. 1280 at 14 (brackets omitted). The "problem[]" with the ear protection, specifically, was that it did not protect against anything. Nevertheless, 3M continued to sell the CAEv2—first in individual batches, and then

4

under a formal procurement contract signed in 2006—for fourteen years. Dkt. 1280 at 14-15. The company only discontinued the CAEv2 after it was forced to disclose the internal report outlining the "problems" with its product during discovery in an unrelated patent lawsuit. Dkt. 1280 at 15.

During those fourteen years, millions of soldiers used the CAEv2 in training, in combat, and while working on heavy machinery. The results were predictable. In fact, they were predicted by 3M itself. *See* Dkt. 1280 at 14-15. As of 2013, a year before 3M discontinued the CAEv2, more than 414,000 post-9/11 veterans were diagnosed with hearing loss or tinnitus. Kay Miller, *Hearing Loss Widespread Among Post-9/11 Veterans*, The Center for Public Integrity, (Aug. 29, 2013), https://bit.ly/3zXTen1.

Some of those servicemembers are members of the Purple Heart Foundation. *Amicus* writes to highlight three of their stories:

**First Sergeant Richard Vendl.** Sergeant Vendl grew up in Munster, Indiana, and enlisted in the Army in December 1988, at the age of seventeen. After his 18th birthday, he shipped off to Fort Dix, New Jersey, for basic training and Advanced Individual Training to become an Army helicopter mechanic.

Sergeant Vendl excelled at his job from day one. It didn't take long for the Army to notice. After returning from serving in Desert Storm with the 82nd Airborne

Division—the first of eight deployments over his 25-year career—he was assigned to the 160th Special Operations Aviation Regiment. The 160th "assesses the best-qualified aviators, crew members, and support personnel in the Army" and selects only a few of them. U.S. Army Special Operations Command, *160th Special Operations Aviation Regiment (Airborne)*, https://bit.ly/39LOTbM (last accessed June 20, 2022).

Over the next several years, Sergeant Vendl deployed to Central America multiple times for special operations missions. A month after the attacks on September 11, 2001, he was part of the first wave of American troops to invade Afghanistan. After a few months' rest back home, he deployed to Afghanistan with the 160th for a second time. During a mission to insert a Quick Reaction Force of special operations soldiers into an active firefight on March 12, 2002, Sergeant Vendl was wounded by an armor-piercing round that penetrated his crew's CH-47 Chinook helicopter.

Throughout his first five deployments, Sergeant Vendl used ear protection other than the CAEv2 and was never diagnosed with hearing loss, despite regular testing. When Sergeant Vendl deployed to Iraq as a platoon sergeant in 2008, however, he and his soldiers were all issued the CAEv2. As part of that mission, his platoon spent three days each month recalibrating the flight controls on the

6

helicopters—an in-depth task that required them to use the Auxiliary Power Unit ("APU") on the aircraft. The APU emits a piercing, high-pitched sound that causes hearing loss unless soldiers wear earplugs. Cognizant of the risk to their hearing, Sergeant Vendl and his soldiers diligently used the CAEv2 devices they had been issued. As platoon sergeant, he frequently checked the men in his platoon to confirm that they had the CAEv2 hearing protection firmly inserted in their ears throughout the process. During and after the 2008 deployment where he used the CAEv2, Sergeant Vendl "began losing [his] hearing so gradually, that [he] didn't really realize it was happening."

In 2011, Sergeant Vendl took another routine hearing test as part of a pre-deployment medical exam for his seventh tour overseas. This time, he failed it. The Army referred Sergeant Vendl to a medical retention board to determine whether he was fit to continue serving in his assigned job and eventually prescribed him hearing aids for both ears in 2012. When he arrived at home for the first time after receiving the hearing aids, Sergeant Vendl noticed that he could hear the clock ticking on the wall again for the first time in years.

Sergeant Vendl's near-total hearing loss degrades his quality of life on a daily basis. Without his hearing aids, he "cannot be involved in any conversations" at work or in social settings. When he takes them out at night before bed, he can barely

7

hear his wife lying next to him. Even with the hearing aids, things are not the way they were before Sergeant Vendl used the CAEv2. He no longer eats at restaurants because the hearing aids amplify the background noise and make it impossible for him to hear the person on the other side of the table. His hearing loss also interferes with his ability to play with his twin grandchildren. Because one of Sergeant Vendl's grandchildren has difficulty regulating his volume, he is forced to choose between turning his hearing aids down—and having difficulty carrying on a conversation—or keeping them at their normal settings and experiencing significant discomfort when his grandchild's volume increases.

In sum, Sergeant Vendl served his country honorably, dutifully used the CAEv2 as instructed, and his resulting injuries now deprive him "of so many of the little joys in life." Those deprivations are permanent, but they could have been avoided if 3M had simply disclosed what it knew about the CAEv2.

***Staff Sergeant Marteze Ford.*** Sergeant Ford medically retired from the Army Reserve in May 2021 after serving for twenty-one years. As a teenager, he had no plan to join the Army—he was recruited to play college football at Jackson State University and other historically black universities. His plans changed when he learned that he was having a daughter. To support his new family, Sergeant Ford enlisted in the Army in 2000, shortly before graduating from high school. He

graduated on May 23rd, 2000, and left for basic training at Fort Sill, Oklahoma, eight days later. After completing basic training, he attended Advanced Individual Training and became a motor transport operator in the Army Reserve.

In 2003, Sergeant Ford deployed to Iraq with the 498th Transportation Company based out of Mobile, Alabama. Their mission—which lasted a grueling 15 months—was to conduct resupply convoys in the city of Tikrit, a hotbed of enemy insurgent activity. Throughout their deployment, Sergeant Ford and the other members of his company used the CAEv2 hearing protection they were issued. They nicknamed the CAEv2 the "bumblebee," based on its yellow and dark green appearance. On July 2, 2004, Sergeant Ford's vehicle struck an Improvised Explosive Device ("IED") placed by enemy insurgents while participating in a resupply mission outside Tikrit. He suffered shrapnel wounds to his abdomen and right leg from the blast and burns to his back and neck while escaping from the cab of the burning vehicle. At the time of the attack, Sergeant Ford was dutifully following the 498th's standing order that all soldiers wear the CAEv2 during missions.

Soon after returning home to Alabama, Sergeant Ford started experiencing interpersonal difficulties. Colleagues and family members frequently asked him to stop yelling during conversations, even though he thought he was speaking at a

normal volume. He heard an inexplicable "hollow whistling sound" in his ears at random intervals. The ringing quickly escalated in volume and then slowly decreased, before temporarily dying out. Sometimes it began while he was in mid-sentence, leading him to increase the volume of his speech for reasons that were unapparent to those he was addressing. When Sergeant Ford asked friends and family members if they heard the "whistling sound," too, they responded that he was likely experiencing psychological issues and having flashbacks to the attack that wounded him. After a while, he started to believe them. No other explanation made sense—he had always worn his CAEv2 ear protection as instructed.

For the next four years, Sergeant Ford continued using the CAEv2 devices provided by his unit during monthly drills, during Annual Training exercises every summer, and during rotations in Romania and Germany. His hearing issues continued to worsen. Throughout this period—and in fact, throughout Sergeant Ford's entire military career to date—3M knew that the CAEv2 was faulty when soldiers used it as instructed. In 2008, Sergeant Ford's unit switched from the CAEv2 to another ear protection device made by a different contractor. He immediately noticed a difference in quality and realized the CAEv2 had not guarded his hearing. By then, of course, the damage was already done. He requested a medical evaluation from his local Department of Veterans Affairs clinic and was

quickly diagnosed with tinnitus and hearing impairment. After his diagnosis, he continued to serve in the Army Reserve, but his injuries limited his career advancement.

Sergeant Ford's injuries from using the CAEv2 have significantly disrupted his civilian career, as well. He works as an auto liability claims adjuster (a job he has held for years) and was recently hired by a new employer. The nature of his job requires him to spend most of his day on the phone with customers. Despite his diagnosis, he still has difficulty regulating his pitch during those conversations, particularly when his tinnitus symptoms begin mid-conversation. Sergeant Ford's co-workers have commented on his volume, but he is embarrassed to explain the nature and the cause of his injuries to them, and he worries that they would view him differently if he did.

***Sergeant Joseph James.*** Sergeant James is a third-generation veteran. Like his father and grandfather before him, he enlisted in the Army in 2003. He completed basic training and Advanced Individual Training at Fort Benning, Georgia, before deploying to Iraq three times: the first time in Baghdad in 2004, the second in Ramadi from 2005 to 2006, and the third in from 2009 to 2010 just outside of Tikrit. Firefights between U.S. forces and enemy insurgents were routine in all three locations.

From his second deployment onward, Sergeant James used the CAEv2. While in Germany awaiting their flight to Iraq, he and the other members of his crew received a briefing about the CAEv2 from a medical unit. They were taught how to insert the CAEv2 and ensure that it was properly sealed to protect their hearing. Those instructions were the original version the Army received from 3M—not the "revised" version that 3M later devised but failed to relay to anyone else. As a self-described "stickler" for following instructions, Sergeant James used the CAEv2 exactly as told.

In 2012, Sergeant James deployed to Bagram Air Base in Afghanistan. Like his previous units, Sergeant James's new unit—the 359th Cargo Transportation Company—used the CAEv2. Their mission in Afghanistan was to conduct resupply convoys from the sprawling, 30-square mile air base in the center of the country to smaller bases in surrounding provinces. The logistical support provided by resupply convoys like those executed by Sergeant James were a lifeline to the units stationed at smaller outposts in far-flung locations.

On March 19, 2013, Sergeant James was providing security for a convoy on the final leg of a 20-hour round trip mission, when an enemy combatant detonated a remote-controlled IED next to his vehicle. His wounds included lacerations to his leg and face, and an injury to his neck. At a ceremony at Bagram weeks later, he

received the Purple Heart. As always, Sergeant James was wearing his CAEv2 ear protection at the time of the attack—he trusted that the CAEv2 worked because the Army had issued it to him. He experienced a ringing in his ears immediately after the blast but initially thought little of it. Still, his symptoms persisted days afterwards and continued when he returned home from Afghanistan later that year. Sergeant James continues to experience those symptoms to this day.

Sergeant James was medically discharged from the Army in 2015. He still suffers from his injuries almost a decade later and will likely do so for the rest of his life. His tinnitus exacerbates his migraines and frequently wakes him up in the middle of the night and makes it difficult to go back to sleep. The migraines, loss of sleep, and persistent ringing in his ears worsen his depression and sometimes trigger PTSD symptoms. During eleven out of Sergeant James's twelve years in the Army— and all three of the deployments where he used the CAEv2—3M was aware that the CAEv2 did not provide the hearing protection it advertised.

\*    \*    \*

The stories of all three men follow a common theme: they all suffered life-altering injuries while serving their country because they used the CAEv2 devices that 3M sold to the Army, and the Army in turn issued to them. And 3M knew for years beforehand that the CAEv2 placed men like Sergeants Vindl, Ford, and James

13

at risk. These stories are galling but, sadly, they are not unique. Hundreds of thousands of post-9/11 veterans suffer from similar symptoms. Adding insult to injury, their suffering was entirely avoidable—and would have been avoided—if 3M had come forward and disclosed its internal conclusions about CAEv2's defects twenty-two years ago.

## I.    3M is not entitled to a government contractor defense.

3M spills much ink insisting that it deserves a government contractor defense under *Boyle* and is categorically immune from any liability for its decades-long failure to disclose the defects in its product. 3M is wrong.

*Boyle* was designed to prevent "'significant conflict[s]' between federal interests and state law in the context of Government procurement." *Boyle*, 487 U.S. at 511. Because the government's "*selection of the appropriate design* for military equipment to be used by our Armed Forces is assuredly a discretionary function within the meaning of" the Federal Tort Claims Act, a "state law which holds Government contractors liable for design defects in military equipment does *in some circumstances* present a 'significant conflict' with federal policy and must be displaced." *Id.* at 512 (emphasis added).

Those circumstances are narrowly limited. Government contractors are immune from civil liability in design-defect cases only when three conditions are

14

present: "(1) the United States approved reasonably precise specifications" for the design of the equipment to be purchased; "(2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States." *Id.* at 512.

3M is not entitled to a *Boyle* defense, for at least three reasons:

**First,** this Court has already held that *Boyle* does not apply to failure-to-warn cases. Rather, a heightened standard exists. Defendants are only entitled to the government contractor defense in such cases if they can show that a contract with the government affirmatively prohibited warnings or required a specific warning that conflicted with state law. *See Dorse*, 98 F.2d at 1489. The district court properly applied this standard and concluded that 3M did not satisfy it.

3M's only response is to claim that *Dorse* means something other than what it says. *See* 3M Br. 34-36. That is wrong. In *Glassco v. Miller Equipment Co.*, 966 F.2d 641 (11th Cir. 1992), a plaintiff who had been injured while using a lineman's belt brought design-defect and failure-to-warn claims against the defense contractor who manufactured the belt under a contract with the Army. The plaintiff claimed that the contractor "should have warned the government concerning its knowledge of the limited useful life" of its product. *Id.* at 643. The district court applied the

15

*Boyle* test to both sets of claims and entered summary judgment for the contractor. *Id.* at 642. The Eleventh Circuit affirmed the summary judgment as to the design-defect claims, but it reversed on the failure-to-warn claim because the district court's application of *Boyle* was "inconsistent with *Dorse*." *Id.* at 643.

According to 3M, *Glassco* "said nothing about the applicability of *Boyle* to failure-to-warn claims." 3M Br. 35. To the contrary, the court reaffirmed that *Dorse* "pertains to whether the government contractor defense is available with respect to a duty to warn claim." *Glassco*, 966 F.2d at 643 n.4. *Dorse*, turn, held that "the three-part test" adopted by the Court in *Boyle* "is necessarily limited to design defect cases." *Dorse*, 898 F.2d at 1489. Tellingly, 3M claims that *Dorse* merely applied a "rejiggered" version of *Boyle* but can point to no passage revealing the substance of that test. 3M Br. 36.

Moreover, *Dorse and Glassco* are not outliers. The Second Circuit has likewise concluded that the conflicts between state and federal law raised by design-defect claims against government contractors are not present in failure-to-warn claims. *See In re Joint E. & S. Dist. New York Asbestos Litig.*, 897 F.2d 626, 631 (2d Cir. 1990). For that reason, the concerns that animated the Court's decision in *Boyle* simply do not apply:

> To us, a plaintiff's ability to pursue a failure-to-warn claim when *Boyle* may foreclose a design defect claim is not indicative of

16

some loophole inadvertently left open by *Boyle,* but rather demonstrates a crucial lack of the necessary conflict between state and federal warning requirements. Indeed, it is not unreasonable to imagine that, as in this case, government contracts often may focus upon product content and design while leaving other safety-related decisions, such as the method of product manufacture or the nature of product warnings, to the contractor's sole discretion. In these instances, state law design requirements are displaced, although state law warning requirements are not.

*Id.*

So too, here. 3M's contract with the Army to produce the CAEv2 did not prohibit 3M from warning about the "problems" it found with the CAEv2, nor did it prescribe some other standard regarding 3M's duty to warn about the risks of using its product. Dkt. 1280 at 51. Thus, 3M's state-law duty to warn was not displaced, and *Boyle* does not apply.

**Second,** even if *Boyle* did apply, 3M still isn't entitled to the government contractor defense because it cannot satisfy all three *Boyle* factors. For starters, 3M designed the CAEv2 prior to soliciting a contract from the Army, and the Army "[n]ever issued any specifications for the earplug." Dkt. 1280 at 11. And while 3M sent the Army "production samples" of the CAEv2 model it unilaterally redesigned to fit inside the Army Combat Helmet, there is no evidence that 3M sent formal specifications to the Army for approval. Dkt. 1280 at 11. Thus, nothing in the record

17

supports the notion that the Army "approved reasonably precise specifications" for the CAEv2 as required by the first *Boyle* factor. *Cf. Boyle*, 487 U.S. at 512.

Furthermore, the third *Boyle* factor requires contractors to "warn[] the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States." *Id.* 3M's failure to inform the Army about its circa-2000 report is not in question. Dkt. 1280 at 15. 3M's only argument on this front is that the Army likely had enough information in its possession to figure out the problem on its own. *See* 3M Br. 37-39. That is not the law. Because the CAEv2's deficiencies were "known to [3M] but not to the United States," and 3M never "warned the United States" about them, it fails the final step in the *Boyle* analysis in addition to the first. *Boyle*, 487 U.S. at 512.

**Finally,** overruling the district court would create perverse incentives for other defense contractors to inflict the same types of injuries 3M inflicted on the Order's members. *See supra* 5-14. Enshrining a rule that defense contractors are immune from failure-to-warn claims as long as the military purchases their products—even if they know those products to be defective—will inevitably prompt future contractors to follow 3M's example and prioritize balance sheets over the safety of men and women in uniform. That is precisely the outcome the Supreme Court sought to avoid in *Boyle*. Namely, it would "create some incentive for the

18

manufacturer to withhold knowledge of risks, since conveying that knowledge might disrupt the contract but withholding it would produce no liability." *Boyle*, 487 U.S. at 512. This Court should not encourage such malfeasance. The veterans harmed by 3M—and those that will come after them—deserve no less.

## **CONCLUSION**

For the foregoing reasons, this Court should affirm the judgment of the district court.

Patrick N. Strawbridge
  *Counsel of Record*
CONSOVOY MCCARTHY PLLC
Ten Post Office Square
8th Floor South PMB #706
Boston, MA 02109
(617) 227-0548
patrick@consovoymccarthy.com

James F. Hasson
CONSOVOY MCCARTHY PLLC
1600 Wilson Boulevard
Suite 700
Arlington, VA 22209
(703) 243-9423

Dated: July 11, 2022

*Counsel for Amicus Curiae*

19

## **CERTIFICATE OF COMPLIANCE**

This brief complies with the Rules because it contains 4,262 words and is prepared in a proportionally spaced face using Microsoft Word 2016 in 14-point Times New Roman font.

Dated: July 11, 2022                    */s/ Patrick N. Strawbridge*

## **CERTIFICATE OF SERVICE**

I filed this brief with the Court via ECF, which will email everyone requiring notice.

Dated: July 11, 2022                    */s/ Patrick N. Strawbridge*